FILED      X    LODGED
RECEIVED     COPY

**JUL 0 9 2010**

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____DEPUTY

Roberto Javier Frisancho
1311 Delaware Avenue, S.W., Apt. S 337
Washington, D.C. 20024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### Phoenix Division

| | |
|---|---|
| ROBERTO JAVIER FRISANCHO )<br><br>Plaintiff, *pro se* )<br><br>vs. )<br><br>JAN BREWER, )<br>in her official capacity as )<br>Governor of the State Arizona; and )<br>TERRY GODDARD, )<br>in his official capacity as )<br>Attorney General of the State of Arizona, )<br><br>Defendants. )<br>_____ ) | Case No. 2:10cv926-PHX-SRB<br><br>THIRD AMENDED COMPLAINT<br>FOR DECLARATORY AND<br>INJUNCTIVE RELIEF<br><br>(Violation of Article II, the Supremacy<br>Clause, and the Fourth Amendment of the<br>United States Constitution;<br>Violation of the Due Process and<br>Equal Protection Clauses of the Fourteenth<br>Amendment of the United States<br>Constitution; Violation of the right to travel;<br>Violation of 42 U.S.C. § 1983; Violation of<br>the Due Process and Equal Protection<br>Clauses of the Arizona Constitution) |

The Plaintiff brings this civil action for declaratory and injunctive relief and alleges:

### NATURE OF THE CASE

1.     In this civil rights case, the Plaintiff seeks to enjoin illegal, discriminatory and unauthorized enforcement of federal immigration laws against Hispanics in Arizona.

2.     The Plaintiff brings this action to obtain declaratory and injunctive relief to prevent the execution of Sections 1, 2, and 3 of the Support Our Law Enforcement and Safe Neighborhoods Act (hereinafter "the Act"), Senate Bill 1070, on the ground that they are preempted by federal law and unconstitutional under the Supremacy Clause of the United States Constitution. Further, the Plaintiff avers that Sections 1, 2, and 3 of the Act are a violation of Article II and the Fourteenth Amendment of the United States Constitution, the right to travel, 42 U.S.C. § 1983, and the Due Process and Equal Protection Clauses of the Arizona Constitution.

3.     On April 23, 20010, the State of Arizona enacted a Hispanic Code, the Support

Our Law Enforcement and Safe Neighborhoods Act (hereinafter "the Act"), Senate Bill 1070.

The Act will, in pertinent part:

> •     Require police officers during any "lawful contact" with a person
> to determine the person's immigration status if the officers have a "reasonable
> suspicion" to believe that the person might be in the country illegally.

> •     Require legal immigrants to carry at all times paperwork proving
> their status.

> •     Make it a state crime to be in the country illegally.

> •     Allow people to sue local governments or agencies if they think
> federal or state immigration law is not being enforced.

The Act is attached as Exhibit A.

4.     On April 30, 2010, the State of Arizona enacted another Hispanic Code, House

Bill 2162, which amended the Act as follows:

> •     The phrase "lawful contact" was changed to instead require police
> officers during any "lawful stop, detention or arrest" of a person while enforcing
> another law to determine the person's immigration status if the officers have a
> "reasonable suspicion" to believe that the person might be in the country illegally.

> •     The word "solely" was eliminated from the sentence "A law
> enforcement official or agency . . . may not solely consider race, color or national
> origin" in establishing reasonable suspicion that someone is in the country
> illegally.

> •     Added a clause that requires police officers responding to city
> ordinance violations to determine the immigration status of an individual they
> have "reasonable suspicion" to believe is in the country illegally.

House Bill 2162 is attached as Exhibit B.

5.     The added clause pertaining to city ordinance violations is a pretext to allow state

and local law enforcement officials to selectively enforce the laws against Hispanics.  Ordinance

violations vary by municipality but could include things like loud parties, barking dogs, cars on blocks in the yard or too many renters.

6.  The discriminatory purpose of this clause was admitted by Kris W. Kobach, one of the principal drafters of Senate Bill 1070, in a message he sent by electronic mail on April 28, 2010, to Russell Pearce, the state senator who authored Senate Bill 1070 and the amendments in House Bill 2162:

> When we drop out "lawful contact" and replace it with "a stop, detention, or [ar]rest, in the enforcement a violation of any title or section of the Arizona code' we need to add 'or any county or municipal ordinance." This will allow police to use violations of property codes (ie, cars on blocks in the yard) or rental codes (too many occupants of a rental accommodation) to initiate queries as well.

(E-mail from Kris W. Kobach to Russell Pearce (Apr. 28, 2010, 19:42 PST)) (Ex. C).  Kobach described himself as "one of the principal drafters of Arizona S.B. 1070" in an Op-Ed published the same day in *The Washington Times*.  (Kris W. Kobach, Op-Ed, *Kobach: Arizona acts as Washington dithers*, Wash. Times, Apr. 28, 2010) (Ex. D).

7.  The Act will take effect on July 29, 2010.  The Act engrossed with House Bill 2162 is attached as Exhibit E.

### JURISDICTION AND VENUE

8.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because the Plaintiff asserts claims under the Constitution of the United States and 42 U.S.C. § 1983.

9.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

### PARTIES

10.  Plaintiff, Roberto Javier Frisancho, a Hispanic male, is a natural born citizen of the United States and a resident of the District of Columbia.  He will travel to Arizona on July 29, 2010 and stay for a few days.  He will return over the next few years to research the

"Chandler Roundup," a joint operation of the Chandler Police Department and the Tucson Border Patrol Sector to capture undocumented immigrants that took place over a five-day period in July 1997.  The Chandler Roundup cost the City of Chandler $400,000 for the settlement of lawsuits in which plaintiffs alleged that they were stopped and questioned based solely on their apparent Mexican descent.  He will also research the discriminatory practices of Joseph M. Arpaio, Sheriff of Maricopa County, Arizona.

11.     Defendant Jan Brewer is sued in her official capacity as the Governor of the State of Arizona.  Governor Brewer signed a Hispanic Code, the Support Our Law Enforcement and Safe Neighborhoods Act, Senate Bill 1070, into law on April 23, 2010.  Governor Brewer signed another Hispanic Code, House Bill 2162, into law on April 30, 2010.  Pursuant to article V, section 4, of the Arizona Constitution, the Governor "shall take care that the laws be faithfully executed." Ariz. Const. art. V, § 4.

12.     Defendant Terry Goddard is sued in his official capacity as the Attorney General of the State of Arizona.  The Attorney General is Arizona's chief legal officer.  Ariz. Rev. Stat. § 41-192(A).

## PRELIMINARY STATEMENT

### A.     The Regulation of Citizenship and Immigration Matters:  The Exclusive Province of the Federal Government.

13.     Pursuant to Article I, Section 8, Clauses 3 and 4 of the United States Constitution, the federal government has the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  In fact, the Supreme Court of the United States has held that the federal government's power to control immigration is inherent in the nation's sovereignty.

14.     Pursuant to its exclusive power over matters of immigration, the federal government has established a comprehensive system of administrative agencies, statutes, regulations, and procedures to determine, subject to judicial review, whether and under what conditions aliens may enter, live, and work in the United States—and, if desired, become citizens thereof.

15.     Pursuant to the United States Constitution's grant of authority to Congress to establish a uniform rule of naturalization, and its exclusive powers over matters of immigration, over the past 200 years Congress has established a comprehensive national framework for regulating admission and work authorization of aliens, protecting our country's national and economic security, and defining the role of U.S. employers in controlling illegal immigration.

16.     Beginning with the Naturalization Act of 1790, the federal government has long occupied the field of immigration through a series of federal laws.  The many major pieces of federal immigration legislation include the comprehensive 1952 Immigration and Nationality Act ("INA"), which serves as the foundation of current immigration law; the Immigration Reform and Control Act of 1986 ("IRCA"); the Immigration Act of 1990; the Anti-Terrorism and Effective Death Penalty Act of 1996; the Illegal Immigration Reform and Immigrant Responsibility Act of 1996; the American Competitiveness in the 21st Century Act of 2000; the USA PATRIOT Act of 2001; the Homeland Security Act of 2002; and the REAL ID Act of 2005.

17.     These and other federal immigration statutes identify and establish a number of federal agencies—including the Department of Homeland Security, Department of State, Department of Justice, Citizenship and Immigration Service, Immigration and Customs Enforcement, and the Executive Office for Immigration Review—that are charged with the

administrative tasks of admitting aliens into the United States, adjudicating immigration benefits, removing deportable aliens, protecting workers from unfair immigration-related employment practices, and enforcing rules against employers that knowingly employ unauthorized workers. These agencies have established a national system of processing centers and administrative tribunals to administer the comprehensive federal regulation of immigration matters. The federal government occupies the field of immigration with its substantial volume of statutes, regulations, procedures and administrative guidance.

      18.    The Act states its intent as follows:

> The legislature finds that there is a compelling interest in the cooperative enforcement of federal immigration laws throughout all of Arizona. The legislature declares that the intent of this act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona. The provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.

(S.B. 1070 § 1) (Ex. E).

      19.    The federal government has chosen to allow certain aliens to remain in the United States even though such persons may not have valid immigrant (permanent) or non-immigrant (temporary) status or may otherwise be removable or subject to deportation. For instance, under federal law, various categories of persons can receive federal permission to work, and implicitly to stay and reside, in the United States even though they may be violating immigration laws. Moreover, persons with pending applications to adjust to a lawful status are often permitted to remain in the United States despite being in the country unlawfully. Of course, determinations of who may continue living here are within the exclusive province of the United States government and any attempt by state or local officials to usurp that function constitutes an inappropriate interference with an exclusive federal function. Indeed, with limited exceptions,

only an immigration judge may determine whether an alien may be admitted or removed from the United States.

20.     The Act will require police to determine the immigration status of anyone they have "reasonable suspicion" to believe might be in the United States illegally.  The Act provides, in relevant part:

> For any lawful stop, detention or arrest made by a law enforcement official or a law enforcement agency of this state or a law enforcement official or a law enforcement agency of a county, city, town or other political subdivision of this state in the enforcement of any other law or ordinance of a county, city or town or this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation.  Any person who is arrested shall have the person's immigration status determined before the person is released.  The person's immigration status shall be verified with the federal government pursuant to 8 United States Code Section 1373(c).

(S.B. 1070 § 2 (adding Article 8, § 11-1051(B), to Title 11, chapter 7, Arizona Revised Statutes))

(Ex. E).

**B.      Most Hispanics in Arizona are Lawfully Present in the United States.**

21.     Arizona has a population of 6,500,180 people, of which 1,964,625 (30.2 percent) are Hispanics.  (Ex. F.)  Of these, 1,309,000 are natural born citizens.  Further, 90 percent of Hispanics under 18 in Arizona are natural born citizens.  There are 655,000 Hispanics in Arizona who are foreign born.  (Ex. G.)  Of these, 195,000 Hispanics are naturalized citizens or legal residents.  And it is estimated that the remaining 460,000 are undocumented.

22.     In other words, of the 1,964,625 Hispanics in Arizona, 1,504,000 (76.55 percent) are natural born citizens, naturalized citizens, or legal residents.   Only 23.45 percent are undocumented.  Thus, a Hispanic who is stopped or detained is four times more likely to be a natural born citizen, naturalized citizen, or a legal resident than an undocumented immigrant.

**C.     Crime Statistics Prove that Arizona Has No Compelling Interest to Enact the Act.**

23.     Governor Brewer argues that she signed the Act because crime in Arizona is rampant as a direct and proximate result of undocumented immigration:

> I've decided to sign Senate Bill 1070 into law because, though many people disagree, I firmly believe it represents what's best for Arizona. Border-related violence and crime due to illegal immigration are critically important issues to the people of our state, to my Administration and to me, as your Governor and as a citizen.

(Press Release, Office of the Governor, Statement by Governor Jan Brewer on Senate Bill 1070 (Apr. 23, 2010)) (Ex. H).

24.     Governor Brewer's argument overlooks the fact that crime rates have already been falling in Arizona for years despite the presence of undocumented immigrants, and research demonstrates that immigrants are less likely to commit crimes or be behind bars than the native born. (See Ex. I.)

25.     Crime in Arizona has consistently gone down over the last 15 years, even while undocumented immigration was increasing. The Uniform Crime Reports of the Federal Bureau of Investigation ("FBI") show that the violent crime rate statewide in Arizona has been cut by almost 40 percent since 1995, and property crimes have followed the same pattern.

26.     Violent crime rates—including rape, murder and robbery—haven't been this low since 1972, and Arizona's violent crime decreased at a faster rate than the national decline over the same period. More importantly, this decline in violent crime occurred during the very period that Arizona experienced a huge influx of undocumented immigrants, with the Arizona border becoming the main source of illegal entry from Mexico in every year since 1998. Governor Brewer can't blame undocumented immigrants for a non-existent rise in violent crime.

8

27.     And the FBI's Preliminary Annual Uniform Crime Report indicates that violent crime in Arizona continued to decline in 2009.  (Ex. J.)

28.     FBI statistics show that violent and property crimes in Phoenix, Scottsdale, and Glendale have decreased in the last three years at a rate that is even faster than the nation's as a whole.  And violent crime is down as well in Tucson (property crime figures are not available).

29.     And even as people settling into the East Valley (which senator Pearce represents) rose three percent in 2009 to 1.13 million, violent and property crimes didn't follow and dropped nearly 9 percent, according to FBI statistics.

30.     Overall, there were 40,902 violent and property crimes in 2009, in Tempe, Chandler, Mesa and Gilbert, nearly 4,000 fewer than in 2008, according to the FBI's Preliminary Annual Uniform Crime Report.

31.     The figures are released twice a year and offer a picture of crime trends throughout the East Valley, where violent crimes such as homicide, rape, robbery and assaults dropped 13 percent, and property crime such as burglary, theft and arson dropped 7 percent.

32.     Mirroring trends seen across the Valley, Peoria's overall crime rate also fell in 2009 for the second year in a row.

33.     And most crime was down in Surprise in 2009, compared to 2008, according to crime statistics the city provided to the FBI.

34.     The FBI's Preliminary Annual Uniform Crime Report and statistics provided by police agencies also show that the crime rates in Nogales, Douglas, Yuma and other Arizona border towns have remained essentially flat for the past decade, even as drug-related violence has spiraled out of control on the other side of the international line.

35.     Thus, the evidence is clear that crime is not a compelling interest to enact the Act.

**D.     The Act Violates Due Process.**

36.     The Fourteenth Amendment guarantees due process of law, and proscribes laws that are so vague that persons of common intelligence must necessarily guess at their meaning. A law is unconstitutionally vague where it fails to provide those targeted by the law a reasonable opportunity to know specifically what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.

37.     A law is void for vagueness under the Due Process Clause if it lacks standards or if its enforcement depends upon arbitrary discretion vested in those ultimately responsible for achieving its objectives.   Of these, the more important aspect of vagueness doctrine is the requirement that a legislature establish minimal guidelines to govern law enforcement.

38.     Arizona has enacted a law that affords too much discretion to the police.  The Act requires police officers to determine the immigration status of anyone they have a "reasonable suspicion" to believe might be in the country illegally.

39.     The Act is unconstitutional, not because a police officer will apply this discretion wisely or poorly in a particular case, but rather because the police officer enjoys too much discretion in *every* case.  And if every application of the Act represents an exercise of unlimited discretion, then the Act *is* invalid in all its applications.

40.     As such, the Act invites arbitrary and discriminatory enforcement practices and violates the constitutional requirement of due process.

**E.     The Consequences of the City's Unlawful Scheme:  Plaintiff Will Suffer Irreparable Injury in the Absence of the Court's Intervention and Issuance of Appropriate Relief.**

41.     Unless this Court declares the Act to be invalid and enjoins enforcement thereof, the Plaintiff will suffer irreparable injury.

42.     As mentioned previously, the Plaintiff will travel to Arizona on July 29, 2010, the day that the Act is to take effect.

43.     In particular, he will spend the entire day in Maricopa County on July 30, 2010, when Joseph M. Arpaio, Sheriff of Maricopa County, will launch his 16th crime and immigration sweep.  (See Ex. K.)

44.     During the sweeps, deputies flood an area of a city—usually heavily Latino areas—to seek out traffic violators and arrest other alleged lawbreakers.

45.     While in Maricopa County and everywhere else in Arizona, the Plaintiff will be exercising his right not to carry identification.   For example, he will not be carrying identification when he is a passenger in someone's motor vehicle, a guest at someone's house or simply standing where other Hispanics are congregating.

46.     There is no general requirement in the United States for citizens to carry *any* identification. See 6 U.S.C. § 554.

47.     In other words, *United States citizens are not required to carry identification,* unless they are engaged in a regulated activity such as operating a motor vehicle.

48.     Likewise, a passenger in a motor vehicle is not required to carry a driver's license or, for that matter, any identification at all.

49.     Further, apart from disclosing one's identity, a person detained by police has no general obligation to answer questions or volunteer information.  If stopped or detained by a law enforcement official, the Plaintiff will, if asked, disclose his identity but will not answer any further questions, including questions about his citizenship status.

50.     The Act does not presume that a person without identification is lawfully present in the United States.

51.     Rather, the Act requires a person to produce identification in order to be presumed lawfully present in the United States:

> A person is presumed to not be an alien who is unlawfully present in the United States if the person provides to the law enforcement officer or agency any of the following:
>
> 1.     A valid Arizona driver license.
>
> 2.     A valid Arizona nonoperating identification license.
>
> 3.     A valid tribal enrollment card or other form of tribal identification.
>
> 4.     If the entity requires proof of legal presence in the United States before issuance, any valid United States federal, state or local government issued identification.

(S.B. 1070 § 2 (adding Article 8, § 11-1051(B)(1)-(4), to Title 11, chapter 7, Arizona Revised Statutes)) (Ex. E).  To the extent that the Act can be construed to require a person to carry identification, the Plaintiff will violate it by not carrying identification.

52.     The Act also contains an alien registration provision, which provides that legal immigrants must register and carry registration documents:

> In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code Section 1304(e) or 1306(a).

(S.B. 1070 § 3 (adding § 13-1509(A) to Title 13, chapter 15, Arizona Revised Statutes)) (Ex. E).  To the extent that the Act can be construed to require a person to answer questions regarding alienage or citizenship status, the Plaintiff will violate it by not answering these questions.

53.     When the Plaintiff is stopped or detained by a police officer, the Plaintiff, as a Hispanic, will be asked, on the basis of his ethnicity, for his papers based on the "reasonable suspicion" that he is unlawfully present in the United States or a legal immigrant who is not carrying his alien registration card.

54.     Further, the Act contains a citizen suit provision that allows residents to sue state

and local agencies that have a policy of not enforcing federal immigration law:

> A person who is a legal resident of this state may bring an action in
> Superior Court to challenge any official or agency of this state or a county, city,
> town or other political subdivision of this state that adopts or implements a policy
> that limits or restricts the enforcement of federal immigration laws, including 8
> United States Code Sections 1373 and 1644, to less than the full extent permitted
> by federal law.  If there is a judicial finding that an entity has violated this section,
> the court shall order that the entity pay a civil penalty of not less than five
> hundred dollars and not more than five thousand dollars for each day that the
> policy has remained in effect after the filing of an action pursuant to this
> subsection.

(S.B. 1070 § 2 (adding Article 8, § 11-1051(H), to Title 11, chapter 7, Arizona Revised Statutes))

(Ex. E).

55.     The citizen suit provision will lead to a policy of law enforcement officers, who

stop or detain Hispanics, not carrying identification, to prolong the stop or detention and

eventually arrest the Hispanics.

56.     As a Hispanic, by not carrying identification, which as a United States citizen the

Plaintiff is not required to do, the Act permits a police officer, who stops or detains the Plaintiff,

to have a "reasonable suspicion" that the Plaintiff is unlawfully present in the United States or a

legal immigrant who is not carrying his alien registration card.

57.     As a Hispanic, by not carrying identification, which as a United States citizen the

Plaintiff is not required to do, the Act permits a police officer, who stops or detains the Plaintiff,

to prolong the stop or detention and eventually arrest the Plaintiff on the basis of the police

officer's "reasonable suspicion" that the Plaintiff is unlawfully present in the United States or a

legal immigrant who is not carrying his alien registration card.

58.     The Plaintiff will be irreparably injured by a prolonged stop or detention or

custodial arrest on the basis that a police officer has a "reasonable suspicion" that the Plaintiff is

unlawfully present in the United States or a legal immigrant who is not carrying his alien registration card.

59.     A prolonged stop or detention or custodial arrest will irreparably injure the Plaintiff by violating his constitutional rights, which cannot be compensated adequately by money damages.

60.     The State's adoption and threatened enforcement of the Act has violated, and will continue to do injury to, the Plaintiff's constitutional, statutory, and common law rights. Therefore, judicial intervention and appropriate declaratory and injunctive relief is necessary to prevent further deprivations and violations of the Plaintiff's rights.

## FIRST CLAIM FOR RELIEF
## Violation of Article II of the United States Constitution

61.     Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

### A.     The Act hinders the President's ability to have meaningful control over the regulation of immigration.

62.     The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, "shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, personally and through officers whom he appoints (save for such inferior officers as Congress may authorize to be appointed by the "Courts of Law" or by the "Heads of Departments" who are themselves presidential appointees), U.S. Const. art. II, § 2, cl. 2.

63.     The Act effectively transfers this responsibility to thousands of state and local law enforcement officers in Arizona, who are left to regulate immigration without meaningful Presidential control (by not being subject to the President's power of appointment and removal).

64.     By the Constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.

65.     To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

66.     In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion.

67.     Article II makes a single President responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch.

68.     These constitutional objectives explain why a President, though able to delegate duties to others, cannot delegate ultimate responsibility or the active obligation to supervise that goes with it.  The Act violates this basic principle because, under the Act, the President is not the one who decides whether the state and local law enforcement officers are abusing their offices or neglecting their duties.  He can neither ensure that the laws are faithfully executed, nor be held responsible for a law enforcement officer's breach of duty.

69.     President Barack H. Obama stated on June 3, 2010, that the Act would hinder his ability to have meaningful control over the regulation of immigration because "a patchwork of different state immigration regulations around the country would interfere with the federal government's responsibility to set and enforce immigration policy." (Press Release, The White House, Readout of the President's Meeting with Governor Brewer of Arizona (June 3, 2010)) (Ex. L).

70.     On July 1, 2010, in his first presidential speech on immigration reform, President Obama further expressed his concern that if other states pass laws such as the Act, it would interfere with his ability to have meaningful control over the regulation of immigration because "as other states and localities go their own ways, we face the prospect that different rules for immigration will apply in different parts of the country—a patchwork of local immigration rules where we all know one clear national standard is needed."  (Ex. M.)

71.     The Framers established a single President by design:   A single head of the Executive Branch enhances efficiency and energy in the administration of the Government.  And a single head furthers accountability by making one person responsible for *all* decisions made by and in the Executive Branch.

72.     The insistence of the Framers upon unity in the Federal Executive—to insure both vigor and accountability—is well known.

73.     That unity would be shattered, and the power of the President would be subject to reduction, if state officers could act as effectively without the President as with him, by simply being allowed to execute federal laws.

**B.      The Act takes the President's prosecutorial discretion and gives it to state and local law enforcement officials.**

74.     Article II, § 1, cl. 1, of the Constitution provides:  "The executive Power shall be vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl. 1.

75.     This does not mean *some* of the executive power, but *all* of the executive power.

76.     Prosecutorial discretion is a special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to "take Care that the Laws be faithfully executed . . . ."  U.S. Const. art. II, § 3.

77.     Almost all investigative and prosecutorial decisions—including the ultimate decision whether, after a technical violation of the law has been found, prosecution is warranted—involve the balancing of innumerable legal and practical considerations.  Indeed, even political considerations (in the nonpartisan sense) must be considered.

78.     The Act takes the enforcement of federal immigration laws away from the President and gives it to state and local law enforcement officials.

79.     In sum, the balancing of various legal, practical, and political considerations, none of which is absolute, is the every essence of prosecutorial discretion.  To take this away is to remove the core of the prosecutorial function, and not merely "some" Presidential control.

80.     It is ultimately irrelevant *how much* the Act reduces Presidential control.

81.     It is a violation of the Constitution to give purely executive functions to state and local law enforcement officials whose actions are not fully within the supervision and control of the President.

82.     It is not for the courts to determine how much of the purely executive powers of government must be within the full control of the President.  The Constitution prescribes that they *all* are.

**SECOND CLAIM FOR RELIEF**
**Violation of The Supremacy Clause of the United States Constitution**

83.     Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

84.     Article VI of the United States Constitution provides:  "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the

Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

85.     The power to regulate immigration is exclusively given to the federal government by the Constitution. Any regulation of immigration by a state or local government intrudes on that federal authority and is preempted by the Supremacy Clause. Further, the Supremacy Clause mandates that federal law preempts state and local government laws in areas where Congress has expressly or impliedly exercised exclusive authority and when those laws conflict with federal law.

86.     The Act is a regulation of immigration in a field where Congress has exercised exclusive authority. Moreover, the Act conflicts with federal law. Accordingly, the Act is preempted by the Supremacy Clause of the United States Constitution.

### A. The Act is an improper attempt to regulate immigration.

87.     The Act is an improper attempt to regulate immigration because it intrudes on the federal government's exclusive power to regulate immigration. A regulation of immigration is a determination of whether an alien should or should not be admitted in the United States and the conditions under which the alien can remain. The Act limits individuals' rights to travel in Arizona based on immigration status, and does so in a manner different than that set out by Congress.

88.     Specifically, through the Act the State seeks to identify aliens traveling in Arizona and assess whether they are lawfully present in the United States. Deciding who may stay and who must depart, and expelling the latter, is the very core of immigration regulation.

89.     Arizona has, independent of the federal government, designed its own system of regulation that seeks to regulate the presence of foreign nationals with the State's borders.

Accordingly, the Act is a regulation of immigration that is preempted under the Supremacy Clause of the Constitution of the United States.

90.     The sole stated purpose and the sole effect of Sections 1, 2, and 3 are to impermissibly regulate immigration.

91.     A state statue impermissibly invades the exclusive power of the federal government to regulate immigration if it essentially requires state or local officials to make a determination of who should or should not be admitted into the country, and defines the conditions under which a legal entrant may remain.

92.     The Act requires state actors to determine whether a person who has been stopped, detained or arrested should or should not remain in this country.

93.     Section 2 of the Act requires a state or local law enforcement official, who has a "reasonable suspicion" to believe that a person is in the country illegally,

> to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person's immigration status determined before the person is released. The person's immigration status shall be verified with the federal government pursuant to 8 United States Code Section 1373(c).

(S.B. 1070 § 2 (adding Article 8, § 11-1051(B), to Title 11, chapter 7, Arizona Revised Statutes)) (Ex. E).

94.     The Act is preempted because it requires a state actor to determine who is and who is not present in the United States unlawfully.

95.     States do not have the power to regulate immigration. It is manifest that immigration is a classic area of national import that requires uniformity.

96.     Congress has plenary power to govern immigration issues. Indeed, the power to regulate immigration is unquestionably exclusively a federal power.

97.     Accordingly, the States are precluded from regulating immigration, and state laws that have the effect of regulating immigration are unconstitutional.

98.     Thus, the States do not have the power to draft criminal laws regulating immigration.

> **B.      The Act intrudes into areas where Congress has occupied the field of regulation.**

99.     Not only does Congress have the authority to regulate immigration, but Congress exhibited an intent to preemptively occupy the immigration sphere by passing the comprehensive, detailed regulatory scheme embodied in the INA, § 101 et seq., as amended, 8 U.S.C. § 1101 et seq.

100.    Congress has occupied the field of alien registration with the Alien Registration Act, 8 U.S.C. §§ 1302, 1304, 1306.

101.    As previously discussed, Senate Bill 1070 contains an alien registration provision, which provides that legal immigrants must register and carry registration documents:

> In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code Section 1304(e) or 1306(a).

(S.B. 1070 § 3 (adding § 13-1509(A) to Title 13, chapter 15, Arizona Revised Statutes)) (Ex. E).

102.    Senate Bill 1070 further provides that legal immigrants who fail to register or carry registration documents will be guilty of a misdemeanor and sent to prison:

> A violation of this section is a class 1 misdemeanor, except that the maximum fine is one hundred dollars and for a first violation of this section the court shall not sentence the person to more than twenty days in jail and for a second or subsequent violation the court shall not sentence the person to more than thirty days in jail.

(S.B. 1070 § 3 (adding § 13-1509(H) to Title 13, chapter 15, Arizona Revised Statutes)) (Ex. E).

103.     Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.

104.     And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or *complement*, the federal law, or *enforce additional* or *auxiliary regulations*.

105.     The power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.

106.     The federal statutory and regulatory scheme governing immigration and work authorization for aliens is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement or change it.   Congress has thus occupied the field that Sections 1, 2, and 3 of the Act seek to regulate.

107.     The civil provisions of the Immigration and Naturalization Act are so comprehensive that no opportunity for state activity remains.

108.     Illegal presence in the United States is a civil, not a criminal, violation of federal immigration law.

109.     Arizona's attempt to legislate immigration is preempted both by the pervasiveness of the federal regulation in these areas, as well as by the compelling federal interest in establishing a carefully balanced and uniform national immigration policy.

**C.    The Act conflicts with federal law and federal policies.**

110.    The Act also violates the Supremacy Clause because it conflicts and interferes with clear federal policies.

111.    Sections 1, 2, and 3 of the Act conflict with federal law in violation of the Supremacy Clause because they require actions inconsistent with, and contrary to, federal law.

112.    Although local police officers are not precluded from enforcement of *criminal* provisions of federal immigration laws, such authorization does not extend to illegal presence, which constitutes a civil violation.

113.    The Act also conflicts with federal law in violation of the Supremacy Clause because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

114.    The federal government has chosen to allow certain categories of noncitizens, and certain individual noncitizens, to remain in the United States, even though such noncitizens may not have valid immigrant (permanent) or nonimmigrant (temporary) status and/or may be removable under the INA.

**i.    The Act conflicts with federal enforcement priorities towards undocumented immigrants.**

115.    The Act provides for a law enforcement agency to transport persons in the agency's custody who are unlawfully present in the United States to a federal facility:

> Notwithstanding any other law, a law enforcement agency may securely transport an alien who the agency has received verification is unlawfully present in the United States and who is in the agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency.

(S.B. 1070 § 2 (adding Article 8, § 11-1051(D), to Title 11, chapter 7, Arizona Revised Statutes)) (Ex. E).

116.    John T. Morton, Assistant Secretary of Homeland Security for the U.S. Immigration and Customs Enforcement ("ICE"), said on May 19, 2010, that ICE will not necessarily process undocumented immigrants referred to it by Arizona officials when Senate Bill 1070 goes into effect. (Ex. N.)

117.    Further, on June 9, 2010, Morton announced to ICE employees that a new ICE directorate, Enforcement and Removal Operations, "will ensure a coherent and consistent approach to civil immigration enforcement in a manner that *prioritizes* convicted criminals, fugitives and illegal re-entrants, and recent border violators." (Ex. O at 1) (emphasis added).

118.    By providing for a law enforcement agency to transport persons in the agency's custody who are unlawfully present in the United States to a federal facility, the Act conflicts with federal enforcement priorities to take into federal custody only those undocumented immigrants who have committed serious crimes.

### ii.    The Act conflicts with federal policy not to enforce federal alien registration laws.

119.    As previously mentioned, the Act contains an alien registration provision, which provides that legal immigrants must register and carry registration documents:

> In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code Section 1304(e) or 1306(a).

(S.B. 1070 § 3 (adding § 13-1509(A) to Title 13, chapter 15, Arizona Revised Statutes)) (Ex. E).

120.    The Act further provides that legal immigrants who fail to register or carry registration documents will be guilty of a misdemeanor and sent to prison:

> A violation of this section is a class 1 misdemeanor, except that the maximum fine is one hundred dollars and for a first violation of this section the court shall not sentence the person to more than twenty days in jail and for a second or subsequent violation the court shall not sentence the person to more than thirty days in jail.

(S.B. 1070 § 3 (adding § 13-1509(H) to Title 13, chapter 15, Arizona Revised Statutes)) (Ex. E).

121.    Therefore, under the Act, a defendant will be guilty of a misdemeanor by violating certain federal statutes, which require that a violator be over 14 years old, 8 U.S.C. § 1302(a), has not registered within 30 days as an alien, *id.*, and has willfully failed to carry registration documents, 8 U.S.C. § 1306(a).

122.    On June 11, 2010, a legal analysis by the Maricopa County Attorney's Office was presented to 16 prosecutors from across Arizona during a training session for the Arizona Prosecuting Attorneys' Advisory Council, known as APAAC.  (Ex. P.)

123.    The analysis pointed out that Senate Bill 1070 is based on outdated sections of federal law.

124.    The Alien Registration Act was passed in 1940, just before World War II, to monitor certain foreign nationals who were in the country legally but were suspected of sedition. Few, if any cases have been brought under the Alien Registration Act in many years.

125.    The Alien Registration Act requires immigrants to register if they are in the country for more than 30 days and are older than 14. 8 U.S.C. § 1302(a).

126.    But the registration cards referenced in the Alien Registration Act, 8 U.S.C. § 1304(d)-(e), are not currently used.

127.    Further, there is no specific government form or other mechanism for registration under 8 U.S.C. § 1306(a).

128.    And any prosecutions under the Alien Registration Act cannot be enforced at the local level without federal cooperation.

129.    Most undocumented immigrants are prosecuted under a federal statute against illegal entry into the country, 8 U.S.C. § 1325, not failure to provide documents.

130.    In fact, the Maricopa County analysis admits that there are currently "no Alien Registration Act prosecutions at AZ US Attorney's Office."  (Ex. P at 11.)

131.    By providing that legal immigrants who fail to register or carry registration documents will be guilty of a misdemeanor and sent to prison, the Act conflicts with federal policy not to enforce federal alien registration laws.

### iii.    The Act conflicts with federal prosecutorial discretion.

132.    Morton's statements and the Maricopa county analysis demonstrate that the Act conflicts with federal prosecutorial discretion—federal policies to prioritize the type of undocumented immigrants that will be taken into custody and which immigration laws will be enforced.

133.    These laws, procedures, and policies created by the federal government regulate immigration and confer rights in a careful balance reflecting the national interest, and have been found to preempt any contrary state laws.

134.    In addition, a final determination of the immigration status of a person is to be made by the state or local law enforcement officer under the Act solely by attempting to ascertain from the federal government, pursuant to 8 U.S.C. § 1373(c), whether the reported person is an alien who is not lawfully present in the United States.  However, that is not how a determination of legal status is finally made by the federal government, and the federal immigration system does not produce a final determination of immigrant status at the request of a local government.

135.    Due to the Act's lack of procedural safeguards, some persons who are permitted by the federal government to live and/or work in the United States will nevertheless be effectively barred from travelling to and residing in Arizona.

136.    By requiring the use of federal government resources to verify the immigration status of people travelling in Arizona, the Act places a burden on the resources of the federal immigration system without federal authorization.   As such, the Act conflicts with the administrative apparatus designed to enforce the immigration laws.

137.    The Act is preempted by federal law because it conflicts with and interferes with Congress' comprehensive scheme of immigration regulation.

**D.    Because the Act is preempted, it must be enjoined.**

138.    By implementing a law based on immigration status, the Act ignores the complex system of federal classification and discretion.   Ultimately, the effect of the Act is to upset the system established by Congress in order to implement Arizona's own enforcement mechanisms, penalties, and interpretations in place of the federal system.

139.    In addition, the chilling effects of the Act will generally discourage travelers of Hispanic descent to visit Arizona.

140.    Accordingly, this Court should declare the Act unconstitutional and preliminarily and permanently enjoin its effectuation and enforcement.

**THIRD CLAIM FOR RELIEF**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**of the United States Constitution**

141.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

142.    The Fourteenth Amendment of the Constitution of the United States provides that: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

143.    The Due Process Clause of the Fourteenth Amendment applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

144.    The Act violates the Due Process Clause of the Fourteenth Amendment because it deprives the Plaintiff of substantial liberty without either substantive or procedural due process of law.

### A.    The Act fails to provide sufficient procedural due process.

145.    The Act does not contain sufficient procedural safeguards to protect these important interests.

146.    The Act would require police officers to determine the immigration status of persons they have a "reasonable suspicion" to believe might be unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

147.    The Act would essentially require racial and ethnic profiling by police officers, who would inevitably come up with their own characteristics based on physical appearance and accent to determine if persons might be unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

148.    Due to their ethnicity, Hispanics, not carrying identification, are likely to have their immigration status questioned based on the "reasonable suspicion" that they are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

149.    A criminal law must not permit the police to conduct a standardless sweep to pursue their personal predilections.

150.   The Act is unconstitutionally vague because it lacks sufficient minimal standards to guide law enforcement officers.

151.   Accordingly, the Act denies due process because it establishes a crime of being Hispanic.  Therefore, the Act is void for vagueness.

152.   The Act would deprive the Plaintiff of substantial rights without due process.  The sheer number of constitutional shortcomings make it imperative for the Court to enjoin the Act before it goes into effect.

**B.   The Act fails to meet the requirements of substantive due process.**

153.   The Act substantially burdens the liberty interest of the Plaintiff.  This burden is imposed on the Plaintiff without due process of law because the Act is not rationally related to any legitimate state interest.  The sole function of the scheme created by the Act is to detain certain aliens.  Regulation of immigration is not a legitimate state interest as that function is reserved to the federal government.  Accordingly, the Act is not rationally related to any state interest and must be enjoined because it substantially burdens the liberty interest of the Plaintiff without due process of law.

154.   The Act, therefore, deprives the Plaintiff of liberty interest without either substantive or procedural due process.  Accordingly, the Court should preliminarily and permanently enjoin the effectuation and enforcement of the Act.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Equal Protection Clause of the Fourteenth Amendment**
**of the United States Constitution**

155.   The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

156.    The Fourteenth Amendment of the Constitution of the United States provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

157.    Generally, the Equal Protection Clause requires that all similarly situated persons be treated substantially alike.  The Equal Protection Clause also prohibits states from creating laws for the purpose of treating people differently based on race, alienage, or national origin.

158.    As a Hispanic, the Plaintiff is a member of a protected class.

159.    The Act is facially unconstitutional because it treats Hispanics and non-Hispanics differently.  Due to their ethnicity, Hispanics are more likely than non-Hispanics to have their immigration status questioned based on the "reasonable suspicion" that they are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

160.    The Act permits police officers, who stop or detain Hispanics, not carrying identification, to have a "reasonable suspicion" that the Hispanics are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

161.    The Act permits police officers, who stop or detain Hispanics, not carrying identification, to prolong a stop or detention and eventually arrest the Hispanics on the basis that there is a "reasonable suspicion" that the Hispanics are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

162.    In contrast, police officers, who stop or detain non-Hispanics, not carrying identification, will never prolong a stop or detention and eventually arrest the non-Hispanics on the basis that there is a "reasonable suspicion" that the non-Hispanics are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

163.   Police officers, who stop or detain non-Hispanics, not carrying identification, will never prolong a stop or detention and eventually arrest the non-Hispanics on the basis that there is a "reasonable suspicion" that the non-Hispanics are unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards because the police officers will never find it practicable to determine the immigration status of the non-Hispanics.

164.   In other words, Hispanics, not carrying identification, who are stopped or detained by the police, are presumed under the Act to be unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

165.   But non-Hispanics, not carrying identification, who are stopped or detained by the police, are presumed under the Act to be lawfully present in the United States.

166.   Further, a law neutral on its face still may be unconstitutional if it is motivated by a discriminatory purpose.

167.   Nowhere does the Act state that its intent is to deter Hispanics from travelling and living in Arizona.  But despite its facial neutrality there is little doubt that the Act was effectively drawn for these racial and ethnic purposes as evidenced by the e-mail discussed in Paragraph 6.

168.   The State adopted the Act because of, not merely in spite of, its adverse effect upon a discrete and insular minority—Hispanics.  Merely by enacting the Act, the State achieved its purpose of discouraging Hispanics from travelling and living in Arizona.  As the State intends, the Act will have a discriminatory effect if enforced because Hispanics, not carrying identification, who are stopped or detained when travelling in Arizona, will be suspected of being unlawfully present in the United States or legal immigrants who are not carrying their alien registration cards.

169.    Purposeful discrimination is the condition that offends the Constitution, for the central purpose of the Equal Protection Clause is the prevention of official conduct discriminating on the basis of race or ethnicity.

170.    The Act serves no compelling government purpose.  In fact, the Act exists solely to discriminate against Hispanics.  The Act will deny the Plaintiff, a Hispanic, the equal protection of the laws by allowing state and local law enforcement officials to treat him differently than non-Hispanics.

171.    The Court should declare the Act unconstitutional and enjoin the effectuation and enforcement of the Act because it violates the Equal Protection Clause.  Further, because the enacting of discriminatory statutes, including the Act, has had a discriminatory effect, Arizona should be ordered to take action to encourage Hispanics to travel and live in Arizona.

## FIFTH CLAIM FOR RELIEF
### Violation of the right to travel

172.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

173.    Citizens of the United States have the right to travel and move from one state to another and within one state.  This right is protected by the Privileges and Immunities Clause of Article IV, Section 2, of the Constitution of the United States.  A state cannot deny a citizen the right to travel in that state, nor can it deter or attempt to deter a citizen from moving into the state.

174.    Accordingly, the Act deters interstate travel (and commerce) by placing considerable burdens on the ability of Hispanic citizens to visit Arizona without being questioned about their immigration status on the basis of "reasonable suspicion."  Because the

Act interferes with the right to travel without serving a legitimate public interest, the Plaintiff requests that the Court enjoin the effectuation and enforcement of the Act.

## SIXTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983

175.    Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

176.    The Act deprives the Plaintiff of the rights, privileges, and immunities secured by the United States Constitution and federal laws.

177.    Arizona was acting under color of law when it passed the Act, and all agents of Arizona attempting to effectuate or enforce the Act are, and will be, acting under color of law.

178.    The Act has deprived the Plaintiff, and subjects the Plaintiff to the future deprivation, of rights secured by the Constitution and federal law.  Accordingly, the Plaintiff is entitled to a declaration that the Act is unconstitutional and injunctive relief prohibiting the effectuation and enforcement of the Act and remedying the discriminatory effects results from the enactment of the Act.

## SEVENTH CLAIM FOR RELIEF
### Violation of the Due Process Clause of the Arizona Constitution

179.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

180.    The Act will violate the Plaintiff's right to due process of law under article II, section 4, of the Arizona Constitution, which provides:  "No person shall be deprived of life, liberty, or property without due process of law."  Ariz. Const. art. II, § 4.

181.    The Due Process Clause of the Arizona Constitution is construed similarly to the same clause in the United States Constitution.

182.    As described above, the Act will violate the due process rights guaranteed to the Plaintiff under article II, section 4, of the Arizona Constitution.

183.    The Plaintiff will suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless the Act is enjoined and declared unconstitutional.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Equal Protection Clause of the Arizona Constitution

184.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

185.    The Act will violate the Plaintiff's right to equal protection of the laws under article II, section 13, of the Arizona Constitution, which provides: "No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. II, § 13.

186.    The Equal Protection Clauses of the Arizona and the United States Constitutions have for all practical purposes the same effect.

187.    As described above, the Act will violate the equal protection rights guaranteed to the Plaintiff under article II, section 13, of the Arizona Constitution.

188.    The Plaintiff will suffer tremendous harm and public humiliation and be subjected to unlawful discrimination unless the Act is enjoined and declared unconstitutional.

## NINTH CLAIM FOR RELIEF
### Violation of the Fourth Amendment of the United States Constitution

189.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

190.    A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.

191.    A lawful seizure can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

192.    The Fourth Amendment prohibits detention based on an inchoate and unparticularized suspicion or "hunch," and instead requires law enforcement to provide specific and articulable facts showing that a crime has occurred.

193.    The Fourth Amendment simply does not allow a detention based on an officer's "gut feeling" that a suspect is up to no good.

194.    Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity.

195.    In other words, law enforcement does not get a free pass to extend a lawful detention into an unlawful one simply because the unlawful extension was brief.

196.    The Act will violate the Plaintiff's Fourth Amendment rights because as a Hispanic, by not carrying identification, which as a United States citizen the Plaintiff is not required to do, the Act permits a police officer, who stops or detains the Plaintiff, to prolong the stop or detention and eventually arrest the Plaintiff on the basis of the police officer's "reasonable suspicion" that the Plaintiff is unlawfully present in the United States or a legal immigrant who is not carrying his alien registration card.

197.    The Plaintiff will be irreparably injured by a prolonged stop or detention or custodial arrest on the basis that a police officer has a "reasonable suspicion" that the Plaintiff is unlawfully present in the United States or a legal immigrant who is not carrying his alien registration card.

198.    The Plaintiff will suffer irreparable harm by a prolonged stop or detention or custodial arrest in violation of the Fourth Amendment.

## NECESSITY OF INJUNCTIVE RELIEF

199.    The Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

200.    The provisions of Sections 1, 2, and 3 of the Act are preempted by conflict with federal law, and are preempted by incursion in a field that is fully occupied by federal law. Sections 1, 2, and 3 of the Act are therefore unconstitutional and void.

201.    The Plaintiff will suffer irreparable harm if this Court does not enter an injunction.  A party is irreparably harmed when it is subjected to state legislation that is preempted by a comprehensive federal scheme.  In addition, the Act's imminent implementation imposes serious costs and burdens on the State.

202.    An injunction will not adversely affect the public interest.  Indeed, it will serve the public interest.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

## REQUEST FOR RELIEF

In light of the foregoing, the Plaintiff requests that the Court, upon notice to the Defendants, pursuant to Fed. R. Civ. P. 65, issue a temporary restraining order and, following any necessary hearing with respect thereto, enter a preliminary injunction prohibiting the effectuation and enforcement of the Act pending entry of a final judgment in favor of the Plaintiff and against Arizona, providing for the following relief:

1.    A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 stating that Sections 1, 2, and 3 of the Act are preempted by federal law, and are invalid, null and void;

35

2.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the Support Our Law Enforcement and Safe Neighborhoods Act, S.B. 1070, is unconstitutional and contrary to applicable federal and state law;

3.     A permanent injunction pursuant to Fed. R. Civ. P. 65 prohibiting the effectuation, enforcement, and threatened enforcement of the Support Our Law Enforcement and Safe Neighborhoods Act, S.B. 1070;

4.     A declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that the State adopted the Support Our Law Enforcement and Safe Neighborhoods Act, S.B. 1070, for the unlawful purpose of discriminating against Hispanics;

5.     A permanent injunction pursuant to Fed. R. Civ. P. 65 prohibiting the State from enacting, effectuating, or enforcing any laws which address citizenship or immigration status without making, recording, and retaining factual findings concerning the problem to be resolved and considering available alternatives;

6.     An order requiring the State to take affirmative steps to remedy past discrimination, including the publication of statements in at least two newspapers of general circulation, and on its official Web page, that Arizona welcomes minority, and especially Hispanics, travelers and residents;

7.     Other affirmative injunctive relief to remediate the discriminatory effect of the State's unconstitutional actions;

8.     Costs of Court pursuant to Fed. R. Civ. P. 54; and

9.     Any other relief, at law or in equity, to which the Plaintiff may be entitled and which the Court deems just and proper.

Respectfully submitted,

Dated:  July 6, 2010                          By:  _Roberto Javier Frisancho_____
                                                   Roberto Javier Frisancho, *pro se*
                                                   1311 Delaware Avenue, S.W., Apt. S 337
                                                   Washington, D.C.  20024

# EXHIBIT A

House Engrossed Senate Bill

State of Arizona
Senate
Forty-ninth Legislature
Second Regular Session
2010

# SENATE BILL 1070

### AN ACT

AMENDING TITLE 11, CHAPTER 7, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 8;
AMENDING TITLE 13, CHAPTER 15, ARIZONA REVISED STATUTES, BY ADDING SECTION
13-1509; AMENDING SECTION 13-2319, ARIZONA REVISED STATUTES; AMENDING TITLE
13, CHAPTER 29, ARIZONA REVISED STATUTES, BY ADDING SECTIONS 13-2928 AND
13-2929; AMENDING SECTIONS 13-3883, 23-212, 23-212.01, 23-214 AND 28-3511,
ARIZONA REVISED STATUTES; AMENDING TITLE 41, CHAPTER 12, ARTICLE 2, ARIZONA
REVISED STATUTES, BY ADDING SECTION 41-1724; RELATING TO UNLAWFULLY PRESENT
ALIENS.

(TEXT OF BILL BEGINS ON NEXT PAGE)

S.B. 1070

1  Be it enacted by the Legislature of the State of Arizona:
2      Section 1.  Intent
3      The legislature finds that there is a compelling interest in the
4  cooperative enforcement of federal immigration laws throughout all of
5  Arizona.  The legislature declares that the intent of this act is to make
6  attrition through enforcement the public policy of all state and local
7  government agencies in Arizona.  The provisions of this act are intended to
8  work together to discourage and deter the unlawful entry and presence of
9  aliens and economic activity by persons unlawfully present in the United
10 States.
11     Sec. 2.  Title 11, chapter 7, Arizona Revised Statutes, is amended by
12 adding article 8, to read:
13             ARTICLE 8.  ENFORCEMENT OF IMMIGRATION LAWS
14     11-1051.  Cooperation  and  assistance  in  enforcement  of
15             immigration laws; indemnification
16     A.  NO OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR
17 OTHER POLITICAL SUBDIVISION OF THIS STATE MAY LIMIT OR RESTRICT THE
18 ENFORCEMENT OF FEDERAL IMMIGRATION LAWS TO LESS THAN THE FULL EXTENT
19 PERMITTED BY FEDERAL LAW.
20     B.  FOR ANY LAWFUL CONTACT MADE BY A LAW ENFORCEMENT OFFICIAL OR A LAW
21 ENFORCEMENT AGENCY OF THIS STATE OR A LAW ENFORCEMENT OFFICIAL OR A LAW
22 ENFORCEMENT AGENCY OF A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF
23 THIS STATE WHERE REASONABLE SUSPICION EXISTS THAT THE PERSON IS AN ALIEN WHO
24 IS UNLAWFULLY PRESENT IN THE UNITED STATES, A REASONABLE ATTEMPT SHALL BE
25 MADE, WHEN PRACTICABLE, TO DETERMINE THE IMMIGRATION STATUS OF THE PERSON,
26 EXCEPT IF THE DETERMINATION MAY HINDER OR OBSTRUCT AN INVESTIGATION.  ANY
27 PERSON WHO IS ARRESTED SHALL HAVE THE PERSON'S IMMIGRATION STATUS DETERMINED
28 BEFORE THE PERSON IS RELEASED.  THE PERSON'S IMMIGRATION STATUS SHALL BE
29 VERIFIED WITH THE FEDERAL GOVERNMENT PURSUANT TO 8 UNITED STATES CODE SECTION
30 1373(c).  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY,
31 CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT SOLELY
32 CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN IMPLEMENTING THE REQUIREMENTS OF
33 THIS SUBSECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR
34 ARIZONA CONSTITUTION.  A PERSON IS PRESUMED TO NOT BE AN ALIEN WHO IS
35 UNLAWFULLY PRESENT IN THE UNITED STATES IF THE PERSON PROVIDES TO THE LAW
36 ENFORCEMENT OFFICER OR AGENCY ANY OF THE FOLLOWING:
37     1.  A VALID ARIZONA DRIVER LICENSE.
38     2.  A VALID ARIZONA NONOPERATING IDENTIFICATION LICENSE.
39     3.  A VALID TRIBAL ENROLLMENT CARD OR OTHER FORM OF TRIBAL
40 IDENTIFICATION.
41     4.  IF THE ENTITY REQUIRES PROOF OF LEGAL PRESENCE IN THE UNITED STATES
42 BEFORE ISSUANCE, ANY VALID UNITED STATES FEDERAL, STATE OR LOCAL GOVERNMENT
43 ISSUED IDENTIFICATION.

S.B. 1070

1    C.  IF AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES IS
2  CONVICTED OF A VIOLATION OF STATE OR LOCAL LAW, ON DISCHARGE FROM
3  IMPRISONMENT OR ON THE ASSESSMENT OF ANY MONETARY OBLIGATION THAT IS IMPOSED,
4  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES
5  CUSTOMS AND BORDER PROTECTION SHALL BE IMMEDIATELY NOTIFIED.
6    D.  NOTWITHSTANDING ANY OTHER LAW, A LAW ENFORCEMENT AGENCY MAY
7  SECURELY TRANSPORT AN ALIEN WHO THE AGENCY HAS RECEIVED VERIFICATION IS
8  UNLAWFULLY PRESENT IN THE UNITED STATES AND WHO IS IN THE AGENCY'S CUSTODY TO
9  A FEDERAL FACILITY IN THIS STATE OR TO ANY OTHER POINT OF TRANSFER INTO
10  FEDERAL CUSTODY THAT IS OUTSIDE THE JURISDICTION OF THE LAW ENFORCEMENT
11  AGENCY.  A LAW ENFORCEMENT AGENCY SHALL OBTAIN JUDICIAL AUTHORIZATION BEFORE
12  SECURELY TRANSPORTING AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES
13  TO A POINT OF TRANSFER THAT IS OUTSIDE OF THIS STATE.
14    E.  EXCEPT AS PROVIDED IN FEDERAL LAW, OFFICIALS OR AGENCIES OF THIS
15  STATE AND COUNTIES, CITIES, TOWNS AND OTHER POLITICAL SUBDIVISIONS OF THIS
16  STATE MAY NOT BE PROHIBITED OR IN ANY WAY BE RESTRICTED FROM SENDING,
17  RECEIVING OR MAINTAINING INFORMATION RELATING TO THE IMMIGRATION STATUS,
18  LAWFUL OR UNLAWFUL, OF ANY INDIVIDUAL OR EXCHANGING THAT INFORMATION WITH ANY
19  OTHER FEDERAL, STATE OR LOCAL GOVERNMENTAL ENTITY FOR THE FOLLOWING OFFICIAL
20  PURPOSES:
21    1.  DETERMINING ELIGIBILITY FOR ANY PUBLIC BENEFIT, SERVICE OR LICENSE
22  PROVIDED BY ANY FEDERAL, STATE, LOCAL OR OTHER POLITICAL SUBDIVISION OF THIS
23  STATE.
24    2.  VERIFYING ANY CLAIM OF RESIDENCE OR DOMICILE IF DETERMINATION OF
25  RESIDENCE OR DOMICILE IS REQUIRED UNDER THE LAWS OF THIS STATE OR A JUDICIAL
26  ORDER ISSUED PURSUANT TO A CIVIL OR CRIMINAL PROCEEDING IN THIS STATE.
27    3.  IF THE PERSON IS AN ALIEN, DETERMINING WHETHER THE PERSON IS IN
28  COMPLIANCE WITH THE FEDERAL REGISTRATION LAWS PRESCRIBED BY TITLE II, CHAPTER
29  7 OF THE FEDERAL IMMIGRATION AND NATIONALITY ACT.
30    4.  PURSUANT TO 8 UNITED STATES CODE SECTION 1373 AND 8 UNITED STATES
31  CODE SECTION 1644.
32    F.  THIS SECTION DOES NOT IMPLEMENT, AUTHORIZE OR ESTABLISH AND SHALL
33  NOT BE CONSTRUED TO IMPLEMENT, AUTHORIZE OR ESTABLISH THE REAL ID ACT OF 2005
34  (P.L. 109-13, DIVISION B; 119 STAT. 302), INCLUDING THE USE OF A RADIO
35  FREQUENCY IDENTIFICATION CHIP.
36    G.  A PERSON WHO IS A LEGAL RESIDENT OF THIS STATE MAY BRING AN ACTION
37  IN SUPERIOR COURT TO CHALLENGE ANY OFFICIAL OR AGENCY OF THIS STATE OR A
38  COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE THAT ADOPTS
39  OR IMPLEMENTS A POLICY OR PRACTICE THAT LIMITS OR RESTRICTS THE ENFORCEMENT
40  OF FEDERAL IMMIGRATION LAWS TO LESS THAN THE FULL EXTENT PERMITTED BY FEDERAL
41  LAW.  IF THERE IS A JUDICIAL FINDING THAT AN ENTITY HAS VIOLATED THIS
42  SECTION, THE COURT SHALL ORDER THAT THE ENTITY PAY A CIVIL PENALTY OF NOT
43  LESS THAN ONE THOUSAND DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS FOR
44  EACH DAY THAT THE POLICY HAS REMAINED IN EFFECT AFTER THE FILING OF AN ACTION
45  PURSUANT TO THIS SUBSECTION.

S.B. 1070

1   H.  A COURT SHALL COLLECT THE CIVIL PENALTY PRESCRIBED IN SUBSECTION G
2   OF THIS SECTION AND REMIT THE CIVIL PENALTY TO THE STATE TREASURER FOR
3   DEPOSIT IN THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION
4   FUND ESTABLISHED BY SECTION 41-1724.
5   I.  THE COURT MAY AWARD COURT COSTS AND REASONABLE ATTORNEY FEES TO ANY
6   PERSON OR ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR
7   OTHER POLITICAL SUBDIVISION OF THIS STATE THAT PREVAILS BY AN ADJUDICATION ON
8   THE MERITS IN A PROCEEDING BROUGHT PURSUANT TO THIS SECTION.
9   J.  EXCEPT IN RELATION TO MATTERS IN WHICH THE OFFICER IS ADJUDGED TO
10  HAVE ACTED IN BAD FAITH, A LAW ENFORCEMENT OFFICER IS INDEMNIFIED BY THE LAW
11  ENFORCEMENT OFFICER'S AGENCY AGAINST REASONABLE COSTS AND EXPENSES, INCLUDING
12  ATTORNEY FEES, INCURRED BY THE OFFICER IN CONNECTION WITH ANY ACTION, SUIT OR
13  PROCEEDING BROUGHT PURSUANT TO THIS SECTION IN WHICH THE OFFICER MAY BE A
14  DEFENDANT BY REASON OF THE OFFICER BEING OR HAVING BEEN A MEMBER OF THE LAW
15  ENFORCEMENT AGENCY.
16  K.  THIS SECTION SHALL BE IMPLEMENTED IN A MANNER CONSISTENT WITH
17  FEDERAL LAWS REGULATING IMMIGRATION, PROTECTING THE CIVIL RIGHTS OF ALL
18  PERSONS AND RESPECTING THE PRIVILEGES AND IMMUNITIES OF UNITED STATES
19  CITIZENS.
20  Sec. 3.  Title 13, chapter 15, Arizona Revised Statutes, is amended by
21  adding section 13-1509, to read:
22  13-1509.  Willful failure to complete or carry an alien
23           registration document; assessment; exception;
24           authenticated records; classification
25  A.  IN ADDITION TO ANY VIOLATION OF FEDERAL LAW, A PERSON IS GUILTY OF
26  WILLFUL FAILURE TO COMPLETE OR CARRY AN ALIEN REGISTRATION DOCUMENT IF THE
27  PERSON IS IN VIOLATION OF 8 UNITED STATES CODE SECTION 1304(e) OR 1306(a).
28  B.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS
29  MAY BE DETERMINED BY:
30  1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL
31  GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.
32  2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED
33  STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION
34  1373(c).
35  C.  A PERSON WHO IS SENTENCED PURSUANT TO THIS SECTION IS NOT ELIGIBLE
36  FOR SUSPENSION OF SENTENCE, PROBATION, PARDON, COMMUTATION OF SENTENCE, OR
37  RELEASE FROM CONFINEMENT ON ANY BASIS EXCEPT AS AUTHORIZED BY SECTION 31-233,
38  SUBSECTION A OR B UNTIL THE SENTENCE IMPOSED BY THE COURT HAS BEEN SERVED OR
39  THE PERSON IS ELIGIBLE FOR RELEASE PURSUANT TO SECTION 41-1604.07.
40  D.  IN ADDITION TO ANY OTHER PENALTY PRESCRIBED BY LAW, THE COURT SHALL
41  ORDER THE PERSON TO PAY JAIL COSTS AND AN ADDITIONAL ASSESSMENT IN THE
42  FOLLOWING AMOUNTS:
43  1.  AT LEAST FIVE HUNDRED DOLLARS FOR A FIRST VIOLATION.
44  2.  TWICE THE AMOUNT SPECIFIED IN PARAGRAPH 1 OF THIS SUBSECTION IF THE
45  PERSON WAS PREVIOUSLY SUBJECT TO AN ASSESSMENT PURSUANT TO THIS SUBSECTION.

S.B. 1070

1    E.  A COURT SHALL COLLECT THE ASSESSMENTS PRESCRIBED IN SUBSECTION D OF
2  THIS SECTION AND REMIT THE ASSESSMENTS TO THE DEPARTMENT OF PUBLIC SAFETY,
3  WHICH SHALL ESTABLISH A SPECIAL SUBACCOUNT FOR THE MONIES IN THE ACCOUNT
4  ESTABLISHED FOR THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT
5  MISSION APPROPRIATION.   MONIES IN THE SPECIAL SUBACCOUNT ARE SUBJECT TO
6  LEGISLATIVE  APPROPRIATION  FOR  DISTRIBUTION  FOR  GANG  AND  IMMIGRATION
7  ENFORCEMENT AND FOR COUNTY JAIL REIMBURSEMENT COSTS RELATING TO ILLEGAL
8  IMMIGRATION.
9    F.   THIS SECTION DOES NOT APPLY TO A PERSON WHO MAINTAINS AUTHORIZATION
10 FROM THE FEDERAL GOVERNMENT TO REMAIN IN THE UNITED STATES.
11    G.  ANY RECORD THAT RELATES TO THE IMMIGRATION STATUS OF A PERSON IS
12 ADMISSIBLE IN ANY COURT WITHOUT FURTHER FOUNDATION OR TESTIMONY FROM A
13 CUSTODIAN  OF  RECORDS  IF  THE  RECORD  IS  CERTIFIED  AS  AUTHENTIC  BY  THE
14 GOVERNMENT AGENCY THAT IS RESPONSIBLE FOR MAINTAINING THE RECORD.
15    H.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR, EXCEPT THAT A
16 VIOLATION OF THIS SECTION IS:
17    1.  A CLASS 3 FELONY IF THE PERSON VIOLATES THIS SECTION WHILE IN
18 POSSESSION OF ANY OF THE FOLLOWING:
19    (a)  A DANGEROUS DRUG AS DEFINED IN SECTION 13-3401.
20    (b)  PRECURSOR  CHEMICALS  THAT  ARE  USED  IN  THE  MANUFACTURING  OF
21 METHAMPHETAMINE IN VIOLATION OF SECTION 13-3404.01.
22    (c)  A DEADLY WEAPON OR A DANGEROUS INSTRUMENT, AS DEFINED IN SECTION
23 13-105.
24    (d)  PROPERTY THAT IS USED FOR THE PURPOSE OF COMMITTING AN ACT OF
25 TERRORISM AS PRESCRIBED IN SECTION 13-2308.01.
26    2.  A CLASS 4 FELONY IF THE PERSON EITHER:
27    (a)  IS CONVICTED OF A SECOND OR SUBSEQUENT VIOLATION OF THIS SECTION.
28    (b)  WITHIN SIXTY MONTHS BEFORE THE VIOLATION, HAS BEEN REMOVED FROM
29 THE UNITED STATES PURSUANT TO 8 UNITED STATES CODE SECTION 1229a OR HAS
30 ACCEPTED A VOLUNTARY REMOVAL FROM THE UNITED STATES PURSUANT TO 8 UNITED
31 STATES CODE SECTION 1229c.
32    Sec. 4.   Section 13-2319, Arizona Revised Statutes, is amended to read:
33    13-2319.   Smuggling; classification; definitions
34    A.  It is unlawful for a person to intentionally engage in the
35 smuggling of human beings for profit or commercial purpose.
36    B.  A violation of this section is a class 4 felony.
37    C.  Notwithstanding subsection B of this section, a violation of this
38 section:
39    1.  Is a class 2 felony if the human being who is smuggled is under
40 eighteen years of age and is not accompanied by a family member over eighteen
41 years of age or the offense involved the use of a deadly weapon or dangerous
42 instrument.
43    2.  Is a class 3 felony if the offense involves the use or threatened
44 use of deadly physical force and the person is not eligible for suspension of
45 sentence, probation, pardon or release from confinement on any other basis

- 4 -

S.B. 1070

1   except pursuant to section 31-233, subsection A or B until the sentence
2   imposed by the court is served, the person is eligible for release pursuant
3   to section 41-1604.07 or the sentence is commuted.
4       D.  Chapter 10 of this title does not apply to a violation of
5   subsection C, paragraph 1 of this section.
6       E.  NOTWITHSTANDING ANY OTHER LAW, IN THE ENFORCEMENT OF THIS SECTION A
7   PEACE OFFICER MAY LAWFULLY STOP ANY PERSON WHO IS OPERATING A MOTOR VEHICLE
8   IF THE OFFICER HAS REASONABLE SUSPICION TO BELIEVE THE PERSON IS IN VIOLATION
9   OF ANY CIVIL TRAFFIC LAW.
10      E.  F.  For the purposes of this section:
11      1.  "Family member" means the person's parent, grandparent, sibling or
12  any other person who is related to the person by consanguinity or affinity to
13  the second degree.
14      2.  "Procurement of transportation" means any participation in or
15  facilitation of transportation and includes:
16      (a)  Providing services that facilitate transportation including travel
17  arrangement services or money transmission services.
18      (b)  Providing property that facilitates transportation, including a
19  weapon, a vehicle or other means of transportation or false identification,
20  or selling, leasing, renting or otherwise making available a drop house as
21  defined in section 13-2322.
22      3.  "Smuggling of human beings" means the transportation, procurement
23  of transportation or use of property or real property by a person or an
24  entity that knows or has reason to know that the person or persons
25  transported or to be transported are not United States citizens, permanent
26  resident aliens or persons otherwise lawfully in this state or have attempted
27  to enter, entered or remained in the United States in violation of law.
28      Sec. 5.  Title 13, chapter 29, Arizona Revised Statutes, is amended by
29  adding sections 13-2928 and 13-2929, to read:
30      13-2928.  Unlawful stopping to hire and pick up passengers for
31              work; unlawful application, solicitation or
32              employment; classification; definitions
33      A.  IT IS UNLAWFUL FOR AN OCCUPANT OF A MOTOR VEHICLE THAT IS STOPPED
34  ON A STREET, ROADWAY OR HIGHWAY TO ATTEMPT TO HIRE OR HIRE AND PICK UP
35  PASSENGERS FOR WORK AT A DIFFERENT LOCATION IF THE MOTOR VEHICLE BLOCKS OR
36  IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.
37      B.  IT IS UNLAWFUL FOR A PERSON TO ENTER A MOTOR VEHICLE THAT IS
38  STOPPED ON A STREET, ROADWAY OR HIGHWAY IN ORDER TO BE HIRED BY AN OCCUPANT
39  OF THE MOTOR VEHICLE AND TO BE TRANSPORTED TO WORK AT A DIFFERENT LOCATION IF
40  THE MOTOR VEHICLE BLOCKS OR IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.
41      C.  IT IS UNLAWFUL FOR A PERSON WHO IS UNLAWFULLY PRESENT IN THE UNITED
42  STATES AND WHO IS AN UNAUTHORIZED ALIEN TO KNOWINGLY APPLY FOR WORK, SOLICIT
43  WORK IN A PUBLIC PLACE OR PERFORM WORK AS AN EMPLOYEE OR INDEPENDENT
44  CONTRACTOR IN THIS STATE.
45      D.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR.

S.B. 1070

```
 1        E.  FOR THE PURPOSES OF THIS SECTION:
 2        1.  "SOLICIT" MEANS VERBAL OR NONVERBAL COMMUNICATION BY A GESTURE OR A
 3   NOD THAT WOULD INDICATE TO A REASONABLE PERSON THAT A PERSON IS WILLING TO BE
 4   EMPLOYED.
 5        2.  "UNAUTHORIZED ALIEN" MEANS AN ALIEN WHO DOES NOT HAVE THE LEGAL
 6   RIGHT OR AUTHORIZATION UNDER FEDERAL LAW TO WORK IN THE UNITED STATES AS
 7   DESCRIBED IN 8 UNITED STATES CODE SECTION 1324a(h)(3).
 8        13-2929.  Unlawful transporting, moving, concealing, harboring
 9                   or shielding of unlawful aliens; vehicle
10                   impoundment; exception; classification
11        A.  IT IS UNLAWFUL FOR A PERSON WHO IS IN VIOLATION OF A CRIMINAL
12   OFFENSE TO:
13        1.  TRANSPORT OR MOVE OR ATTEMPT TO TRANSPORT OR MOVE AN ALIEN IN THIS
14   STATE, IN FURTHERANCE OF THE ILLEGAL PRESENCE OF THE ALIEN IN THE UNITED
15   STATES, IN A MEANS OF TRANSPORTATION IF THE PERSON KNOWS OR RECKLESSLY
16   DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE
17   UNITED STATES IN VIOLATION OF LAW.
18        2.  CONCEAL, HARBOR OR SHIELD OR ATTEMPT TO CONCEAL, HARBOR OR SHIELD
19   AN ALIEN FROM DETECTION IN ANY PLACE IN THIS STATE, INCLUDING ANY BUILDING OR
20   ANY MEANS OF TRANSPORTATION, IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE
21   FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES
22   IN VIOLATION OF LAW.
23        3.  ENCOURAGE OR INDUCE AN ALIEN TO COME TO OR RESIDE IN THIS STATE IF
24   THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT SUCH COMING TO,
25   ENTERING OR RESIDING IN THIS STATE IS OR WILL BE IN VIOLATION OF LAW.
26        B.  A MEANS OF TRANSPORTATION THAT IS USED IN THE COMMISSION OF A
27   VIOLATION OF THIS SECTION IS SUBJECT TO MANDATORY VEHICLE IMMOBILIZATION OR
28   IMPOUNDMENT PURSUANT TO SECTION 28-3511.
29        C.  THIS SECTION DOES NOT APPLY TO A CHILD PROTECTIVE SERVICES WORKER
30   ACTING IN THE WORKER'S OFFICIAL CAPACITY OR A PERSON WHO IS ACTING IN THE
31   CAPACITY OF A FIRST RESPONDER, AN AMBULANCE ATTENDANT OR AN EMERGENCY MEDICAL
32   TECHNICIAN AND WHO IS TRANSPORTING OR MOVING AN ALIEN IN THIS STATE PURSUANT
33   TO TITLE 36, CHAPTER 21.1.
34        D.  A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A CLASS 1
35   MISDEMEANOR AND IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND DOLLARS, EXCEPT
36   THAT A VIOLATION OF THIS SECTION THAT INVOLVES TEN OR MORE ILLEGAL ALIENS IS
37   A CLASS 6 FELONY AND THE PERSON IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND
38   DOLLARS FOR EACH ALIEN WHO IS INVOLVED.
39        Sec. 6.  Section 13-3883, Arizona Revised Statutes, is amended to read:
40        13-3883.  Arrest by officer without warrant
41        A.  A peace officer may, without a warrant, MAY arrest a person if he
42   THE OFFICER has probable cause to believe:
43        1.  A felony has been committed and probable cause to believe the
44   person to be arrested has committed the felony.
```

S.B. 1070

 1        2.  A misdemeanor has been committed in ~~his~~ THE OFFICER'S presence and
 2   probable cause to believe the person to be arrested has committed the
 3   offense.
 4        3.  The person to be arrested has been involved in a traffic accident
 5   and violated any criminal section of title 28, and that such violation
 6   occurred prior to or immediately following such traffic accident.
 7        4.  A misdemeanor or a petty offense has been committed and probable
 8   cause to believe the person to be arrested has committed the offense.  A
 9   person arrested under this paragraph is eligible for release under section
10   13-3903.
11        5.  THE PERSON TO BE ARRESTED HAS COMMITTED ANY PUBLIC OFFENSE THAT
12   MAKES THE PERSON REMOVABLE FROM THE UNITED STATES.
13        B.  A peace officer may stop and detain a person as is reasonably
14   necessary to investigate an actual or suspected violation of any traffic law
15   committed in the officer's presence and may serve a copy of the traffic
16   complaint for any alleged civil or criminal traffic violation.  A peace
17   officer who serves a copy of the traffic complaint shall do so within a
18   reasonable time of the alleged criminal or civil traffic violation.
19        Sec. 7.  Section 23-212, Arizona Revised Statutes, is amended to read:
20        23-212.  Knowingly employing unauthorized aliens; prohibition;
21                 false    and    frivolous    complaints;    violation;
22                 classification; license suspension and revocation;
23                 affirmative defense
24        A.  An employer shall not knowingly employ an unauthorized alien.  If,
25   in the case when an employer uses a contract, subcontract or other
26   independent contractor agreement to obtain the labor of an alien in this
27   state, the employer knowingly contracts with an unauthorized alien or with a
28   person who employs or contracts with an unauthorized alien to perform the
29   labor, the employer violates this subsection.
30        B.  The attorney general shall prescribe a complaint form for a person
31   to allege a violation of subsection A of this section.  The complaint shall
32   not be required to list the complainant's social security number on the
33   complaint form or to have the complaint form notarized.  On receipt of a
34   complaint on a prescribed complaint form that an employer allegedly knowingly
35   employs an unauthorized alien, the attorney general or county attorney shall
36   investigate whether the employer has violated subsection A of this section.
37   If a complaint is received but is not submitted on a prescribed complaint
38   form, the attorney general or county attorney may investigate whether the
39   employer has violated subsection A of this section.  This subsection shall
40   not be construed to prohibit the filing of anonymous complaints that are not
41   submitted on a prescribed complaint form.  The attorney general or county
42   attorney shall not investigate complaints that are based solely on race,
43   color or national origin.  A complaint that is submitted to a county attorney
44   shall be submitted to the county attorney in the county in which the alleged
45   unauthorized alien is or was employed by the employer.  The county sheriff or

- 7 -

S.B. 1070

1   any other local law enforcement agency may assist in investigating a
2   complaint. When investigating a complaint, the attorney general or county
3   attorney shall verify the work authorization of the alleged unauthorized
4   alien with the federal government pursuant to 8 United States Code section
5   1373(c). A state, county or local official shall not attempt to
6   independently make a final determination on whether an alien is authorized to
7   work in the United States. An alien's immigration status or work
8   authorization status shall be verified with the federal government pursuant
9   to 8 United States Code section 1373(c). A person who knowingly files a
10  false and frivolous complaint under this subsection is guilty of a class 3
11  misdemeanor.
12      C.  If, after an investigation, the attorney general or county attorney
13  determines that the complaint is not false and frivolous:
14      1.  The attorney general or county attorney shall notify the United
15  States immigration and customs enforcement of the unauthorized alien.
16      2.  The attorney general or county attorney shall notify the local law
17  enforcement agency of the unauthorized alien.
18      3.  The attorney general shall notify the appropriate county attorney
19  to bring an action pursuant to subsection D of this section if the complaint
20  was originally filed with the attorney general.
21      D.  An action for a violation of subsection A of this section shall be
22  brought against the employer by the county attorney in the county where the
23  unauthorized alien employee is or was employed by the employer. The county
24  attorney shall not bring an action against any employer for any violation of
25  subsection A of this section that occurs before January 1, 2008. A second
26  violation of this section shall be based only on an unauthorized alien who is
27  or was employed by the employer after an action has been brought for a
28  violation of subsection A of this section or section 23-212.01, subsection A.
29      E.  For any action in superior court under this section, the court
30  shall expedite the action, including assigning the hearing at the earliest
31  practicable date.
32      F.  On a finding of a violation of subsection A of this section:
33      1.  For a first violation, as described in paragraph 3 of this
34  subsection, the court:
35      (a)  Shall order the employer to terminate the employment of all
36  unauthorized aliens.
37      (b)  Shall order the employer to be subject to a three year
38  probationary period for the business location where the unauthorized alien
39  performed work. During the probationary period the employer shall file
40  quarterly reports in the form provided in section 23-722.01 with the county
41  attorney of each new employee who is hired by the employer at the business
42  location where the unauthorized alien performed work.
43      (c)  Shall order the employer to file a signed sworn affidavit with the
44  county attorney within three business days after the order is issued. The
45  affidavit shall state that the employer has terminated the employment of all

S.B. 1070

1   unauthorized aliens in this state and that the employer will not
2   intentionally or knowingly employ an unauthorized alien in this state.  The
3   court shall order the appropriate agencies to suspend all licenses subject to
4   this subdivision that are held by the employer if the employer fails to file
5   a signed sworn affidavit with the county attorney within three business days
6   after the order is issued.  All licenses that are suspended under this
7   subdivision shall remain suspended until the employer files a signed sworn
8   affidavit with the county attorney.  Notwithstanding any other law, on filing
9   of the affidavit the suspended licenses shall be reinstated immediately by
10  the appropriate agencies.  For the purposes of this subdivision, the licenses
11  that are subject to suspension under this subdivision are all licenses that
12  are held by the employer specific to the business location where the
13  unauthorized alien performed work.  If the employer does not hold a license
14  specific to the business location where the unauthorized alien performed
15  work, but a license is necessary to operate the employer's business in
16  general, the licenses that are subject to suspension under this subdivision
17  are all licenses that are held by the employer at the employer's primary
18  place of business.  On receipt of the court's order and notwithstanding any
19  other law, the appropriate agencies shall suspend the licenses according to
20  the court's order.  The court shall send a copy of the court's order to the
21  attorney general and the attorney general shall maintain the copy pursuant to
22  subsection G of this section.
23      (d)  May order the appropriate agencies to suspend all licenses
24  described in subdivision (c) of this paragraph that are held by the employer
25  for not to exceed ten business days.  The court shall base its decision to
26  suspend under this subdivision on any evidence or information submitted to it
27  during the action for a violation of this subsection and shall consider the
28  following factors, if relevant:
29      (i)  The number of unauthorized aliens employed by the employer.
30      (ii)  Any prior misconduct by the employer.
31      (iii)  The degree of harm resulting from the violation.
32      (iv)  Whether the employer made good faith efforts to comply with any
33  applicable requirements.
34      (v)  The duration of the violation.
35      (vi)  The role of the directors, officers or principals of the employer
36  in the violation.
37      (vii)  Any other factors the court deems appropriate.
38      2.  For a second violation, as described in paragraph 3 of this
39  subsection, the court shall order the appropriate agencies to permanently
40  revoke all licenses that are held by the employer specific to the business
41  location where the unauthorized alien performed work.  If the employer does
42  not hold a license specific to the business location where the unauthorized
43  alien performed work, but a license is necessary to operate the employer's
44  business in general, the court shall order the appropriate agencies to
45  permanently revoke all licenses that are held by the employer at the

- 9 -

S.B. 1070

1   employer's primary place of business. On receipt of the order and
2   notwithstanding any other law, the appropriate agencies shall immediately
3   revoke the licenses.
4       3.  The violation shall be considered:
5       (a)  A first violation by an employer at a business location if the
6   violation did not occur during a probationary period ordered by the court
7   under this subsection or section 23-212.01, subsection F for that employer's
8   business location.
9       (b)  A second violation by an employer at a business location if the
10  violation occurred during a probationary period ordered by the court under
11  this subsection or section 23-212.01, subsection F for that employer's
12  business location.
13      G.  The attorney general shall maintain copies of court orders that are
14  received pursuant to subsection F of this section and shall maintain a
15  database of the employers and business locations that have a first violation
16  of subsection A of this section and make the court orders available on the
17  attorney general's website.
18      H.  On determining whether an employee is an unauthorized alien, the
19  court shall consider only the federal government's determination pursuant to
20  8 United States Code section 1373(c). The federal government's determination
21  creates a rebuttable presumption of the employee's lawful status.  The court
22  may take judicial notice of the federal government's determination and may
23  request the federal government to provide automated or testimonial
24  verification pursuant to 8 United States Code section 1373(c).
25      I.  For the purposes of this section, proof of verifying the employment
26  authorization of an employee through the e-verify program creates a
27  rebuttable presumption that an employer did not knowingly employ an
28  unauthorized alien.
29      J.  For the purposes of this section, an employer that establishes that
30  it has complied in good faith with the requirements of 8 United States Code
31  section 1324a(b) establishes an affirmative defense that the employer did not
32  knowingly employ an unauthorized alien.  An employer is considered to have
33  complied with the requirements of 8 United States Code section 1324a(b),
34  notwithstanding an isolated, sporadic or accidental technical or procedural
35  failure to meet the requirements, if there is a good faith attempt to comply
36  with the requirements.
37      K.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS
38  SECTION THAT THE EMPLOYER WAS ENTRAPPED.  TO CLAIM ENTRAPMENT, THE EMPLOYER
39  MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL
40  ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS
41  THE BURDEN OF PROVING THE FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE:
42      1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT
43  OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.
44      2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE
45  EMPLOYER TO COMMIT THE VIOLATION.

- 10 -

S.B. 1070

1    3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE
2    LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO
3    COMMIT THE VIOLATION.
4         L.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS
5    PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT
6    OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO
7    COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR
8    THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT
9    OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING
10   IF AN EMPLOYER HAS PROVEN ENTRAPMENT.
11        Sec. 8.  Section 23-212.01, Arizona Revised Statutes, is amended to
12   read:
13        23-212.01.  Intentionally   employing   unauthorized   aliens;
14                    prohibition;  false  and  frivolous  complaints;
15                    violation; classification; license suspension and
16                    revocation; affirmative defense
17        A.  An employer shall not intentionally employ an unauthorized alien.
18   If, in the case when an employer uses a contract, subcontract or other
19   independent contractor agreement to obtain the labor of an alien in this
20   state, the employer intentionally contracts with an unauthorized alien or
21   with a person who employs or contracts with an unauthorized alien to perform
22   the labor, the employer violates this subsection.
23        B.  The attorney general shall prescribe a complaint form for a person
24   to allege a violation of subsection A of this section.  The complainant shall
25   not be required to list the complainant's social security number on the
26   complaint form or to have the complaint form notarized.  On receipt of a
27   complaint on a prescribed complaint form that an employer allegedly
28   intentionally employs an unauthorized alien, the attorney general or county
29   attorney shall investigate whether the employer has violated subsection A of
30   this section.  If a complaint is received but is not submitted on a
31   prescribed complaint form, the attorney general or county attorney may
32   investigate whether the employer has violated subsection A of this section.
33   This subsection shall not be construed to prohibit the filing of anonymous
34   complaints that are not submitted on a prescribed complaint form.   The
35   attorney general or county attorney shall not investigate complaints that are
36   based solely on race, color or national origin.  A complaint that is
37   submitted to a county attorney shall be submitted to the county attorney in
38   the county in which the alleged unauthorized alien is or was employed by the
39   employer.  The county sheriff or any other local law enforcement agency may
40   assist in investigating a complaint.  When investigating a complaint, the
41   attorney general or county attorney shall verify the work authorization of
42   the alleged unauthorized alien with the federal government pursuant to
43   8 United States Code section 1373(c).  A state, county or local official
44   shall not attempt to independently make a final determination on whether an
45   alien is authorized to work in the United States.  An alien's immigration

S.B. 1070

1 status or work authorization status shall be verified with the federal
2 government pursuant to 8 United States Code section 1373(c).  A person who
3 knowingly files a false and frivolous complaint under this subsection is
4 guilty of a class 3 misdemeanor.
5        C.  If, after an investigation, the attorney general or county attorney
6 determines that the complaint is not false and frivolous:
7        1.  The attorney general or county attorney shall notify the United
8 States immigration and customs enforcement of the unauthorized alien.
9        2.  The attorney general or county attorney shall notify the local law
10 enforcement agency of the unauthorized alien.
11        3.  The attorney general shall notify the appropriate county attorney
12 to bring an action pursuant to subsection D of this section if the complaint
13 was originally filed with the attorney general.
14        D.  An action for a violation of subsection A of this section shall be
15 brought against the employer by the county attorney in the county where the
16 unauthorized alien employee is or was employed by the employer.  The county
17 attorney shall not bring an action against any employer for any violation of
18 subsection A of this section that occurs before January 1, 2008. A second
19 violation of this section shall be based only on an unauthorized alien who is
20 or was employed by the employer after an action has been brought for a
21 violation of subsection A of this section or section 23-212, subsection A.
22        E.  For any action in superior court under this section, the court
23 shall expedite the action, including assigning the hearing at the earliest
24 practicable date.
25        F.  On a finding of a violation of subsection A of this section:
26        1.  For a first violation, as described in paragraph 3 of this
27 subsection, the court shall:
28        (a)  Order the employer to terminate the employment of all unauthorized
29 aliens.
30        (b)  Order the employer to be subject to a five year probationary
31 period for the business location where the unauthorized alien performed work.
32 During the probationary period the employer shall file quarterly reports in
33 the form provided in section 23-722.01 with the county attorney of each new
34 employee who is hired by the employer at the business location where the
35 unauthorized alien performed work.
36        (c)  Order the appropriate agencies to suspend all licenses described
37 in subdivision (d) of this paragraph that are held by the employer for a
38 minimum of ten days.  The court shall base its decision on the length of the
39 suspension under this subdivision on any evidence or information submitted to
40 it during the action for a violation of this subsection and shall consider
41 the following factors, if relevant:
42        (i)  The number of unauthorized aliens employed by the employer.
43        (ii)  Any prior misconduct by the employer.
44        (iii)  The degree of harm resulting from the violation.

- 12 -

S.B. 1070

1    (iv)  Whether the employer made good faith efforts to comply with any
2    applicable requirements.
3         (v)  The duration of the violation.
4         (vi)  The role of the directors, officers or principals of the employer
5    in the violation.
6         (vii)  Any other factors the court deems appropriate.
7         (d)  Order the employer to file a signed sworn affidavit with the
8    county attorney.  The affidavit shall state that the employer has terminated
9    the employment of all unauthorized aliens in this state and that the employer
10   will not intentionally or knowingly employ an unauthorized alien in this
11   state.   The court shall order the appropriate agencies to suspend all
12   licenses subject to this subdivision that are held by the employer if the
13   employer fails to file a signed sworn affidavit with the county attorney
14   within three business days after the order is issued.  All licenses that are
15   suspended under this subdivision for failing to file a signed sworn affidavit
16   shall remain suspended until the employer files a signed sworn affidavit with
17   the county attorney.  For the purposes of this subdivision, the licenses that
18   are subject to suspension under this subdivision are all licenses that are
19   held by the employer specific to the business location where the unauthorized
20   alien performed work.  If the employer does not hold a license specific to
21   the business location where the unauthorized alien performed work, but a
22   license is necessary to operate the employer's business in general, the
23   licenses that are subject to suspension under this subdivision are all
24   licenses that are held by the employer at the employer's primary place of
25   business.  On receipt of the court's order and notwithstanding any other law,
26   the appropriate agencies shall suspend the licenses according to the court's
27   order.   The court shall send a copy of the court's order to the attorney
28   general and the attorney general shall maintain the copy pursuant to
29   subsection G of this section.
30        2.  For a second violation, as described in paragraph 3 of this
31   subsection, the court shall order the appropriate agencies to permanently
32   revoke all licenses that are held by the employer specific to the business
33   location where the unauthorized alien performed work.  If the employer does
34   not hold a license specific to the business location where the unauthorized
35   alien performed work, but a license is necessary to operate the employer's
36   business in general, the court shall order the appropriate agencies to
37   permanently revoke all licenses that are held by the employer at the
38   employer's primary place of business.  On receipt of the order and
39   notwithstanding any other law, the appropriate agencies shall immediately
40   revoke the licenses.
41        3.  The violation shall be considered:
42        (a)  A first violation by an employer at a business location if the
43   violation did not occur during a probationary period ordered by the court
44   under this subsection or section 23-212, subsection F for that employer's
45   business location.

- 13 -

S.B. 1070

1      (b)  A second violation by an employer at a business location if the
2    violation occurred during a probationary period ordered by the court under
3    this subsection or section 23-212, subsection F for that employer's business
4    location.
5        G.  The attorney general shall maintain copies of court orders that are
6    received pursuant to subsection F of this section and shall maintain a
7    database of the employers and business locations that have a first violation
8    of subsection A of this section and make the court orders available on the
9    attorney general's website.
10        H.  On determining whether an employee is an unauthorized alien, the
11    court shall consider only the federal government's determination pursuant to
12    8 United States Code section 1373(c).  The federal government's determination
13    creates a rebuttable presumption of the employee's lawful status.  The court
14    may take judicial notice of the federal government's determination and may
15    request  the  federal  government  to  provide  automated  or  testimonial
16    verification pursuant to 8 United States Code section 1373(c).
17        I.  For the purposes of this section, proof of verifying the employment
18    authorization of an employee through the e-verify program creates a
19    rebuttable presumption that an employer did not intentionally employ an
20    unauthorized alien.
21        J.  For the purposes of this section, an employer that establishes that
22    it has complied in good faith with the requirements of 8 United States Code
23    section 1324a(b) establishes an affirmative defense that the employer did not
24    intentionally employ an unauthorized alien.  An employer is considered to
25    have complied with the requirements of 8 United States Code section 1324a(b),
26    notwithstanding an isolated, sporadic or accidental technical or procedural
27    failure to meet the requirements, if there is a good faith attempt to comply
28    with the requirements.
29        K.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS
30    SECTION THAT THE EMPLOYER WAS ENTRAPPED.  TO CLAIM ENTRAPMENT, THE EMPLOYER
31    MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL
32    ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS
33    THE BURDEN OF PROVING THE FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE:
34        1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT
35    OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.
36        2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE
37    EMPLOYER TO COMMIT THE VIOLATION.
38        3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE
39    LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO
40    COMMIT THE VIOLATION.
41        L.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS
42    PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT
43    OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO
44    COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR
45    THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT

S.B. 1070

1   OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING
2   IF AN EMPLOYER HAS PROVEN ENTRAPMENT.
3        Sec. 9.  Section 23-214, Arizona Revised Statutes, is amended to read:
4        23-214.  Verification of employment eligibility; e-verify
5                 program; economic development incentives; list of
6                 registered employers
7        A.  After December 31, 2007, every employer, after hiring an employee,
8   shall verify the employment eligibility of the employee through the e-verify
9   program AND SHALL KEEP A RECORD OF THE VERIFICATION FOR THE DURATION OF THE
10  EMPLOYEE'S EMPLOYMENT OR AT LEAST THREE YEARS, WHICHEVER IS LONGER.
11       B.  In addition to any other requirement for an employer to receive an
12  economic development incentive from a government entity, the employer shall
13  register with and participate in the e-verify program.  Before receiving the
14  economic development incentive, the employer shall provide proof to the
15  government entity that the employer is registered with and is participating
16  in the e-verify program.  If the government entity determines that the
17  employer is not complying with this subsection, the government entity shall
18  notify the employer by certified mail of the government entity's
19  determination of noncompliance and the employer's right to appeal the
20  determination. On a final determination of noncompliance, the employer shall
21  repay all monies received as an economic development incentive to the
22  government entity within thirty days of the final determination.  For the
23  purposes of this subsection:
24       1.  "Economic development incentive" means any grant, loan or
25  performance-based incentive from any government entity that is awarded after
26  September 30, 2008.  Economic development incentive does not include any tax
27  provision under title 42 or 43.
28       2.  "Government entity" means this state and any political subdivision
29  of this state that receives and uses tax revenues.
30       C.  Every three months the attorney general shall request from the
31  United States department of homeland security a list of employers from this
32  state that are registered with the e-verify program.  On receipt of the list
33  of employers, the attorney general shall make the list available on the
34  attorney general's website.
35       Sec. 10.  Section 28-3511, Arizona Revised Statutes, is amended to
36  read:
37       28-3511.  Removal and immobilization or impoundment of vehicle
38       A.  A peace officer shall cause the removal and either immobilization
39  or impoundment of a vehicle if the peace officer determines that a person is
40  driving the vehicle while any of the following applies:
41       1.  The person's driving privilege is suspended or revoked for any
42  reason.

S.B. 1070

1    2.  The person has not ever been issued a valid driver license or
2  permit by this state and the person does not produce evidence of ever having
3  a valid driver license or permit issued by another jurisdiction.  This
4  paragraph does not apply to the operation of an implement of husbandry.
5    3.  The person is subject to an ignition interlock device requirement
6  pursuant to chapter 4 of this title and the person is operating a vehicle
7  without a functioning certified ignition interlock device.  This paragraph
8  does not apply to a person operating an employer's vehicle or the operation
9  of a vehicle due to a substantial emergency as defined in section 28-1464.
10    4.  IN FURTHERANCE OF THE ILLEGAL PRESENCE OF AN ALIEN IN THE UNITED
11  STATES AND IN VIOLATION OF A CRIMINAL OFFENSE, THE PERSON IS TRANSPORTING OR
12  MOVING OR ATTEMPTING TO TRANSPORT OR MOVE AN ALIEN IN THIS STATE IN A VEHICLE
13  IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME
14  TO, HAS ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.
15    5.  THE PERSON IS CONCEALING, HARBORING OR SHIELDING OR ATTEMPTING TO
16  CONCEAL, HARBOR OR SHIELD FROM DETECTION AN ALIEN IN THIS STATE IN A VEHICLE
17  IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME
18  TO, ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.
19    B.  A peace officer shall cause the removal and impoundment of a
20  vehicle if the peace officer determines that a person is driving the vehicle
21  and if all of the following apply:
22    1.  The person's driving privilege is canceled, suspended or revoked
23  for any reason or the person has not ever been issued a driver license or
24  permit by this state and the person does not produce evidence of ever having
25  a driver license or permit issued by another jurisdiction.
26    2.  The person is not in compliance with the financial responsibility
27  requirements of chapter 9, article 4 of this title.
28    3.  The person is driving a vehicle that is involved in an accident
29  that results in either property damage or injury to or death of another
30  person.
31    C.  Except as provided in subsection D of this section, while a peace
32  officer has control of the vehicle the peace officer shall cause the removal
33  and either immobilization or impoundment of the vehicle if the peace officer
34  has probable cause to arrest the driver of the vehicle for a violation of
35  section 4-244, paragraph 34 or section 28-1382 or 28-1383.
36    D.  A peace officer shall not cause the removal and either the
37  immobilization or impoundment of a vehicle pursuant to subsection C of this
38  section if all of the following apply:
39    1.  The peace officer determines that the vehicle is currently
40  registered and that the driver or the vehicle is in compliance with the
41  financial responsibility requirements of chapter 9, article 4 of this title.
42    2.  The spouse of the driver is with the driver at the time of the
43  arrest.

- 16 -

S.B. 1070

1    3.  The peace officer has reasonable grounds to believe that the spouse
2  of the driver:
3       (a)  Has a valid driver license.
4       (b)  Is not impaired by intoxicating liquor, any drug, a vapor
5  releasing substance containing a toxic substance or any combination of
6  liquor, drugs or vapor releasing substances.
7       (c)  Does not have any spirituous liquor in the spouse's body if the
8  spouse is under twenty-one years of age.
9    4.  The spouse notifies the peace officer that the spouse will drive
10  the vehicle from the place of arrest to the driver's home or other place of
11  safety.
12    5.  The spouse drives the vehicle as prescribed by paragraph 4 of this
13  subsection.
14    E.  Except as otherwise provided in this article, a vehicle that is
15  removed and either immobilized or impounded pursuant to subsection A, B or C
16  of this section shall be immobilized or impounded for thirty days.  An
17  insurance company does not have a duty to pay any benefits for charges or
18  fees for immobilization or impoundment.
19    F.  The owner of a vehicle that is removed and either immobilized or
20  impounded pursuant to subsection A, B or C of this section, the spouse of the
21  owner and each person identified on the department's record with an interest
22  in the vehicle shall be provided with an opportunity for an immobilization or
23  poststorage hearing pursuant to section 28-3514.
24    Sec. 11.  Title 41, chapter 12, article 2, Arizona Revised Statutes, is
25  amended by adding section 41-1724, to read:
26    41-1724.  Gang and immigration intelligence team enforcement
27             mission fund
28    THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND IS
29  ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 11-1051 AND
30  MONIES APPROPRIATED BY THE LEGISLATURE.  THE DEPARTMENT SHALL ADMINISTER THE
31  FUND.  MONIES IN THE FUND ARE SUBJECT TO LEGISLATIVE APPROPRIATION AND SHALL
32  BE USED FOR GANG AND IMMIGRATION ENFORCEMENT AND FOR COUNTY JAIL
33  REIMBURSEMENT COSTS RELATING TO ILLEGAL IMMIGRATION.
34    Sec. 12.  Severability, implementation and construction
35    A.  If a provision of this act or its application to any person or
36  circumstance is held invalid, the invalidity does not affect other provisions
37  or applications of the act that can be given effect without the invalid
38  provision or application, and to this end the provisions of this act are
39  severable.
40    B.  The terms of this act regarding immigration shall be construed to
41  have the meanings given to them under federal immigration law.
42    C.  This act shall be implemented in a manner consistent with federal
43  laws regulating immigration, protecting the civil rights of all persons and
44  respecting the privileges and immunities of United States citizens.

- 17 -

S.B. 1070

1       D.  Nothing in this act shall implement or shall be construed or
2 interpreted to implement or establish the REAL ID act of 2005 (P.L. 109-13,
3 division B; 119 Stat. 302) including the use of a radio frequency
4 identification chip.
5      Sec. 13.  <u>Short title</u>
6      This act may be cited as the "Support Our Law Enforcement and Safe
7 Neighborhoods Act".

Passed the House *April 13*, 20 10,

by the following vote: _____ 35 _____ Ayes,

_____ 21 _____ Nays, _____ 4 _____ Not Voting

_____

_____
Speaker of the House

*Cheryl Laube*
_____
Chief Clerk of the House

Passed the Senate *February 15*, 20 10,

by the following vote: _____ 17 _____ Ayes,

_____ 13 _____ Nays, _____ 0 _____ Not Voting

_____

_____
President of the Senate

_____
Secretary of the Senate

**EXECUTIVE DEPARTMENT OF ARIZONA
OFFICE OF GOVERNOR**
This Bill was received by the Governor this

_____ day of _____, 20____,

at _____ o'clock _____ M.

_____
Secretary to the Governor

Approved this _____ day of

_____, 20____,

at _____ o'clock _____ M.

_____
Governor of Arizona

**EXECUTIVE DEPARTMENT OF ARIZONA
OFFICE OF SECRETARY OF STATE**

This Bill was received by the Secretary of State

this _____ day of _____, 20____,

at _____ o'clock _____ M.

_____
Secretary of State

**S.B. 1070**
**Third Reading**

**SENATE CONCURS IN HOUSE
AMENDMENTS AND FINAL PASSAGE**

Passed the Senate _April 19_, 20 _10_

by the following vote: _17_ Ayes,

_11_ Nays, _2_ Not Voting

_Robert L. Burns_
President of the Senate

_Charmion Billington_
Secretary of the Senate

**EXECUTIVE DEPARTMENT OF ARIZONA
OFFICE OF GOVERNOR**

This Bill received by the Governor this

_19th_ day of _April_, 20 _10_

at _3:00_ o'clock _P._ M.

_Linda Rendle_
Secretary to the Governor

Approved this _23rd_ day of

_April_

at _1:36_ o'clock _P._ M.

_Janice K Brewer_
Governor of Arizona

**EXECUTIVE DEPARTMENT OF ARIZONA
OFFICE OF SECRETARY OF STATE**

This Bill received by the Secretary of State

this _____ day of _____, 20_____

at _____ o'clock _____M.

S.B.  1070

_____
Secretary of State

**EXHIBIT B**

Conference Engrossed

State of Arizona
House of Representatives
Forty-ninth Legislature
Second Regular Session
2010

# HOUSE BILL 2162

### AN ACT

AMENDING SECTIONS 1-501 AND 1-502, ARIZONA REVISED STATUTES; AMENDING SECTION 11-1051, ARIZONA REVISED STATUTES, AS ADDED BY SENATE BILL 1070, SECTION 2, FORTY-NINTH LEGISLATURE, SECOND REGULAR SESSION, AS TRANSMITTED TO THE GOVERNOR; AMENDING SECTION 13-1509, ARIZONA REVISED STATUTES, AS ADDED BY SENATE BILL 1070, SECTION 3, FORTY-NINTH LEGISLATURE, SECOND REGULAR SESSION, AS TRANSMITTED TO THE GOVERNOR; AMENDING SECTION 13-2928, ARIZONA REVISED STATUTES, AS ADDED BY SENATE BILL 1070, SECTION 5, FORTY-NINTH LEGISLATURE, SECOND REGULAR SESSION, AS TRANSMITTED TO THE GOVERNOR; AMENDING SECTION 13-2929, ARIZONA REVISED STATUTES, AS ADDED BY SENATE BILL 1070, SECTION 5, FORTY-NINTH LEGISLATURE, SECOND REGULAR SESSION, AS TRANSMITTED TO THE GOVERNOR; RELATING TO IMMIGRATION AND BORDER SECURITY; PROVIDING FOR CONDITIONAL ENACTMENT.

(TEXT OF BILL BEGINS ON NEXT PAGE)

H.B. 2162

1   Be it enacted by the Legislature of the State of Arizona:
2        Section 1.  Section 1-501, Arizona Revised Statutes, is amended to
3   read:
4        1-501.  Eligibility for federal public benefits; documentation;
5                violation; classification; citizen suits; attorney
6                fees; definition
7        A.  Notwithstanding any other state law and to the extent permitted by
8   federal law, any NATURAL person who applies for a federal public benefit that
9   is administered by this state or a political subdivision of this state and
10  that requires participants to be citizens of the United States, legal
11  residents of the United States or otherwise lawfully present in the United
12  States shall submit at least one of the following documents to the entity
13  that administers the federal public benefit demonstrating lawful presence in
14  the United States:
15       1.  An Arizona driver license issued after 1996 or an Arizona
16  nonoperating identification license.
17       2.  A birth certificate or delayed birth certificate issued in any
18  state, territory or possession of the United States.
19       3.  A United States certificate of birth abroad.
20       4.  A United States passport.
21       5.  A foreign passport with a United States visa.
22       6.  An I-94 form with a photograph.
23       7.  A United States citizenship and immigration services employment
24  authorization document or refugee travel document.
25       8.  A United States certificate of naturalization.
26       9.  A United States certificate of citizenship.
27       10.  A tribal certificate of Indian blood.
28       11.  A tribal or bureau of Indian affairs affidavit of birth.
29       B.  For the purposes of administering the Arizona health care cost
30  containment system, documentation of citizenship and legal residence shall
31  conform with the requirements of title XIX of the social security act.
32       C.  To the extent permitted by federal law, an agency of this state or
33  political subdivision of this state may allow tribal members, the elderly and
34  persons with disabilities or incapacity of the mind or body to provide
35  documentation as specified in section 6036 of the federal deficit reduction
36  act of 2005 (P.L. 109-171; 120 Stat. 81) and related federal guidance in lieu
37  of the documentation required by this section.
38       D.  Any person who applies for federal public benefits shall sign a
39  sworn affidavit stating that the documents presented pursuant to subsection A
40  OF THIS SECTION are true under penalty of perjury.
41       E.  Failure to report discovered violations of federal immigration law
42  by an employee of an agency of this state or a political subdivision of this
43  state that administers any federal public benefit is a class 2 misdemeanor.
44  If that employee's supervisor knew of the failure to report and failed to

H.B. 2162

1   direct the employee to make the report, the supervisor is guilty of a class 2
2   misdemeanor.
3       F.  This section shall be enforced without regard to race, color,
4   religion, sex, age, disability or national origin.
5       G.  Any person who is a resident of this state has standing in any
6   court of record to bring suit against any agent or agency of this state or
7   its political subdivisions to remedy any violation of any provision of this
8   section, including an action for mandamus.  Courts shall give preference to
9   actions brought under this section over other civil actions or proceedings
10  pending in the court.
11      H.  THE COURT MAY AWARD COURT COSTS AND REASONABLE ATTORNEY FEES TO ANY
12  PERSON OR ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR
13  OTHER POLITICAL SUBDIVISION OF THIS STATE THAT PREVAILS BY AN ADJUDICATION ON
14  THE MERITS IN A PROCEEDING BROUGHT PURSUANT TO THIS SECTION.
15      H.  I.  For the purposes of this section, "federal public benefit" has
16  the same meaning prescribed in 8 United States Code section 1611.
17      Sec. 2.  Section 1-502, Arizona Revised Statutes, is amended to read:
18      1-502.  Eligibility   for   state   or   local   public   benefits;
19              documentation;  violation;  classification;  citizen
20              suits; attorney fees; definition
21      A.  Notwithstanding any other state law and to the extent permitted by
22  federal law, any agency of this state or a political subdivision of this
23  state that administers any state or local public benefit shall require each
24  NATURAL person who applies for the state or local public benefit to submit at
25  least one of the following documents to the entity that administers the state
26  or local public benefit demonstrating lawful presence in the United States:
27      1.  An Arizona driver license issued after 1996 or an Arizona
28  nonoperating identification license.
29      2.  A birth certificate or delayed birth certificate issued in any
30  state, territory or possession of the United States.
31      3.  A United States certificate of birth abroad.
32      4.  A United States passport.
33      5.  A foreign passport with a United States visa.
34      6.  An I-94 form with a photograph.
35      7.  A United States citizenship and immigration services employment
36  authorization document or refugee travel document.
37      8.  A United States certificate of naturalization.
38      9.  A United States certificate of citizenship.
39      10.  A tribal certificate of Indian blood.
40      11.  A tribal or bureau of Indian affairs affidavit of birth.
41      B.  For the purposes of administering the Arizona health care cost
42  containment system, documentation of citizenship and legal residence shall
43  conform with the requirements of title XIX of the social security act.

- 2 -

H.B. 2162

1    C.  To the extent permitted by federal law, an agency of this state or
2  political subdivision of this state may allow tribal members, the elderly and
3  persons with disabilities or incapacity of the mind or body to provide
4  documentation as specified in section 6036 of the federal deficit reduction
5  act of 2005 (P.L. 109-171; 120 Stat. 81) and related federal guidance in lieu
6  of the documentation required by this section.
7    D.  Any person who applies for state or local public benefits shall
8  sign a sworn affidavit stating that the documents presented pursuant to
9  subsection A OF THIS SECTION are true under penalty of perjury.
10    E.  Failure to report discovered violations of federal immigration law
11  by an employee of an agency of this state or a political subdivision of this
12  state that administers any state or local public benefit is a class 2
13  misdemeanor. If that employee's supervisor knew of the failure to report and
14  failed to direct the employee to make the report, the supervisor is guilty of
15  a class 2 misdemeanor.
16    F.  This section shall be enforced without regard to race, color,
17  religion, sex, age, disability or national origin.
18    G.  Any person who is a resident of this state has standing in any
19  court of record to bring suit against any agent or agency of this state or
20  its political subdivisions to remedy any violation of any provision of this
21  section, including an action for mandamus. Courts shall give preference to
22  actions brought under this section over other civil actions or proceedings
23  pending in the court.
24    H.  THE COURT MAY AWARD COURT COSTS AND REASONABLE ATTORNEY FEES TO ANY
25  PERSON OR ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR
26  OTHER POLITICAL SUBDIVISION OF THIS STATE THAT PREVAILS BY AN ADJUDICATION ON
27  THE MERITS IN A PROCEEDING BROUGHT PURSUANT TO THIS SECTION.
28    H. I.  For the purposes of this section, "state or local public
29  benefit" has the same meaning prescribed in 8 United States Code section
30  1621, except that it does not include commercial or professional licenses, or
31  benefits provided by the public retirement systems and plans of this state OR
32  SERVICES WIDELY AVAILABLE TO THE GENERAL POPULATION AS A WHOLE.
33    Sec. 3.  Section 11-1051, Arizona Revised Statutes, as added by Senate
34  Bill 1070, section 2, forty-ninth legislature, second regular session, as
35  transmitted to the governor, is amended to read:
36    11-1051.  Cooperation and assistance in enforcement of
37        immigration laws; indemnification
38    A.  No official or agency of this state or a county, city, town or
39  other political subdivision of this state may limit or restrict the
40  enforcement of federal immigration laws to less than the full extent
41  permitted by federal law.
42    B.  For any lawful contact STOP, DETENTION OR ARREST made by a law
43  enforcement official or a law enforcement agency of this state or a law
44  enforcement official or a law enforcement agency of a county, city, town or
45  other political subdivision of this state IN THE ENFORCEMENT OF ANY OTHER LAW

- 3 -

H.B. 2162

1   OR ORDINANCE OF A COUNTY, CITY OR TOWN OR THIS STATE where reasonable
2   suspicion exists that the person is an alien who AND is unlawfully present in
3   the United States, a reasonable attempt shall be made, when practicable, to
4   determine the immigration status of the person, except if the determination
5   may hinder or obstruct an investigation.  Any person who is arrested shall
6   have the person's immigration status determined before the person is
7   released.  The person's immigration status shall be verified with the federal
8   government pursuant to 8 United States code section 1373(c).  A law
9   enforcement official or agency of this state or a county, city, town or other
10  political subdivision of this state may not solely consider race, color or
11  national origin in implementing the requirements of this subsection except to
12  the extent permitted by the United States or Arizona Constitution.  A person
13  is presumed to not be an alien who is unlawfully present in the United States
14  if the person provides to the law enforcement officer or agency any of the
15  following:
16          1.  A valid Arizona driver license.
17          2.  A valid Arizona nonoperating identification license.
18          3.  A valid tribal enrollment card or other form of tribal
19  identification.
20          4.  If the entity requires proof of legal presence in the United States
21  before issuance, any valid United States federal, state or local government
22  issued identification.
23          C.  If an alien who is unlawfully present in the United States is
24  convicted of a violation of state or local law, on discharge from
25  imprisonment or on the assessment of any monetary obligation that is imposed,
26  the United States immigration and customs enforcement or the United States
27  customs and border protection shall be immediately notified.
28          D.  Notwithstanding any other law, a law enforcement agency may
29  securely transport an alien who the agency has received verification is
30  unlawfully present in the united states and who is in the agency's custody to
31  a federal facility in this state or to any other point of transfer into
32  federal custody that is outside the jurisdiction of the law enforcement
33  agency.  A law enforcement agency shall obtain judicial authorization before
34  securely transporting an alien who is unlawfully present in the United States
35  to a point of transfer that is outside of this state.
36          E.  IN THE IMPLEMENTATION OF THIS SECTION, AN ALIEN'S IMMIGRATION
37  STATUS MAY BE DETERMINED BY:
38          1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL
39  GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.
40          2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED
41  STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION
42  1373(c).
43          E. F.  Except as provided in federal law, officials or agencies of
44  this state and counties, cities, towns and other political subdivisions of
45  this state may not be prohibited or in any way be restricted from sending,

- 4 -

H.B. 2162

1 receiving or maintaining information relating to the immigration status,
2 lawful or unlawful, of any individual or exchanging that information with any
3 other federal, state or local governmental entity for the following official
4 purposes:
5      1.   Determining eligibility for any public benefit, service or license
6 provided by any federal, state, local or other political subdivision of this
7 state.
8      2.   Verifying any claim of residence or domicile if determination of
9 residence or domicile is required under the laws of this state or a judicial
10 order issued pursuant to a civil or criminal proceeding in this state.
11      3.   If the person is an alien, determining whether the person is in
12 compliance with the federal registration laws prescribed by title II, chapter
13 7 of the federal immigration and Nationality act.
14      4.   Pursuant to 8 United States Code section 1373 and 8 United States
15 Code section 1644.
16      ~~F.~~ G. This section does not implement, authorize or establish and
17 shall not be construed to implement, authorize or establish the REAL ID act
18 of 2005 (P.L. 109-13, division B; 119 Stat. 302), including the use of a
19 radio frequency identification chip.
20      ~~G.~~ H. A person who is a legal resident of this state may bring an
21 action in superior court to challenge any official or agency of this state or
22 a county, city, town or other political subdivision of this state that adopts
23 or implements a policy ~~or practice~~ that limits or restricts the enforcement
24 of federal immigration laws, INCLUDING 8 UNITED STATES CODE SECTIONS 1373 AND
25 1644, to less than the full extent permitted by federal law. If there is a
26 judicial finding that an entity has violated this section, the court shall
27 order that the entity pay a civil penalty of not less than ~~one thousand~~ FIVE
28 HUNDRED dollars and not more than five thousand dollars for each day that the
29 policy has remained in effect after the filing of an action pursuant to this
30 subsection.
31      ~~H.~~ I. A court shall collect the civil penalty prescribed in
32 subsection ~~G~~ H of this section and remit the civil penalty to the state
33 treasurer for deposit in the gang and immigration intelligence team
34 enforcement mission fund established by section 41-1724.
35      ~~I.~~ J. The court may award court costs and reasonable attorney fees to
36 any person or any official or agency of this state or a county, city, town or
37 other political subdivision of this state that prevails by an adjudication on
38 the merits in a proceeding brought pursuant to this section.
39      ~~J.~~ K. Except in relation to matters in which the officer is adjudged
40 to have acted in bad faith, a law enforcement officer is indemnified by the
41 law enforcement officer's agency against reasonable costs and expenses,
42 including attorney fees, incurred by the officer in connection with any
43 action, suit or proceeding brought pursuant to this section in which the
44 officer may be a defendant by reason of the officer being or having been a
45 member of the law enforcement agency.

- 5 -

H.B. 2162

1    K̶.̶ L.  This section shall be implemented in a manner consistent with
2  federal laws regulating immigration, protecting the civil rights of all
3  persons and respecting the privileges and immunities of United States
4  citizens.
5       Sec. 4.  Section 13-1509, Arizona Revised Statutes, as added by Senate
6  Bill 1070, section 3, forty-ninth legislature, second regular session, as
7  transmitted to the governor, is amended to read:
8       13-1509.  <u>Willful failure to complete or carry an alien</u>
9            <u>registration document; assessment; exception;</u>
10           <u>authenticated records; classification</u>
11       A.  In addition to any violation of federal law, a person is guilty of
12  willful failure to complete or carry an alien registration document if the
13  person is in violation of 8 United States Code section 1304(e) or 1306(a).
14       B.  In the enforcement of this section, an alien's immigration status
15  may be determined by:
16       1.  A law enforcement officer who is authorized by the federal
17  government to verify or ascertain an alien's immigration status.
18       2.  The United States immigration and customs enforcement or the United
19  States customs and border protection pursuant to 8 United States Code section
20  1373(c).
21       C.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY,
22  CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER
23  RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO
24  THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.
25       C̶.̶ D.  A person who is sentenced pursuant to this section is not
26  eligible for suspension of sentence, probation, pardon, commutation of
27  sentence, or release from confinement on any basis except as authorized by
28  section 31-233, subsection A or B until the sentence imposed by the court has
29  been served or the person is eligible for release pursuant to section 41-
30  1604.07.
31       D̶.̶ E.  In addition to any other penalty prescribed by law, the court
32  shall order the person to pay jail costs. a̶n̶d̶ a̶n̶ a̶d̶d̶i̶t̶i̶o̶n̶a̶l̶ a̶s̶s̶e̶s̶s̶m̶e̶n̶t̶ i̶n̶
33  t̶h̶e̶ f̶o̶l̶l̶o̶w̶i̶n̶g̶ a̶m̶o̶u̶n̶t̶s̶:̶
34       1̶.̶ A̶t̶ l̶e̶a̶s̶t̶ f̶i̶v̶e̶ h̶u̶n̶d̶r̶e̶d̶ d̶o̶l̶l̶a̶r̶s̶ f̶o̶r̶ a̶ f̶i̶r̶s̶t̶ v̶i̶o̶l̶a̶t̶i̶o̶n̶.̶
35       2̶.̶ T̶w̶i̶c̶e̶ t̶h̶e̶ a̶m̶o̶u̶n̶t̶ s̶p̶e̶c̶i̶f̶i̶e̶d̶ i̶n̶ p̶a̶r̶a̶g̶r̶a̶p̶h̶ 1̶ o̶f̶ t̶h̶i̶s̶ s̶u̶b̶s̶e̶c̶t̶i̶o̶n̶ i̶f̶ t̶h̶e̶
36  p̶e̶r̶s̶o̶n̶ w̶a̶s̶ p̶r̶e̶v̶i̶o̶u̶s̶l̶y̶ s̶u̶b̶j̶e̶c̶t̶ t̶o̶ a̶n̶ a̶s̶s̶e̶s̶s̶m̶e̶n̶t̶ p̶u̶r̶s̶u̶a̶n̶t̶ t̶o̶ t̶h̶i̶s̶ s̶u̶b̶s̶e̶c̶t̶i̶o̶n̶.̶
37       E̶.̶ A̶ c̶o̶u̶r̶t̶ s̶h̶a̶l̶l̶ c̶o̶l̶l̶e̶c̶t̶ t̶h̶e̶ a̶s̶s̶e̶s̶s̶m̶e̶n̶t̶s̶ p̶r̶e̶s̶c̶r̶i̶b̶e̶d̶ i̶n̶ s̶u̶b̶s̶e̶c̶t̶i̶o̶n̶ D̶ o̶f̶
38  t̶h̶i̶s̶ s̶e̶c̶t̶i̶o̶n̶ a̶n̶d̶ r̶e̶m̶i̶t̶ t̶h̶e̶ a̶s̶s̶e̶s̶s̶m̶e̶n̶t̶s̶ t̶o̶ t̶h̶e̶ d̶e̶p̶a̶r̶t̶m̶e̶n̶t̶ o̶f̶ p̶u̶b̶l̶i̶c̶ s̶a̶f̶e̶t̶y̶,̶
39  w̶h̶i̶c̶h̶ s̶h̶a̶l̶l̶ e̶s̶t̶a̶b̶l̶i̶s̶h̶ a̶ s̶p̶e̶c̶i̶a̶l̶ s̶u̶b̶a̶c̶c̶o̶u̶n̶t̶ f̶o̶r̶ t̶h̶e̶ m̶o̶n̶i̶e̶s̶ i̶n̶ t̶h̶e̶ a̶c̶c̶o̶u̶n̶t̶
40  e̶s̶t̶a̶b̶l̶i̶s̶h̶e̶d̶ f̶o̶r̶ t̶h̶e̶ g̶a̶n̶g̶ a̶n̶d̶ i̶m̶m̶i̶g̶r̶a̶t̶i̶o̶n̶ i̶n̶t̶e̶l̶l̶i̶g̶e̶n̶c̶e̶ t̶e̶a̶m̶ e̶n̶f̶o̶r̶c̶e̶m̶e̶n̶t̶
41  m̶i̶s̶s̶i̶o̶n̶ a̶p̶p̶r̶o̶p̶r̶i̶a̶t̶i̶o̶n̶.̶ M̶o̶n̶i̶e̶s̶ i̶n̶ t̶h̶e̶ s̶p̶e̶c̶i̶a̶l̶ s̶u̶b̶a̶c̶c̶o̶u̶n̶t̶ a̶r̶e̶ s̶u̶b̶j̶e̶c̶t̶ t̶o̶
42  l̶e̶g̶i̶s̶l̶a̶t̶i̶v̶e̶ a̶p̶p̶r̶o̶p̶r̶i̶a̶t̶i̶o̶n̶ f̶o̶r̶ d̶i̶s̶t̶r̶i̶b̶u̶t̶i̶o̶n̶ f̶o̶r̶ g̶a̶n̶g̶ a̶n̶d̶ i̶m̶m̶i̶g̶r̶a̶t̶i̶o̶n̶
43  e̶n̶f̶o̶r̶c̶e̶m̶e̶n̶t̶ a̶n̶d̶ f̶o̶r̶ c̶o̶u̶n̶t̶y̶ j̶a̶i̶l̶ r̶e̶i̶m̶b̶u̶r̶s̶e̶m̶e̶n̶t̶ c̶o̶s̶t̶s̶ r̶e̶l̶a̶t̶i̶n̶g̶ t̶o̶ i̶l̶l̶e̶g̶a̶l̶
44  i̶m̶m̶i̶g̶r̶a̶t̶i̶o̶n̶.̶

- 6 -

H.B. 2162

1      F.  This section does not apply to a person who maintains authorization
2  from the federal government to remain in the United States.
3      G.  Any record that relates to the immigration status of a person is
4  admissible in any court without further foundation or testimony from a
5  custodian of records if the record is certified as authentic by the
6  government agency that is responsible for maintaining the record.
7      H.  A violation of this section is a class 1 misdemeanor, except that
8  THE MAXIMUM FINE IS ONE HUNDRED DOLLARS AND FOR a FIRST violation of this
9  section ~~is:~~ THE COURT SHALL NOT SENTENCE THE PERSON TO MORE THAN TWENTY DAYS
10 IN JAIL AND FOR A SECOND OR SUBSEQUENT VIOLATION THE COURT SHALL NOT SENTENCE
11 THE PERSON TO MORE THAN THIRTY DAYS IN JAIL.
12     ~~1.  A class 3 felony if the person violates this section while in~~
13 ~~possession of any of the following:~~
14     ~~(a)  A dangerous drug as defined in section 13-3401.~~
15     ~~(b)  Precursor chemicals that are used in the manufacturing of~~
16 ~~methamphetamine in violation of section 13-3404.01.~~
17     ~~(c)  A deadly weapon or a dangerous instrument, as defined in section~~
18 ~~13-105.~~
19     ~~(d)  Property that is used for the purpose of committing an act of~~
20 ~~terrorism as prescribed in section 13-2308.01.~~
21     ~~2.  A class 4 felony if the person either:~~
22     ~~(a)  Is convicted of a second or subsequent violation of this section.~~
23     ~~(b)  Within sixty months before the violation, has been removed from~~
24 ~~the United States pursuant to 8 United States Code section 1229a or has~~
25 ~~accepted a voluntary removal from the United States pursuant to 8 United~~
26 ~~States Code section 1229c.~~
27     Sec. 5.  Section 13-2928, Arizona Revised Statutes, as added by Senate
28 Bill 1070, section 5, forty-ninth legislature, second regular session, as
29 transmitted to the governor, is amended to read:
30     13-2928.  <u>Unlawful stopping to hire and pick up passengers for</u>
31                 <u>work;  unlawful  application,  solicitation  or</u>
32                  <u>employment; classification; definitions</u>
33     A.  It is unlawful for an occupant of a motor vehicle that is stopped
34 on a street, roadway or highway to attempt to hire or hire and pick up
35 passengers for work at a different location if the motor vehicle blocks or
36 impedes the normal movement of traffic.
37     B.  It is unlawful for a person to enter a motor vehicle that is
38 stopped on a street, roadway or highway in order to be hired by an occupant
39 of the motor vehicle and to be transported to work at a different location if
40 the motor vehicle blocks or impedes the normal movement of traffic.
41     C.  It is unlawful for a person who is unlawfully present in the United
42 States and who is an unauthorized alien to knowingly apply for work, solicit
43 work in a public place or perform work as an employee or independent
44 contractor in this state.

- 7 -

H.B. 2162

D.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.

E.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS MAY BE DETERMINED BY:

1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.

2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).

D. F.  A violation of this section is a class 1 misdemeanor.

E. G.  For the purposes of this section:

1.  "Solicit" means verbal or nonverbal communication by a gesture or a nod that would indicate to a reasonable person that a person is willing to be employed.

2.  "Unauthorized alien" means an alien who does not have the legal right or authorization under federal law to work in the United States as described in 8 United States Code section 1324a(h)(3).

Sec. 6.  Section 13-2929, Arizona Revised Statutes, as added by Senate Bill 1070, section 5, forty-ninth legislature, second regular session, as transmitted to the governor, is amended to read:

13-2929.  Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens; vehicle impoundment; exception; classification

A.  It is unlawful for a person who is in violation of a criminal offense to:

1.  Transport or move or attempt to transport or move an alien in this state, in furtherance of the illegal presence of the alien in the United States, in a means of transportation if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.

2.  Conceal, harbor or shield or attempt to conceal, harbor or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.

3.  Encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such coming to, entering or residing in this state is or will be in violation of law.

B.  A means of transportation that is used in the commission of a violation of this section is subject to mandatory vehicle immobilization or impoundment pursuant to section 28-3511.

H.B. 2162

1      C.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY,
2 CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER
3 RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO
4 THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.
5      D.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS
6 MAY BE DETERMINED BY:
7      1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL
8 GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.
9      2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED
10 STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION
11 1373(c).
12      ~~C.~~ E.  This section does not apply to a child protective services
13 worker acting in the worker's official capacity or a person who is acting in
14 the capacity of a first responder, an ambulance attendant or an emergency
15 medical technician and who is transporting or moving an alien in this state
16 pursuant to title 36, chapter 21.1.
17      ~~D.~~ F.  A person who violates this section is guilty of a class 1
18 misdemeanor and is subject to a fine of at least one thousand dollars, except
19 that a violation of this section that involves ten or more illegal aliens is
20 a class 6 felony and the person is subject to a fine of at least one thousand
21 dollars for each alien who is involved.
22      Sec. 7.  <u>Joint border security advisory committee; membership;</u>
23               <u>duties; report; delayed repeal</u>
24      A.  The joint border security advisory committee is established
25 consisting of the following members:
26      1.  The president of the senate or the president's designee.
27      2.  The speaker of the house of representatives or the speaker's
28 designee.
29      3.  Two members of the house of representatives who are appointed by
30 the speaker of the house of representatives.
31      4.  Two members of the senate who are appointed by the president of the
32 senate.
33      5.  Six members who are appointed by the governor.
34      B.  Committee members are not eligible to receive compensation for
35 committee activities but may be eligible for reimbursement of expenses
36 pursuant to title 38, chapter 4, article 2, Arizona Revised Statutes.
37      C.  The president and the speaker of the house of representatives shall
38 each appoint a cochairperson of the committee.
39      D.  The commission shall meet on the call of the two cochairpersons,
40 but no more frequently than monthly.
41      E.  The committee may:
42      1.  Take testimony and other evidence regarding the international
43 border with Mexico.
44      2.  Analyze border crossing statistics.
45      3.  Analyze related crime statistics.

H.B. 2162

1      4.  Make recommendations designed to increase border security.
2      5.  Make other recommendations deemed essential by the committee.
3      F.  The committee may use the services of legislative staff as
4  required.
5      G.  Beginning November 30, 2010 and each month thereafter, the
6  commission shall submit a written report of its findings and recommendations
7  to the speaker of the house of representatives, the president of the senate
8  and the governor.  The commission shall provide a copy of the report to the
9  secretary of state.
10     H.  Notwithstanding any law to the contrary, the committee may vote to
11 go into executive session to take testimony or evidence it considers
12 sensitive or confidential in nature, which if released could compromise the
13 security or safety of law enforcement or military personnel or a law
14 enforcement or national guard law enforcement support operation.
15     I.  This section is repealed from and after December 31, 2014.
16     Sec. 8.  Immigration legislation challenges
17     A.  Notwithstanding title 41, chapter 1, Arizona Revised Statutes, and
18 any other law, through December 31, 2010, the attorney general shall act at
19 the direction of the governor in any challenge in a state or federal court to
20 Laws 2010, chapter 113 and any amendments to that law.
21     B.  Notwithstanding title 41, chapter 1, Arizona Revised Statutes, and
22 any other law, through December 31, 2010, the governor may direct counsel
23 other than the attorney general to appear on behalf of this state to defend
24 any challenge to Laws 2010, chapter 113 and any amendments to that law.
25     Sec. 9.  Conditional enactment
26     Sections 11-1051, 13-1509, 13-2928 and 13-2929, Arizona Revised
27 Statutes, as amended by this act, do not become effective unless Senate Bill
28 1070, forty-ninth legislature, second regular session, relating to unlawfully
29 present aliens, becomes law.

- 10 -

Passed the House _March 17_, 20_10_      Passed the Senate _April 26_, 20_10_

by the following vote: ___38___ Ayes,      by the following vote: ___18___ Ayes,

_17_ Nays, ___5___ Not Voting           _11_ Nays, ___1___ Not Voting

_____             _____
Speaker of the House                    President of the Senate

_____             _____
Chief Clerk of the House                Secretary of the Senate

**EXECUTIVE DEPARTMENT OF ARIZONA**
**OFFICE OF GOVERNOR**

This Bill received by the Governor this

_____ day of _____, 20_____

at _____ o'clock _____ M.

_____
Secretary to the Governor

Approved this _____ day of

_____

at _____ o'clock _____ M.

_____
Governor of Arizona

**EXECUTIVE DEPARTMENT OF ARIZONA**
**OFFICE OF SECRETARY OF STATE**

This Bill received by the Secretary of State

this _____ day of _____, 20_____

H.B. 2162

at _____ o'clock _____ M.

_____
Secretary of State

**HOUSE FINAL PASSAGE**
as per Joint Conference

Passed the House _April 29_ , 20 _10_

by the following vote: _33_ Ayes,

_22_ Nays, _5_ Not Voting

_____
Speaker of the House

_____
Chief Clerk of the House

**SENATE FINAL PASSAGE**
as per Joint Conference

Passed the Senate _April 29_ , 20 _10_

by the following vote: _16_ Ayes,

_11_ Nays, _3_ Not Voting

_____
President of the Senate

_____
Secretary of the Senate

**EXECUTIVE DEPARTMENT OF ARIZONA**
**OFFICE OF GOVERNOR**

This Bill received by the Governor this

_30_ day of _April_ , 20 _10_

at _9:10_ o'clock _A._ M.

_____
Secretary to the Governor

Approved this _30th_ day of

_April_

at _3:00_ o'clock _P._ M.

_____
Governor of Arizona

**EXECUTIVE DEPARTMENT OF ARIZONA**
**OFFICE OF SECRETARY OF STATE**

This Bill received by the Secretary of State

this _____ day of _____, 20_____

at _____ o'clock _____M.

_____
Secretary of State

H.B. 2162

# EXHIBIT C

**From:** Kobach, Kris W.
**To:** russellpearce : rpearce@azleg.gov
**Sent:** Wednesday, April 28, 2010 7:42 PM
**Subject:** One more change!

Russell,

I discussed all of the changes with Mike Hethmon and he concurred.  But there is one additional point that he suggested--which you will certainly agree with.  When we drop out "lawful contact" and replace it with "a stop, detention, or rest, in the enforcement a violation of any title or section of the Arizona code" we need to add "or any county or municipal ordinance."   This will allow police to use violations of property codes (ie, cars on blocks in the yard) or rental codes (too many occupants of a rental accommodation) to initiate queries as well.

I have not received anything from the people on the phone this afternoon.  Please ensure that they make this addition as well.  Thanks!

Kris

**EXHIBIT D**

# The Washington Times

## KOBACH: Arizona acts as Washington dithers

By

Wednesday, April 28, 2010



On April 23, Arizona Gov. Jan Brewer signed into law S.B. 1070, sponsored by state Sen. Russell Pearce. The law makes it a state crime for an alien to commit certain federal immigration violations while in Arizona. However, based on the hyperventilating reaction of the open-borders left, one would think Arizona had constructed a police state.

Protesters took to the streets in Arizona displaying Mexican flags, chanting "Si se puede" and carrying signs saying, "Legalize Arizona." Media hound Al Sharpton declared that he would organize "freedom walkers" to challenge the law. Not wanting to miss a chance to play to his liberal base, even President Obama got into the action. He called the Arizona law "misguided" and said that it threatens to "undermine basic notions of fairness that we cherish as Americans."

Mr. Obama's reaction was true to form. Just as with the Cambridge, Mass., arrest fiasco last year, he rushed to the microphone without knowing the facts in order to stir up and capitalize on accusations of racial profiling.

However, far from inviting racial profiling, the Arizona law actually makes racial profiling less likely. But that doesn't fit the story the left would like to tell. There are numerous inaccuracies in what critics of the law are saying, the most prominent of which are the following.

**Myth No. 1:** The law requires aliens to carry identification that they weren't already required to carry. On the contrary, the law simply penalizes aliens who fail to carry the registration documents that federal law already requires them to keep on their person. These federal crimes (8 United States Code Section 1304(a) or 1306(e)) have been around since 1940. The Arizona law simply adds a layer of state penalty to what already was a crime under federal law.

Ironically, the open-borders crowd has for years insisted that we use the term "undocumented" when referring to illegal aliens. Now, when a state takes seriously the documentation requirements of federal law, that crowd becomes apoplectic.

As for U.S. citizens, the law does not require them to carry any identification whatsoever. Indeed, the law cannot possibly be applied against U.S. citizens; only an alien can be found guilty under the Arizona statute.

**Myth No. 2:** The law will encourage racial profiling. The terms of the act make clear that such profiling cannot occur. Section 2 provides that a law enforcement official "may not solely consider race, color, or national origin" in making any stops or determining an alien's immigration status. In addition, all of the normal Fourth Amendment protections against racial profiling still apply.

Moreover, the law actually reduces the likelihood of racial profiling by forcing police officers to contact the federal government to verify a person's immigration status when they suspect a person is an illegal

alien. It already was permissible for police officers across the country to make arrests for violations of federal immigration law where reasonable suspicion existed that a violation had occurred. Now, in Arizona, officers will have to make a phone call to Immigration and Customs Enforcement's (ICE) 24/7 hot line to confirm that any aliens in their custody really are present unlawfully. Officers can no longer proceed based solely on their own assessment of a person's immigration status. In this way, the Arizona law takes any consideration of race out of the equation - strengthening the protections against racial profiling.

**Myth No. 3:** The law will require Arizona police officers to stop and question people. Here again, critics of the law are failing to read it carefully. The law only kicks in when a police officer already has made a "lawful contact" with a person, such as stopping him for breaking another law. The most likely contact is during the issuance of a speeding ticket. The law does not require the officer to begin questioning a person about his immigration status or to do anything the officer would not otherwise do.

Only after a stop is made, and subsequently the officer develops reasonable suspicion on his own that an immigration law has been violated, is any obligation imposed. At that point, the officer is required to call ICE to confirm whether the person is an illegal alien. Are critics seriously suggesting that local law enforcement officers should ignore the violations of federal law that they see at that point?

In sum, the law doesn't make any radical changes. Rather, it is a reasonable step that gives Arizona police officers another tool in their toolbox when they come into contact with illegal aliens during their normal law enforcement duties. It also prohibits Arizona cities from implementing sanctuary policies that prevent their officers from contacting ICE.

Arizona police officers need the tool that S.B. 1070 provides. Arizona is at ground zero with respect to illegal immigration and its criminal consequences. Arizona has witnessed hundreds of violent crimes committed by illegal aliens. Most recently, the brutal murder of rancher Robert Krentz on his own property by a suspected illegal alien shocked all Americans. Phoenix is now the kidnapping capital of North America and the hub of human smuggling into the United States. Three Phoenix police officers have been shot by illegal aliens since 1999.

Arizona is in a state of crisis. No wonder 70 percent of Arizonans support S.B. 1070, with rank-and-file police associations voicing their approval as well. Meanwhile, Mr. Obama accuses Arizonans of having racist motivations and declares his intention to push for an amnesty - which would only trigger an even larger flood of illegal immigration.

Will Mr. Obama recognize his mistake and hold a beer summit this time to atone for his rash accusations? I'm not holding my breath.

*Kris W. Kobach is professor of law at the University of Missouri at Kansas City. He was Attorney General John Ashcroft's chief adviser on immigration law and border security and was one of the principal drafters of Arizona S.B. 1070.*

**Ads by Google**     Law Enforcement     Phoenix Arizona AZ     Arizona Map     UK Immigration Law     Arizona Family Law

**EXHIBIT E**



Arizona State Legislature

Bill Number Search:

Forty-ninth Legislature - Second Regular Session

Email a Member | Email Webmaster

change session | printer friendly version

Senate    House    Legislative Council    JLBC    More Agencies    Bills    Committees    Calendars/News

House Engrossed Senate Bill

State of Arizona
Senate
Forty-ninth Legislature
Second Regular Session
2010

# SENATE BILL 1070 Engrossed with House Bill 2162

## AN ACT

AMENDING TITLE 11, CHAPTER 7, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 8; AMENDING TITLE 13, CHAPTER 15, ARIZONA REVISED STATUTES, BY ADDING SECTION 13-1509; AMENDING SECTION 13-2319, ARIZONA REVISED STATUTES; AMENDING TITLE 13, CHAPTER 29, ARIZONA REVISED STATUTES, BY ADDING SECTIONS 13-2928 AND 13-2929; AMENDING SECTIONS 13-3883, 23-212, 23-212.01, 23-214 AND 28-3511, ARIZONA REVISED STATUTES; AMENDING TITLE 41, CHAPTER 12, ARTICLE 2, ARIZONA REVISED STATUTES, BY ADDING SECTION 41-1724; RELATING TO UNLAWFULLY PRESENT ALIENS.

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1. Intent

The legislature finds that there is a compelling interest in the cooperative enforcement of federal immigration laws throughout all of Arizona. The legislature declares that the intent of this act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona. The provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.

Sec. 2. Title 11, chapter 7, Arizona Revised Statutes, is amended by adding article 8, to read:

ARTICLE 8. ENFORCEMENT OF IMMIGRATION LAWS

11-1051. Cooperation and assistance in enforcement of immigration laws; indemnification

A.   NO OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY LIMIT OR RESTRICT THE ENFORCEMENT OF FEDERAL IMMIGRATION LAWS TO LESS THAN THE FULL EXTENT PERMITTED BY FEDERAL LAW.

B.   FOR ANY LAWFUL STOP, DETENTION OR ARREST MADE BY A LAW ENFORCEMENT OFFICIAL OR A LAW ENFORCEMENT AGENCY OF THIS STATE OR A LAW ENFORCEMENT OFFICIAL OR A LAW ENFORCEMENT AGENCY OF A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE IN THE ENFORCEMENT OF ANY OTHER LAW OR ORDINANCE OF A COUNTY, CITY OR TOWN OR THIS STATE WHERE REASONABLE SUSPICION EXISTS THAT THE PERSON IS AN ALIEN AND IS UNLAWFULLY PRESENT IN THE UNITED STATES, A REASONABLE ATTEMPT SHALL BE MADE, WHEN PRACTICABLE, TO DETERMINE THE IMMIGRATION STATUS OF THE PERSON, EXCEPT IF THE DETERMINATION MAY HINDER OR OBSTRUCT AN INVESTIGATION. ANY PERSON WHO IS ARRESTED SHALL HAVE THE PERSON'S IMMIGRATION STATUS DETERMINED BEFORE THE PERSON IS RELEASED.   THE PERSON'S IMMIGRATION STATUS SHALL BE VERIFIED WITH THE FEDERAL GOVERNMENT PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c). A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN IMPLEMENTING THE REQUIREMENTS OF THIS SUBSECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION. A PERSON IS PRESUMED TO NOT BE AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES IF THE PERSON PROVIDES TO THE LAW ENFORCEMENT OFFICER OR AGENCY ANY OF THE FOLLOWING:

1.   A VALID ARIZONA DRIVER LICENSE.

2.   A VALID ARIZONA NONOPERATING IDENTIFICATION LICENSE.

3.   A VALID TRIBAL ENROLLMENT CARD OR OTHER FORM OF TRIBAL IDENTIFICATION.

4.   IF THE ENTITY REQUIRES PROOF OF LEGAL PRESENCE IN THE UNITED STATES BEFORE ISSUANCE, ANY VALID UNITED STATES FEDERAL, STATE OR LOCAL GOVERNMENT ISSUED IDENTIFICATION.

C.   IF AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES IS CONVICTED OF A VIOLATION OF STATE OR LOCAL LAW, ON DISCHARGE FROM IMPRISONMENT OR ON THE ASSESSMENT OF ANY MONETARY OBLIGATION THAT IS IMPOSED, THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION SHALL BE IMMEDIATELY NOTIFIED.

D.   NOTWITHSTANDING ANY OTHER LAW, A LAW ENFORCEMENT AGENCY MAY SECURELY TRANSPORT AN ALIEN WHO THE AGENCY HAS RECEIVED VERIFICATION IS UNLAWFULLY PRESENT IN THE UNITED STATES AND WHO IS IN THE AGENCY'S CUSTODY TO A FEDERAL FACILITY IN THIS STATE OR TO ANY OTHER POINT OF TRANSFER INTO FEDERAL CUSTODY THAT IS OUTSIDE THE JURISDICTION OF THE LAW ENFORCEMENT AGENCY.   A LAW ENFORCEMENT AGENCY SHALL OBTAIN JUDICIAL AUTHORIZATION BEFORE SECURELY TRANSPORTING AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES TO A POINT OF TRANSFER THAT IS OUTSIDE OF THIS STATE.

E.   IN THE IMPLEMENTATION OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS MAY BE DETERMINED BY:

1.   A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.

2.   THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).

F.   EXCEPT AS PROVIDED IN FEDERAL LAW, OFFICIALS OR AGENCIES OF THIS STATE AND COUNTIES, CITIES, TOWNS AND OTHER POLITICAL SUBDIVISIONS OF THIS STATE MAY NOT BE PROHIBITED OR IN ANY WAY BE RESTRICTED FROM SENDING, RECEIVING OR MAINTAINING INFORMATION RELATING TO THE IMMIGRATION STATUS, LAWFUL OR UNLAWFUL, OF ANY INDIVIDUAL OR EXCHANGING THAT INFORMATION WITH ANY OTHER FEDERAL, STATE OR LOCAL GOVERNMENTAL ENTITY FOR THE FOLLOWING OFFICIAL PURPOSES:

1.   DETERMINING ELIGIBILITY FOR ANY PUBLIC BENEFIT, SERVICE OR LICENSE PROVIDED BY ANY FEDERAL, STATE, LOCAL OR OTHER POLITICAL SUBDIVISION OF THIS STATE.

2.   VERIFYING ANY CLAIM OF RESIDENCE OR DOMICILE IF DETERMINATION OF RESIDENCE OR DOMICILE IS REQUIRED UNDER THE LAWS OF THIS STATE OR A JUDICIAL ORDER ISSUED PURSUANT TO A CIVIL OR CRIMINAL PROCEEDING IN THIS STATE.

3.   IF THE PERSON IS AN ALIEN, DETERMINING WHETHER THE PERSON IS IN COMPLIANCE WITH THE FEDERAL REGISTRATION LAWS PRESCRIBED BY TITLE II, CHAPTER 7 OF THE FEDERAL IMMIGRATION AND NATIONALITY ACT.

4.   PURSUANT TO 8 UNITED STATES CODE SECTION 1373 AND 8 UNITED STATES CODE SECTION 1644.

G.   THIS SECTION DOES NOT IMPLEMENT, AUTHORIZE OR ESTABLISH AND SHALL NOT BE CONSTRUED TO IMPLEMENT, AUTHORIZE OR ESTABLISH THE REAL ID ACT OF 2005 (P.L. 109-13, DIVISION B; 119 STAT. 302), INCLUDING THE USE OF A RADIO FREQUENCY IDENTIFICATION CHIP.

H.   A PERSON WHO IS A LEGAL RESIDENT OF THIS STATE MAY BRING AN ACTION IN SUPERIOR COURT TO CHALLENGE ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE THAT ADOPTS OR IMPLEMENTS A POLICY THAT LIMITS OR RESTRICTS THE

ENFORCEMENT OF FEDERAL IMMIGRATION LAWS, INCLUDING 8 UNITED STATES CODE SECTIONS 1373 AND 1644, TO LESS THAN THE FULL EXTENT PERMITTED BY FEDERAL LAW.  IF THERE IS A JUDICIAL FINDING THAT AN ENTITY HAS VIOLATED THIS SECTION, THE COURT SHALL ORDER THAT THE ENTITY PAY A CIVIL PENALTY OF NOT LESS THAN FIVE HUNDRED DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS FOR EACH DAY THAT THE POLICY HAS REMAINED IN EFFECT AFTER THE FILING OF AN ACTION PURSUANT TO THIS SUBSECTION.

I.  A COURT SHALL COLLECT THE CIVIL PENALTY PRESCRIBED IN SUBSECTION H OF THIS SECTION AND REMIT THE CIVIL PENALTY TO THE STATE TREASURER FOR DEPOSIT IN THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND ESTABLISHED BY SECTION 41-1724.

J.  THE COURT MAY AWARD COURT COSTS AND REASONABLE ATTORNEY FEES TO ANY PERSON OR ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE THAT PREVAILS BY AN ADJUDICATION ON THE MERITS IN A PROCEEDING BROUGHT PURSUANT TO THIS SECTION.

K.  EXCEPT IN RELATION TO MATTERS IN WHICH THE OFFICER IS ADJUDGED TO HAVE ACTED IN BAD FAITH, A LAW ENFORCEMENT OFFICER IS INDEMNIFIED BY THE LAW ENFORCEMENT OFFICER'S AGENCY AGAINST REASONABLE COSTS AND EXPENSES, INCLUDING ATTORNEY FEES, INCURRED BY THE OFFICER IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING BROUGHT PURSUANT TO THIS SECTION IN WHICH THE OFFICER MAY BE A DEFENDANT BY REASON OF THE OFFICER BEING OR HAVING BEEN A MEMBER OF THE LAW ENFORCEMENT AGENCY.

L.  THIS SECTION SHALL BE IMPLEMENTED IN A MANNER CONSISTENT WITH FEDERAL LAWS REGULATING IMMIGRATION, PROTECTING THE CIVIL RIGHTS OF ALL PERSONS AND RESPECTING THE PRIVILEGES AND IMMUNITIES OF UNITED STATES CITIZENS.

Sec. 3. Title 13, chapter 15, Arizona Revised Statutes, is amended by adding section 13-1509, to read:

13-1509.  Willful failure to complete or carry an alien registration document; assessment; exception; authenticated records; classification

A.  IN ADDITION TO ANY VIOLATION OF FEDERAL LAW, A PERSON IS GUILTY OF WILLFUL FAILURE TO COMPLETE OR CARRY AN ALIEN REGISTRATION DOCUMENT IF THE PERSON IS IN VIOLATION OF 8 UNITED STATES CODE SECTION 1304(e) OR 1306(a).

B.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS MAY BE DETERMINED BY:

1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.

2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).

C.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.

D.  A PERSON WHO IS SENTENCED PURSUANT TO THIS SECTION IS NOT ELIGIBLE FOR SUSPENSION OF SENTENCE, PROBATION, PARDON, COMMUTATION OF SENTENCE, OR RELEASE FROM CONFINEMENT ON ANY BASIS EXCEPT AS AUTHORIZED BY SECTION 31-233, SUBSECTION A OR B UNTIL THE SENTENCE IMPOSED BY THE COURT HAS BEEN SERVED OR THE PERSON IS ELIGIBLE FOR RELEASE PURSUANT TO SECTION 41-1604.07.

E.  IN ADDITION TO ANY OTHER PENALTY PRESCRIBED BY LAW, THE COURT SHALL ORDER THE PERSON TO PAY JAIL COSTS.

F.  THIS SECTION DOES NOT APPLY TO A PERSON WHO MAINTAINS AUTHORIZATION FROM THE FEDERAL GOVERNMENT TO REMAIN IN THE UNITED STATES.

G.  ANY RECORD THAT RELATES TO THE IMMIGRATION STATUS OF A PERSON IS ADMISSIBLE IN ANY COURT WITHOUT FURTHER FOUNDATION OR TESTIMONY FROM A CUSTODIAN OF RECORDS IF THE RECORD IS CERTIFIED AS AUTHENTIC BY THE GOVERNMENT AGENCY THAT IS RESPONSIBLE FOR MAINTAINING THE RECORD.

H.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR, EXCEPT THAT THE MAXIMUM FINE IS ONE HUNDRED DOLLARS AND FOR A FIRST VIOLATION OF THIS SECTION THE COURT SHALL NOT SENTENCE THE PERSON TO MORE THAN TWENTY DAYS IN JAIL AND FOR A SECOND OR SUBSEQUENT VIOLATION THE COURT SHALL NOT SENTENCE THE PERSON TO MORE THAN THIRTY DAYS IN JAIL.

Sec. 4. Section 13-2319, Arizona Revised Statutes, is amended to read:

13-2319.  Smuggling; classification; definitions

A.  It is unlawful for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose.

B.  A violation of this section is a class 4 felony.

C.  Notwithstanding subsection B of this section, a violation of this section:

1.  Is a class 2 felony if the human being who is smuggled is under eighteen years of age and is not accompanied by a family member over eighteen years of age or the offense involved the use of a deadly weapon or dangerous instrument.

2.  Is a class 3 felony if the offense involves the use or threatened use of deadly physical force and the person is not eligible for suspension of sentence, probation, pardon or release from confinement on any other basis except pursuant to section 31-233, subsection A or B until the sentence imposed by the court is served, the person is eligible for release pursuant to section 41-1604.07 or the sentence is commuted.

D.  Chapter 10 of this title does not apply to a violation of subsection C, paragraph 1 of this section.

E.  NOTWITHSTANDING ANY OTHER LAW, IN THE ENFORCEMENT OF THIS SECTION A PEACE OFFICER MAY LAWFULLY STOP ANY PERSON WHO IS OPERATING A MOTOR VEHICLE IF THE OFFICER HAS REASONABLE SUSPICION TO BELIEVE THE PERSON IS IN VIOLATION OF ANY CIVIL TRAFFIC LAW.

E. F.  For the purposes of this section:

1.  "Family member" means the person's parent, grandparent, sibling or any other person who is related to the person by consanguinity or affinity to the second degree.

2.  "Procurement of transportation" means any participation in or facilitation of transportation and includes:

(a)  Providing services that facilitate transportation including travel arrangement services or money transmission services.

(b)  Providing property that facilitates transportation, including a weapon, a vehicle or other means of transportation or

false identification, or selling, leasing, renting or otherwise making available a drop house as defined in section 13-2322.

3.  "Smuggling of human beings" means the transportation, procurement of transportation or use of property or real property by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or have attempted to enter, entered or remained in the United States in violation of law.

Sec. 5. Title 13, chapter 29, Arizona Revised Statutes, is amended by adding sections 13-2928 and 13-2929, to read:

13-2928.  Unlawful stopping to hire and pick up passengers for work; unlawful application, solicitation or employment; classification; definitions

A.  IT IS UNLAWFUL FOR AN OCCUPANT OF A MOTOR VEHICLE THAT IS STOPPED ON A STREET, ROADWAY OR HIGHWAY TO ATTEMPT TO HIRE OR HIRE AND PICK UP PASSENGERS FOR WORK AT A DIFFERENT LOCATION IF THE MOTOR VEHICLE BLOCKS OR IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.

B.  IT IS UNLAWFUL FOR A PERSON TO ENTER A MOTOR VEHICLE THAT IS STOPPED ON A STREET, ROADWAY OR HIGHWAY IN ORDER TO BE HIRED BY AN OCCUPANT OF THE MOTOR VEHICLE AND TO BE TRANSPORTED TO WORK AT A DIFFERENT LOCATION IF THE MOTOR VEHICLE BLOCKS OR IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.

C.  IT IS UNLAWFUL FOR A PERSON WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES AND WHO IS AN UNAUTHORIZED ALIEN TO KNOWINGLY APPLY FOR WORK, SOLICIT WORK IN A PUBLIC PLACE OR PERFORM WORK AS AN EMPLOYEE OR INDEPENDENT CONTRACTOR IN THIS STATE.

D.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.

E.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS MAY BE DETERMINED BY:

1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.

2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).

F.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR.

G.  FOR THE PURPOSES OF THIS SECTION:

1.  "SOLICIT" MEANS VERBAL OR NONVERBAL COMMUNICATION BY A GESTURE OR A NOD THAT WOULD INDICATE TO A REASONABLE PERSON THAT A PERSON IS WILLING TO BE EMPLOYED.

2.  "UNAUTHORIZED ALIEN" MEANS AN ALIEN WHO DOES NOT HAVE THE LEGAL RIGHT OR AUTHORIZATION UNDER FEDERAL LAW TO WORK IN THE UNITED STATES AS DESCRIBED IN 8 UNITED STATES CODE SECTION 1324a(h)(3).

13-2929.  Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens; vehicle impoundment; exception; classification

A.  IT IS UNLAWFUL FOR A PERSON WHO IS IN VIOLATION OF A CRIMINAL OFFENSE TO:

1.  TRANSPORT OR MOVE OR ATTEMPT TO TRANSPORT OR MOVE AN ALIEN IN THIS STATE, IN FURTHERANCE OF THE ILLEGAL PRESENCE OF THE ALIEN IN THE UNITED STATES, IN A MEANS OF TRANSPORTATION IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.

2.  CONCEAL, HARBOR OR SHIELD OR ATTEMPT TO CONCEAL, HARBOR OR SHIELD AN ALIEN FROM DETECTION IN ANY PLACE IN THIS STATE, INCLUDING ANY BUILDING OR ANY MEANS OF TRANSPORTATION, IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.

3.  ENCOURAGE OR INDUCE AN ALIEN TO COME TO OR RESIDE IN THIS STATE IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT SUCH COMING TO, ENTERING OR RESIDING IN THIS STATE IS OR WILL BE IN VIOLATION OF LAW.

B.  A MEANS OF TRANSPORTATION THAT IS USED IN THE COMMISSION OF A VIOLATION OF THIS SECTION IS SUBJECT TO MANDATORY VEHICLE IMMOBILIZATION OR IMPOUNDMENT PURSUANT TO SECTION 28-3511.

C.  A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN THE ENFORCEMENT OF THIS SECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR ARIZONA CONSTITUTION.

D.  IN THE ENFORCEMENT OF THIS SECTION, AN ALIEN'S IMMIGRATION STATUS MAY BE DETERMINED BY:

1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.

2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).

E.  THIS SECTION DOES NOT APPLY TO A CHILD PROTECTIVE SERVICES WORKER ACTING IN THE WORKER'S OFFICIAL CAPACITY OR A PERSON WHO IS ACTING IN THE CAPACITY OF A FIRST RESPONDER, AN AMBULANCE ATTENDANT OR AN EMERGENCY MEDICAL TECHNICIAN AND WHO IS TRANSPORTING OR MOVING AN ALIEN IN THIS STATE PURSUANT TO TITLE 36, CHAPTER 21.1.

F.  A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A CLASS 1 MISDEMEANOR AND IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND DOLLARS, EXCEPT THAT A VIOLATION OF THIS SECTION THAT INVOLVES TEN OR MORE ILLEGAL ALIENS IS A CLASS 6 FELONY AND THE PERSON IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND DOLLARS FOR EACH ALIEN WHO IS INVOLVED.

Sec. 6. Section 13-3883, Arizona Revised Statutes, is amended to read:

13-3883.  Arrest by officer without warrant

A.  A peace officer may, without a warrant, MAY arrest a person if he THE OFFICER has probable cause to believe:

1.  A felony has been committed and probable cause to believe the person to be arrested has committed the felony.

2.  A misdemeanor has been committed in his THE OFFICER'S presence and probable cause to believe the person to be arrested has committed the offense.

3. The person to be arrested has been involved in a traffic accident and violated any criminal section of title 28, and that such violation occurred prior to or immediately following such traffic accident.

4. A misdemeanor or a petty offense has been committed and probable cause to believe the person to be arrested has committed the offense. A person arrested under this paragraph is eligible for release under section 13-3903.

5. THE PERSON TO BE ARRESTED HAS COMMITTED ANY PUBLIC OFFENSE THAT MAKES THE PERSON REMOVABLE FROM THE UNITED STATES.

B. A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of any traffic law committed in the officer's presence and may serve a copy of the traffic complaint for any alleged civil or criminal traffic violation. A peace officer who serves a copy of the traffic complaint shall do so within a reasonable time of the alleged criminal or civil traffic violation.

Sec. 7. Section 23-212, Arizona Revised Statutes, is amended to read:

23-212. Knowingly employing unauthorized aliens; prohibition; false and frivolous complaints; violation; classification; license suspension and revocation; affirmative defense

A. An employer shall not knowingly employ an unauthorized alien. If, in the case when an employer uses a contract, subcontract or other independent contractor agreement to obtain the labor of an alien in this state, the employer knowingly contracts with an unauthorized alien or with a person who employs or contracts with an unauthorized alien to perform the labor, the employer violates this subsection.

B. The attorney general shall prescribe a complaint form for a person to allege a violation of subsection A of this section. The complainant shall not be required to list the complainant's social security number on the complaint form or to have the complaint form notarized. On receipt of a complaint on a prescribed complaint form that an employer allegedly knowingly employs an unauthorized alien, the attorney general or county attorney shall investigate whether the employer has violated subsection A of this section. If a complaint is received but is not submitted on a prescribed complaint form, the attorney general or county attorney may investigate whether the employer has violated subsection A of this section. This subsection shall not be construed to prohibit the filing of anonymous complaints that are not submitted on a prescribed complaint form. The attorney general or county attorney shall not investigate complaints that are based solely on race, color or national origin. A complaint that is submitted to a county attorney shall be submitted to the county attorney in the county in which the alleged unauthorized alien is or was employed by the employer. The county sheriff or any other local law enforcement agency may assist in investigating a complaint. When investigating a complaint, the attorney general or county attorney shall verify the work authorization of the alleged unauthorized alien with the federal government pursuant to 8 United States Code section 1373(c). A state, county or local official shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States. An alien's immigration status or work authorization status shall be verified with the federal government pursuant to 8 United States Code section 1373(c). A person who knowingly files a false and frivolous complaint under this subsection is guilty of a class 3 misdemeanor.

C. If, after an investigation, the attorney general or county attorney determines that the complaint is not false and frivolous:

1. The attorney general or county attorney shall notify the United States immigration and customs enforcement of the unauthorized alien.

2. The attorney general or county attorney shall notify the local law enforcement agency of the unauthorized alien.

3. The attorney general shall notify the appropriate county attorney to bring an action pursuant to subsection D of this section if the complaint was originally filed with the attorney general.

D. An action for a violation of subsection A of this section shall be brought against the employer by the county attorney in the county where the unauthorized alien employee is or was employed by the employer. The county attorney shall not bring an action against any employer for any violation of subsection A of this section that occurs before January 1, 2008. A second violation of this section shall be based only on an unauthorized alien who is or was employed by the employer after an action has been brought for a violation of subsection A of this section or section 23-212.01, subsection A.

E. For any action in superior court under this section, the court shall expedite the action, including assigning the hearing at the earliest practicable date.

F. On a finding of subsection A of this section:

1. For a first violation, as described in paragraph 3 of this subsection, the court:

(a) Shall order the employer to terminate the employment of all unauthorized aliens.

(b) Shall order the employer to be subject to a three year probationary period for the business location where the unauthorized alien performed work. During the probationary period the employer shall file quarterly reports in the form provided in section 23-722.01 with the county attorney of each new employee who is hired by the employer at the business location where the unauthorized alien performed work.

(c) Shall order the employer to file a signed sworn affidavit with the county attorney within three business days after the order is issued. The affidavit shall state that the employer has terminated the employment of all unauthorized aliens in this state and that the employer will not intentionally or knowingly employ an unauthorized alien in this state. The court shall order the appropriate agencies to suspend all licenses subject to this subdivision that are held by the employer if the employer fails to file a signed sworn affidavit with the county attorney within three business days after the order is issued. All licenses that are suspended under this subdivision shall remain suspended until the employer files a signed sworn affidavit with the county attorney. Notwithstanding any other law, on filing of the affidavit the suspended licenses shall be reinstated immediately by the appropriate agencies. For the purposes of this subdivision, the licenses that are subject to suspension under this subdivision are all licenses that are held by the employer specific to the business location where the unauthorized alien performed work. If the employer does not hold a license specific to the business location where the unauthorized alien performed work, but a license is necessary to operate the employer's business in general, the licenses that are subject to suspension under this subdivision are all licenses that are held by the employer at the employer's primary place of business. On receipt of the court's order and notwithstanding any other law, the appropriate agencies shall suspend the licenses according to the court's order. The court shall send a copy of the court's order to the attorney general and the attorney general shall maintain the copy pursuant to subsection G of this section.

(d) May order the appropriate agencies to suspend all licenses described in subdivision (c) of this paragraph that are held by the employer for not to exceed ten business days. The court shall base its decision to suspend under this subdivision on any evidence or information submitted to it during the action for a violation of this subsection and shall consider the following factors, if relevant:

(i) The number of unauthorized aliens employed by the employer.

(ii) Any prior misconduct by the employer.

(iii) The degree of harm resulting from the violation.

(iv) Whether the employer made good faith efforts to comply with any applicable requirements.

(v) The duration of the violation.

(vi) The role of the directors, officers or principals of the employer in the violation.

(vii) Any other factors the court deems appropriate.

2. For a second violation, as described in paragraph 3 of this subsection, the court shall order the appropriate agencies to permanently revoke all licenses that are held by the employer specific to the business location where the unauthorized alien performed work. If the employer does not hold a license specific to the business location where the unauthorized alien performed work, but a license is necessary to operate the employer's business in general, the court shall order the appropriate agencies to permanently revoke all licenses that are held by the employer at the employer's primary place of business. On receipt of the order and notwithstanding any other law, the appropriate agencies shall immediately revoke the licenses.

3. The violation shall be considered:

(a) A first violation by an employer at a business location if the violation did not occur during a probationary period ordered by the court under this subsection or section 23-212.01, subsection F for that employer's business location.

(b) A second violation by an employer at a business location if the violation occurred during a probationary period ordered by the court under this subsection or section 23-212.01, subsection F for that employer's business location.

G. The attorney general shall maintain copies of court orders that are received pursuant to subsection F of this section and shall maintain a database of the employers and business locations that have a first violation of subsection A of this section and make the court orders available on the attorney general's website.

H. On determining whether an employee is an unauthorized alien, the court shall consider only the federal government's determination pursuant to 8 United States Code section 1373(c). The federal government's determination creates a rebuttable presumption of the employee's lawful status. The court may take judicial notice of the federal government's determination and may request the federal government to provide automated or testimonial verification pursuant to 8 United States Code section 1373(c).

I. For the purposes of this section, proof of verifying the employment authorization of an employee through the e-verify program creates a rebuttable presumption that an employer did not knowingly employ an unauthorized alien.

J. For the purposes of this section, an employer that establishes that it has complied in good faith with the requirements of 8 United States Code section 1324a(b) establishes an affirmative defense that the employer did not knowingly employ an unauthorized alien. An employer is considered to have complied with the requirements of 8 United States Code section 1324a(b), notwithstanding an isolated, sporadic or accidental technical or procedural failure to meet the requirements, if there is a good faith attempt to comply with the requirements.

K. IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS SECTION THAT THE EMPLOYER WAS ENTRAPPED. TO CLAIM ENTRAPMENT, THE EMPLOYER MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL ELEMENTS OF THE VIOLATION. AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS THE BURDEN OF PROVING THE FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE:

1. THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.

2. THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO COMMIT THE VIOLATION.

3. THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO COMMIT THE VIOLATION.

L. AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY. THE CONDUCT OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING IF AN EMPLOYER HAS PROVEN ENTRAPMENT.

Sec. 8. Section 23-212.01, Arizona Revised Statutes, is amended to read:

23-212.01. Intentionally employing unauthorized aliens; prohibition; false and frivolous complaints; violation; classification; license suspension and revocation; affirmative defense

A. An employer shall not intentionally employ an unauthorized alien. If, in the case when an employer uses a contract, subcontract or other independent contractor agreement to obtain the labor of an alien in this state, the employer intentionally contracts with an unauthorized alien or with a person who employs or contracts with an unauthorized alien to perform the labor, the employer violates this subsection.

B. The attorney general shall prescribe a complaint form for a person to allege a violation of subsection A of this section. The complainant shall not be required to list the complainant's social security number on the complaint form or to have the complaint form notarized. On receipt of a complaint on a prescribed complaint form that an employer allegedly intentionally employs an unauthorized alien, the attorney general or county attorney shall investigate whether the employer has violated subsection A of this section. If a complaint is received but is not submitted on a prescribed complaint form, the attorney general or county attorney may investigate whether the employer has violated subsection A of this section. This subsection shall not be construed to prohibit the filing of anonymous complaints that are not submitted on a prescribed complaint form. The attorney general or county attorney shall not investigate complaints that are based solely on race, color or national origin. A complaint that is submitted to a county attorney shall be submitted to the county attorney in the county in which the alleged unauthorized alien is or was employed by the employer. The county sheriff or any other local law enforcement agency may assist in investigating a complaint. When investigating a complaint, the attorney general or county attorney shall verify the work authorization of the alleged unauthorized alien with the federal government pursuant to 8 United States Code section 1373(c). A state, county or local official shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States. An alien's immigration status or work authorization status shall be verified with the federal government pursuant to 8 United States Code section 1373(c). A person who knowingly files a false and frivolous complaint under this subsection is guilty of a class 3 misdemeanor.

C. If, after an investigation, the attorney general or county attorney determines that the complaint is not false and frivolous:

1. The attorney general or county attorney shall notify the United States immigration and customs enforcement of the unauthorized alien.

2. The attorney general or county attorney shall notify the local law enforcement agency of the unauthorized alien.

3. The attorney general shall notify the appropriate county attorney to bring an action pursuant to subsection D of this section if the complaint was originally filed with the attorney general.

D. An action for a violation of subsection A of this section shall be brought against the employer by the county attorney in the county where the unauthorized alien employee is or was employed by the employer. The county attorney shall not bring an

action against any employer for any violation of subsection A of this section that occurs before January 1, 2008. A second violation of this section shall be based only on an unauthorized alien who is or was employed by the employer after an action has been brought for a violation of subsection A of this section or section 23-212, subsection A.

E.  For any action in superior court under this section, the court shall expedite the action, including assigning the hearing at the earliest practicable date.

F.  On a finding of a violation of subsection A of this section:

1.  For a first violation, as described in paragraph 3 of this subsection, the court shall:

(a)  Order the employer to terminate the employment of all unauthorized aliens.

(b)  Order the employer to be subject to a five year probationary period for the business location where the unauthorized alien performed work. During the probationary period the employer shall file quarterly reports in the form provided in section 23-722.01 with the county attorney of each new employee who is hired by the employer at the business location where the unauthorized alien performed work.

(c)  Order the appropriate agencies to suspend all licenses described in subdivision (d) of this paragraph that are held by the employer for a minimum of ten days. The court shall base its decision on the length of the suspension under this subdivision on any evidence or information submitted to it during the action for a violation of this subsection and shall consider the following factors, if relevant:

(i)  The number of unauthorized aliens employed by the employer.

(ii)  Any prior misconduct by the employer.

(iii)  The degree of harm resulting from the violation.

(iv)  Whether the employer made good faith efforts to comply with any applicable requirements.

(v)  The duration of the violation.

(vi)  The role of the directors, officers or principals of the employer in the violation.

(vii)  Any other factors the court deems appropriate.

(d)  Order the employer to file a signed sworn affidavit with the county attorney. The affidavit shall state that the employer has terminated the employment of all unauthorized aliens in this state and that the employer will not intentionally or knowingly employ an unauthorized alien in this state. The court shall order the appropriate agencies to suspend all licenses subject to this subdivision that are held by the employer if the employer fails to file a signed sworn affidavit with the county attorney within three business days after the order is issued. All licenses that are suspended under this subdivision for failing to file a signed sworn affidavit shall remain suspended until the employer files a signed sworn affidavit with the county attorney. For the purposes of this subdivision, the licenses that are subject to suspension under this subdivision are all licenses that are held by the employer specific to the business location where the unauthorized alien performed work. If the employer does not hold a license specific to the business location where the unauthorized alien performed work, but a license is necessary to operate the employer's business in general, the licenses that are subject to suspension under this subdivision are all licenses that are held by the employer at the employer's primary place of business. On receipt of the court's order and notwithstanding any other law, the appropriate agencies shall suspend the licenses according to the court's order. The court shall send a copy of the court's order to the attorney general and the attorney general shall maintain the copy pursuant to subsection G of this section.

2.  For a second violation, as described in paragraph 3 of this subsection, the court shall order the appropriate agencies to permanently revoke all licenses that are held by the employer specific to the business location where the unauthorized alien performed work. If the employer does not hold a license specific to the business location where the unauthorized alien performed work, but a license is necessary to operate the employer's business in general, the court shall order the appropriate agencies to permanently revoke all licenses that are held by the employer at the employer's primary place of business. On receipt of the order and notwithstanding any other law, the appropriate agencies shall immediately revoke the licenses.

3.  The violation shall be considered:

(a)  A first violation by an employer at a business location if the violation did not occur during a probationary period ordered by the court under this subsection or section 23-212, subsection F for that employer's business location.

(b)  A second violation by an employer at a business location if the violation occurred during a probationary period ordered by the court under this subsection or section 23-212, subsection F for that employer's business location.

G.  The attorney general shall maintain copies of court orders that are received pursuant to subsection F of this section and shall maintain a database of the employers and business locations that have a first violation of subsection A of this section and make the court orders available on the attorney general's website.

H.  On determining whether an employee is an unauthorized alien, the court shall consider only the federal government's determination pursuant to 8 United States Code section 1373(c). The federal government's determination creates a rebuttable presumption of the employee's lawful status. The court may take judicial notice of the federal government's determination and may request the federal government to provide automated or testimonial verification pursuant to 8 United States Code section 1373(c).

I.  For the purposes of this section, proof of verifying the employment authorization of an employee through the e-verify program creates a rebuttable presumption that an employer did not intentionally employ an unauthorized alien.

J.  For the purposes of this section, an employer that establishes that it has complied in good faith with the requirements of 8 United States Code section 1324a(b) establishes an affirmative defense that the employer did not intentionally employ an unauthorized alien. An employer is considered to have complied with the requirements of 8 United States Code section 1324a(b), notwithstanding an isolated, sporadic or accidental technical or procedural failure to meet the requirements, if there is a good faith attempt to comply with the requirements.

K.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS SECTION THAT THE EMPLOYER WAS ENTRAPPED. TO CLAIM ENTRAPMENT, THE EMPLOYER MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL ELEMENTS OF THE VIOLATION. AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS THE BURDEN OF PROVING THE FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE:

1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.

2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO COMMIT THE VIOLATION.

3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO COMMIT THE VIOLATION.

L.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY

PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY. THE CONDUCT OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING IF AN EMPLOYER HAS PROVEN ENTRAPMENT.

Sec. 9. Section 23-214, Arizona Revised Statutes, is amended to read:

23-214.  Verification of employment eligibility; e-verify program; economic development incentives; list of registered employers

A.  After December 31, 2007, every employer, after hiring an employee, shall verify the employment eligibility of the employee through the e-verify program AND SHALL KEEP A RECORD OF THE VERIFICATION FOR THE DURATION OF THE EMPLOYEE'S EMPLOYMENT OR AT LEAST THREE YEARS, WHICHEVER IS LONGER.

B.  In addition to any other requirement for an employer to receive an economic development incentive from a government entity, the employer shall register with and participate in the e-verify program.  Before receiving the economic development incentive, the employer shall provide proof to the government entity that the employer is registered with and is participating in the e-verify program.  If the government entity determines that the employer is not complying with this subsection, the government entity shall notify the employer by certified mail of the government entity's determination of noncompliance and the employer's right to appeal the determination.  On a final determination of noncompliance, the employer shall repay all monies received as an economic development incentive to the government entity within thirty days of the final determination.  For the purposes of this subsection:

1.  "Economic development incentive" means any grant, loan or performance-based incentive from any government entity that is awarded after September 30, 2008.  Economic development incentive does not include any tax provision under title 42 or 43.

2.  "Government entity" means this state and any political subdivision of this state that receives and uses tax revenues.

C.  Every three months the attorney general shall request from the United States department of homeland security a list of employers from this state that are registered with the e-verify program.  On receipt of the list of employers, the attorney general shall make the list available on the attorney general's website.

Sec. 10. Section 28-3511, Arizona Revised Statutes, is amended to read:

28-3511.  Removal and immobilization or impoundment of vehicle

A.  A peace officer shall cause the removal and either immobilization or impoundment of a vehicle if the peace officer determines that a person is driving the vehicle while any of the following applies:

1.  The person's driving privilege is suspended or revoked for any reason.

2.  The person has not ever been issued a valid driver license or permit by this state and the person does not produce evidence of ever having a valid driver license or permit issued by another jurisdiction.  This paragraph does not apply to the operation of an implement of husbandry.

3.  The person is subject to an ignition interlock device requirement pursuant to chapter 4 of this title and the person is operating a vehicle without a functioning certified ignition interlock device.  This paragraph does not apply to a person operating an employer's vehicle or the operation of a vehicle due to a substantial emergency as defined in section 28-1464.

4.  IN FURTHERANCE OF THE ILLEGAL PRESENCE OF AN ALIEN IN THE UNITED STATES AND IN VIOLATION OF A CRIMINAL OFFENSE, THE PERSON IS TRANSPORTING OR MOVING OR ATTEMPTING TO TRANSPORT OR MOVE AN ALIEN IN THIS STATE IN A VEHICLE IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.

5.  THE PERSON IS CONCEALING, HARBORING OR SHIELDING OR ATTEMPTING TO CONCEAL, HARBOR OR SHIELD FROM DETECTION AN ALIEN IN THIS STATE IN A VEHICLE IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.

B.  A peace officer shall cause the removal and impoundment of a vehicle if the peace officer determines that a person is driving the vehicle and if all of the following apply:

1.  The person's driving privilege is canceled, suspended or revoked for any reason or the person has not ever been issued a driver license or permit by this state and the person does not produce evidence of ever having a driver license or permit issued by another jurisdiction.

2.  The person is not in compliance with the financial responsibility requirements of chapter 9, article 4 of this title.

3.  The person is driving a vehicle that is involved in an accident that results in either property damage or injury to or death of another person.

C.  Except as provided in subsection D of this section, while a peace officer has control of the vehicle the peace officer shall cause the removal and either immobilization or impoundment of the vehicle if the peace officer has probable cause to arrest the driver of the vehicle for a violation of section 4-244, paragraph 34 or section 28-1382 or 28-1383.

D.  A peace officer shall not cause the removal and either the immobilization or impoundment of a vehicle pursuant to subsection C of this section if all of the following apply:

1.  The peace officer determines that the vehicle is currently registered and that the driver or the vehicle is in compliance with the financial responsibility requirements of chapter 9, article 4 of this title.

2.  The spouse of the driver is with the driver at the time of the arrest.

3.  The peace officer has reasonable grounds to believe that the spouse of the driver:

(a)  Has a valid driver license.

(b)  Is not impaired by intoxicating liquor, any drug, a vapor releasing substance containing a toxic substance or any combination of liquor, drugs or vapor releasing substances.

(c)  Does not have any spirituous liquor in the spouse's body if the spouse is under twenty-one years of age.

4.  The spouse notifies the peace officer that the spouse will drive the vehicle from the place of arrest to the driver's home or other place of safety.

5.  The spouse drives the vehicle as prescribed by paragraph 4 of this subsection.

E.  Except as otherwise provided in this article, a vehicle that is removed and either immobilized or impounded pursuant to subsection A, B or C of this section shall be immobilized or impounded for thirty days.  An insurance company does not have a duty to pay any benefits for charges or fees for immobilization or impoundment.

F.  The owner of a vehicle that is removed and either immobilized or impounded pursuant to subsection A, B or C of this section, the spouse of the owner and each person identified on the department's record with an interest in the vehicle shall be provided with an opportunity for an immobilization or poststorage hearing pursuant to section 28-3514.

Sec. 11. Title 41, chapter 12, article 2, Arizona Revised Statutes, is amended by adding section 41-1724, to read:

41-1724.  Gang and immigration intelligence team enforcement mission fund

THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND IS ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 11-1051 AND MONIES APPROPRIATED BY THE LEGISLATURE. THE DEPARTMENT SHALL ADMINISTER THE FUND. MONIES IN THE FUND ARE SUBJECT TO LEGISLATIVE APPROPRIATION AND SHALL BE USED FOR GANG AND IMMIGRATION ENFORCEMENT AND FOR COUNTY JAIL REIMBURSEMENT COSTS RELATING TO ILLEGAL IMMIGRATION.

Sec. 12. <u>Severability, implementation and construction</u>

A. If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

B. The terms of this act regarding immigration shall be construed to have the meanings given to them under federal immigration law.

C. This act shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens.

D. Nothing in this act shall implement or shall be construed or interpreted to implement or establish the REAL ID act of 2005 (P.L. 109-13, division B; 119 Stat. 302) including the use of a radio frequency identification chip.

Sec. 13. <u>Short title</u>

This act may be cited as the "Support Our Law Enforcement and Safe Neighborhoods Act".

Sec. 14. <u>Immigration legislation challenges</u>

A. Notwithstanding title 41, chapter 1, Arizona Revised Statutes, and any other law, through December 31, 2010, the attorney general shall act at the direction of the governor in any challenge in a state or federal court to Laws 2010, chapter 113 and any amendments to that law.

B. Notwithstanding title 41, chapter 1, Arizona Revised Statutes, and any other law, through December 31, 2010, the governor may direct counsel other than the attorney general to appear on behalf of this state to defend any challenge to Laws 2010, chapter 113 and any amendments to that law.

- 1 -

---------- DOCUMENT FOOTER ----------

---------- DOCUMENT FOOTER ----------

©2007 Arizona State Legislature.

privacy statment

# EXHIBIT F



**Pew Hispanic Center**
a Pew Research Center project

## Statistical Portrait of Hispanics in the United States, 2008

### Table 13. Hispanic Population, by State:  2008
*States and D.C. are listed in descending order of number of Hispanic residents in 2008*

Universe: 2008 resident population

| | Hispanic population | Total population | Percent Hispanic |
|---|---|---|---|
| California | 13,434,896 | 36,756,666 | 36.6 |
| Texas | 8,815,582 | 24,326,974 | 36.2 |
| Florida | 3,846,267 | 18,328,340 | 21.0 |
| New York | 3,232,360 | 19,490,297 | 16.6 |
| Arizona | 1,964,625 | 6,500,180 | 30.2 |
| Illinois | 1,961,843 | 12,901,564 | 15.2 |
| New Jersey | 1,424,069 | 8,682,661 | 16.4 |
| Colorado | 993,198 | 4,939,456 | 20.1 |
| New Mexico | 895,150 | 1,984,356 | 45.1 |
| Georgia | 780,408 | 9,685,744 | 8.1 |
| | | | |
| North Carolina | 678,023 | 9,222,414 | 7.4 |
| Nevada | 672,393 | 2,600,167 | 25.9 |
| Washington | 642,959 | 6,549,224 | 9.8 |
| Pennsylvania | 588,950 | 12,448,279 | 4.7 |
| Massachusetts | 556,573 | 6,497,967 | 8.6 |
| Virginia | 528,002 | 7,769,089 | 6.8 |
| Connecticut | 424,191 | 3,501,252 | 12.1 |
| Oregon | 417,152 | 3,790,060 | 11.0 |
| Michigan | 408,695 | 10,003,422 | 4.1 |
| Maryland | 372,650 | 5,633,597 | 6.6 |
| | | | |
| Utah | 323,938 | 2,736,424 | 11.8 |
| Indiana | 322,148 | 6,376,792 | 5.1 |
| Ohio | 296,059 | 11,485,910 | 2.6 |
| Wisconsin | 286,382 | 5,627,968 | 5.1 |
| Oklahoma | 278,676 | 3,642,361 | 7.7 |
| Kansas | 268,964 | 2,802,134 | 9.6 |
| Tennessee | 234,868 | 6,214,888 | 3.8 |
| Minnesota | 217,551 | 5,220,393 | 4.2 |
| Missouri | 182,059 | 5,911,605 | 3.1 |
| South Carolina | 177,999 | 4,479,800 | 4.0 |
| | | | |
| Idaho | 159,257 | 1,523,816 | 10.5 |
| Arkansas | 155,309 | 2,855,390 | 5.4 |
| Louisiana | 152,781 | 4,410,796 | 3.5 |
| Nebraska | 147,968 | 1,783,432 | 8.3 |
| Alabama | 128,586 | 4,661,900 | 2.8 |
| Iowa | 124,030 | 3,002,557 | 4.1 |
| Rhode Island | 120,662 | 1,050,788 | 11.5 |
| Hawaii | 108,663 | 1,288,198 | 8.4 |
| Kentucky | 100,366 | 4,269,245 | 2.4 |
| Delaware | 62,506 | 873,092 | 7.2 |

**EXHIBIT G**

**Table 1**

Characteristics of the Population in Arizona, by Race, Ethnicity and Nativity: 2008

*(thousands, unless otherwise noted)*

| | | NON-HISPANICS | | HISPANICS | | |
|---|---|---|---|---|---|---|
| | ALL[1] | White | Black | All | Native born | Foreign born |
| **Total** | 6,500 | 3,773 | 225 | 1,965 | 1,309 | 655 |
| **Gender** | | | | | | |
| Male | 3,259 | 1,857 | 119 | 1,025 | 676 | 349 |
| Female | 3,241 | 1,916 | 106 | 940 | 634 | 306 |
| **Age** | | | | | | |
| Median *(in years)* | 35 | 43 | 30 | 25 | 17 | 35 |
| **Age Groups** | | | | | | |
| Younger than 5 | 521 | 203 | 22 | 241 | 236 | 4 |
| 5-17 | 1,203 | 529 | 50 | 502 | 442 | 61 |
| 18-29 | 1,077 | 555 | 38 | 385 | 229 | 155 |
| 30-39 | 884 | 449 | 35 | 318 | 136 | 181 |
| 40-49 | 872 | 530 | 34 | 239 | 111 | 128 |
| 50-64 | 1,082 | 796 | 30 | 186 | 101 | 85 |
| 65 and older | 860 | 711 | 16 | 95 | 54 | 40 |
| **Marital Status (ages 15 and older)** | | | | | | |
| Married | 2,450 | 1,652 | 52 | 593 | 258 | 334 |
| Never married | 1,592 | 815 | 76 | 534 | 343 | 191 |
| Divorced/separated/widowed | 1,006 | 701 | 37 | 203 | 120 | 83 |
| **Fertility (women ages 15 to 44)** | | | | | | |
| Total number of women | 1,278 | 674 | 46 | 436 | 246 | 190 |
| Women who had a birth in the past 12 months | 92 | 38 | 2 | 42 | 22 | 19 |
| Unmarried women[2] who had a birth in the past 12 months | 34 | 10 | 1 | 19 | 13 | 6 |
| **School Enrollment (ages 5 to 18)** | | | | | | |
| K-12 | 1,163 | 514 | 50 | 484 | 426 | 57 |
| **Educational Attainment (ages 25 and older)** | | | | | | |
| Less than high school diploma | 682 | 195 | 18 | 408 | 105 | 303 |
| High school diploma or equivalent | 1,042 | 671 | 33 | 264 | 150 | 114 |
| Some college | 1,405 | 1,022 | 43 | 264 | 170 | 71 |
| Bachelor's degree or more | 1,057 | 849 | 33 | 98 | 65 | 33 |
| **Median Annual Personal Earnings (*in dollars*)** | | | | | | |
| All (ages 16 and older with earnings) | $29,126 | $32,690 | $29,533 | $22,405 | $24,441 | $20,368 |
| Full-time, year-round workers | $37,680 | $43,180 | $36,662 | $28,515 | $32,588 | $24,441 |
| **Persons in Poverty[3]** | | | | | | |
| Younger than 18 | 350 | 60 | 18 | 228 | 198 | 30 |
| 18-64 | 499 | 203 | 20 | 216 | 84 | 132 |
| 65 and older | 74 | 48 | 2 | 16 | 7 | 9 |
| **Health Insurance** | | | | | | |
| Insured, all ages | 5,256 | 3,347 | 186 | 1,328 | 1,052 | 275 |
| Uninsured, all ages | 1,244 | 426 | 39 | 637 | 257 | 380 |
| Insured, younger than 18 | 1,439 | 662 | 64 | 577 | 557 | 20 |
| Uninsured, younger than 18 | 284 | 70 | 8 | 165 | 121 | 45 |
| **Persons in Households by Type of Household[4]** | | | | | | |
| In family households | 5,322 | 2,937 | 176 | 1,755 | 1,184 | 572 |
| In married-couple households | 3,780 | 2,332 | 85 | 1,093 | 721 | 372 |
| In non-family households | 1,059 | 775 | 38 | 178 | 106 | 73 |
| **Citizenship** | | | | | | |
| Citizen | 5,843 | 3,702 | 210 | 1,447 | 1,309 | 138 |
| Non-citizen | 657 | 71 | 16 | 517 | --- | 517 |
| **Language (ages 5 and older)** | | | | | | |
| Speaks only English at home | 4,318 | 3,387 | 185 | 497 | 475 | 21 |
| Does not speak only English at home | 1,662 | 183 | 19 | 1,227 | 598 | 630 |
| Speaks English very well | 949 | 138 | 11 | 647 | 475 | 172 |
| Speaks English less than very well | 712 | 44 | 8 | 580 | 123 | 457 |
| **Hispanic Origin** | | | | | | |
| Mexican | --- | --- | --- | 1,784 | 1,174 | 610 |
| Central American | --- | --- | --- | 34 | 14 | 19 |
| South American | --- | --- | --- | 30 | 14 | 15 |
| Caribbean | --- | --- | --- | 45 | 40 | 5 |
| Other Hispanic | --- | --- | --- | 73 | 67 | 6 |
| **Year of Entry (foreign-born Hispanics only)** | | | | | | |
| Before 1990 | --- | --- | --- | --- | --- | 224 |
| 1990 to 1999 | --- | --- | --- | --- | --- | 208 |
| 2000 or later | --- | --- | --- | --- | --- | 223 |

[1]Includes groups not shown separately, such as Asians, Native Americans and people of mixed race. [2]Unmarried women includes those who were never married, divorced or widowed. [3]For detailed information on how poverty status is determined, see http://usa.ipums.org/usa-action/variableDescription.do?mnemonic=POVERTY. Due to the way in which the IPUMS assigns poverty values, these data will differ from those that might be provided by the U.S. Census Bureau. [4]The household population excludes persons living in institutions, college dormitories and other group quarters.

Note: Analysis is based on the following number of observations: all 61,541, non-Hispanic white 38,223, non-Hispanic black 1,838, Hispanic all 15,868, Hispanic native born 10,991, Hispanic foreign born 4,877. The symbol *** indicates insufficient number of observations to provide a reliable estimate.

Source: Pew Hispanic Center tabulations of the 2008 ACS (1% IPUMS sample). More information on the source data and sampling error is available at http://usa.ipums.org/usa/design.shtml and http://www.census.gov/acs/www/Downloads/ACS/accuracy2008.pdf.

# EXHIBIT H



**State of Arizona**

Janice K. Brewer
Governor

**Office of the Governor**
**1700 West Washington Street, Phoenix, AZ  85007**

Main Phone: 602-542-4331
Facsimile: 602-542-7601

FOR IMMEDIATE RELEASE
April 23, 2010

CONTACT:   Paul Senseman
(602) 542-1342
psenseman@az.gov

# STATEMENT BY GOVERNOR JAN BREWER

"Thank you for being here today, to join me as we take another step forward in protecting the state of Arizona.

The bill I'm about to sign into law – Senate Bill 1070 – represents another tool for our state to use as we work to solve a crisis we did not create and the federal government has refused to fix …

… The crisis caused by illegal immigration and Arizona's porous border.

This bill, the Support Our Law Enforcement and Safe Neighborhoods Act, strengthens the laws of our state.

It protects all of us, every Arizona citizen and everyone here in our state lawfully.

And, it does so while ensuring that the constitutional rights of ALL in Arizona remain solid -- stable and steadfast.

I will now sign Senate Bill 1070.

For weeks, this legislation has been the subject of vigorous debate and intense criticism. My decision to sign it was by no means made lightly.

I have listened patiently to both sides. I have considered the significance of this new law long into the night. I have prayed for strength and prayed for our state.

I've decided to sign Senate Bill 1070 into law because, though many people disagree, I firmly believe it represents what's best for Arizona. Border-related violence and crime due to illegal immigration are critically important issues to the people of our state, to my Administration and to me, as your Governor and as a citizen.

There is no higher priority than protecting the citizens of Arizona. We cannot sacrifice our safety to the murderous greed of drug cartels. We cannot stand idly by as drop houses, kidnappings and violence compromise our quality of life.

We cannot delay while the destruction happening south of our international border creeps its way north.

We in Arizona have been more than patient waiting for Washington to act.
But decades of federal inaction and misguided policy have created a dangerous and unacceptable situation.

Yesterday, I announced the steps I was taking to enhance security along our border.

Today – with my unwavering signature on this legislation – Arizona strengthens its security WITHIN our borders.

Let me be clear, though: My signature today represents my steadfast support for enforcing the law — both AGAINST illegal immigration AND against racial profiling.

This legislation mirrors federal laws regarding immigration enforcement.

Despite erroneous and misleading statements suggesting otherwise, the new state misdemeanor crime of willful failure to complete or carry an alien registration document is adopted, verbatim, from the same offense found in federal statute.

I will NOT tolerate racial discrimination or racial profiling in Arizona.

Because I feel so strongly on this subject, I worked for weeks with legislators to amend SB 1070, to strengthen its civil rights protections.

That effort led to new language in the bill, language prohibiting law enforcement officers from "solely considering race, color, or national origin in implementing the requirements of this section…"

The bill already required that it "shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."

While the general protection was already included, I believe the issue is so important, we needed to make it CRYSTAL clear.

And I believe that we need to more than simply inscribe it in statute.

Words in a law book are of no use if our police officers are not properly trained on the provisions of SB 1070, including its civil rights provisions.

Today I am issuing an executive order directing the Arizona Peace Officer Standards and Training Board – AZPOST -- to develop training to appropriately implement SB 1070.

Importantly, this training will include what DOES – and DOES NOT – constitute "reasonable suspicion" that a person is not legally present in the United States.

Currently, AZPOST serves approximately 170 law enforcement agencies encompassing over 16,000 sworn peace officers, 9,000 correctional service officers, and 16 training academies.

The AZPOST Board of Directors includes the Arizona Attorney General, the Directors of the Arizona Department of Public Safety, the Arizona Department of Corrections, several county sheriffs, and local police departments.

I am also asking the Board to make recommendations on possible improvements to SB 1070 before the end of the year.

For 28 years in public service, I have worked without fail to solve problems diligently and practically. I have done so <u>always</u> with an eye toward civility, and <u>always</u> with the greatest respect for the rule of law.

This new law is no different: As committed as I am to protecting our state from crime associated with illegal immigration I am EQUALLY committed to holding law enforcement accountable should this statute ever be misused to violate an individual's rights.

Respect for the rule of law means respect for <u>every</u> law. I have led that way every day in every office I have ever held. That will not change.

I have also spent my career in service to Arizona working to bring people together, no matter the color of their skin and no matter the depth of our disagreements.

This bill – and this issue – will be no exception.

While protecting our citizens is paramount, it cannot come at the expense of the diversity that has made Arizona so great. Nor can safety mean a compromise of freedom for some, while we, the many, turn a blind eye.

We must acknowledge the truth – people across America are watching Arizona, seeing how we implement this law, ready to jump on even the slightest misstep.

Some of those people from outside our state have an interest in seeing us fail.

They will wait for a single slip-up, one mistake, and then they will work day and night to create headlines and get the face time they so desperately covet.

We cannot give them that chance.

We must use this new tool wisely, and fight for our safety with the honor Arizona deserves.

We must react calmly.

We must enforce the law evenly, and without regard to skin color, accent, or social status.

We must prove the alarmists and the cynics wrong.

I know in my heart that this great state, my home for more than 40 years, is up to the task.

I believe every one of us wants to be safe, and none of us wants to compromise on the subject of civil rights.

I believe we must love and honor those who fight beside us – just as we must love and honor those who look and believe nothing like we do.

I believe Arizona, like America, is governed by laws.

Good laws … well-intentioned laws … laws that confer respect and that demand respect in return.

In his third State of the Union address, President Theodore Roosevelt said, "No man is above the law and no man is below it; nor do we ask any man's permission when we require him to obey it. Obedience to the law is demanded as a right; not asked as a favor."

So, let us move forward -- ever mindful of our rights …

-- ever faithful to the law … and ever conscious of our bond as Arizonans, and the blessing we share together.

Thank you."

###

# EXHIBIT I

# IMMIGRATION POLICY CENTER

AMERICAN IMMIGRATION COUNCIL

April 28, 2010

## ARIZONA'S PUNISHMENT DOESN'T FIT THE CRIME:
### Studies Show Decrease in Arizona Crime Rates Over Time

Supporters of Arizona's harsh new immigration law claim that it is, in part, a crime-fighting measure. For instance, the bill's author, Republican State Senator Russell Pearce of Mesa, confidently predicts that the law—which requires police to investigate the immigration status of anyone who appears to be unauthorized—will result in "less crime" and "safer neighborhoods."[1]  However, Sen. Pearce overlooks two salient points: crime rates have already been falling in Arizona for years despite the presence of unauthorized immigrants, and a century's worth of research has demonstrated that immigrants are *less* likely to commit crimes or be behind bars than the native-born.  While much has been made about kidnappings in Arizona, law-enforcement officials indicate that most of these involve drug smugglers and human smugglers, as well as smuggled immigrants themselves—not the general population of the state.[2]  Combating crime related to human smuggling requires more trust between immigrants and the police, not less.  Yet the undermining of trust between police and the community is precisely what Arizona's new law accomplishes.  In the final analysis, immigration policy is not an effective means of addressing crime because the vast majority of immigrants are not criminals.

**Crime rates in Arizona have been falling for years.**

➢ According to data from the U.S. Bureau of Justice Statistics, the rates for both property crime and violent crime (including murder, assault, and rape) have fallen in Arizona in recent years.[3]

- The violent crime rate fell from 512 per 100,000 people in 2005 to 447 per 100,000 people in 2008, the last year for which data is available {Figure 1}.[4]

**Figure 1: Violent Crime Rate in Arizona, 2000-2008**



Source: U.S. Bureau of Justice Statistics, Data Online: Crime Trends.

- The property crime rate fell from 5,850 per 100,000 people in 2005 to 4,291 per 100,000 people in 2008 {Figure 2}.[5]

**Figure 2: Property Crime Rate in Arizona, 2000-2008**



Source: U.S. Bureau of Justice Statistics. Data Online: Crime Trends.

- Rates for murder, aggravated assault, and rape in particular have clearly fallen in recent years {Figure 3}.[6]

**Figure 3: Rates of Select Violent Crimes in Arizona, 2000-2008**

Source: U.S. Bureau of Justice Statistics. Data Online: Crime Trends.

2

**"High immigration" states have the lowest crime rates.**

➤ According to a 2008 report from the conservative Americas Majority Foundation, crime rates are lowest in states with the highest immigration growth rates, such as Arizona. From 1999 to 2006, the total crime rate declined 13.6 percent in the 19 highest-immigration states (including Arizona), compared to a 7.1 percent decline in the other 32 states.[7]

➤ As a story in *Reason Magazine* describes, El Paso, Texas—which is a relatively poor and heavily Latino city that is home to many unauthorized immigrants—is among the safest big cities in the United States, even though it is next door to the violence-ridden Mexican city of Ciudad Juarez.[8]

➤ A June 2008 report from the Public Policy Institute of California found that foreign-born adults in California have lower incarceration rates than their native-born counterparts. Based on data from 2005, the report found that "the incarceration rate for foreign-born adults is 297 per 100,000 in the population, compared to 813 per 100,000 for U.S.-born adults. The foreign-born, who make up roughly 35% of California's adult population, constitute 17% of the state prison population, a proportion that has remained fairly constant since 1990."[9]

**Unauthorized immigration is not associated with higher crime rates.**

➤ Although the unauthorized immigrant population *doubled* to about 12 million from 1994 to 2004, data from the Bureau of Justice Statistics indicates that the violent crime rate in the United States *declined* by 35.1 percent during this time and the property crime rate fell by 25.0 percent.[10]

  • The decline in crime rates was not just national, but also occurred in border cities and other cities with large immigrant populations such as San Diego, El Paso, Los Angeles, New York, Chicago, and Miami.[11]

➤ A 2007 study by University of California, Irvine, sociologist Rubén G. Rumbaut, found that for every ethnic group, without exception, incarceration rates among young men are lowest for immigrants, even those who are the least educated. This holds true especially for the Mexicans, Salvadorans, and Guatemalans who make up the bulk of the unauthorized population.[12]

  • Moreover, "these patterns have been observed consistently over the last three decennial censuses, a period that spans the current era of mass immigration, and recall similar national-level findings reported by three major government commissions during the first three decades of the 20th century. The problem of crime in the United States is not 'caused' or even aggravated by immigrants, regardless of their legal status."[13]

**Arizona's new immigration law only serves to distract police from fighting crime.**

➤ One need look no further than Arizona's Maricopa County and Sheriff Joe Arpaio for an example of how turning local police into immigration-enforcement agents detracts from actual crime solving. While Maricopa County has diverted resources to immigration enforcement, response times to 911 calls have increased, arrest rates have dropped, and thousands of felony warrants have not been served.[14]

**For more information contact:**
Walter Ewing
wewing@immcouncil.org
202-507-7507

# Endnotes

[1] Jonathan J. Cooper and Paul Davenport, "Obama: Ariz. immigration bill 'misguided'," Associated Press, April 23, 2010.

[2] E.J. Montini, "Is Phoenix really the 'kidnapping capital'?" *The Arizona Republic*, July 12, 2009.

[3] U.S. Bureau of Justice Statistics, Data Online: Crime Trends.

[4] Ibid.

[5] Ibid.

[6] Ibid.

[7] Richard Nadler, *Immigration and the Wealth of States* (Overland Park, KS: Americas Majority Foundation: January 2008), p. 53.

[8] Radley Balko, "The El Paso Miracle," *Reason Magazine*, July 6, 2009.

[9] Public Policy Institute of California, *Immigrants and Crime* (San Francisco, CA: June 2008).

[10] U.S. Bureau of Justice Statistics, Data Online: Reported Crime in United States—Total, 1960-2008.

[11] Ramiro Martínez, Jr., Matthew T. Lee and A. L. Nielsen, "Segmented Assimilation, Local Context and Determinants of Drug Violence in Miami and San Diego: Does Ethnicity and Immigration Matter?," *International Migration Review* 38(1), March 2004: 131-157; Matthew T. Lee, Ramiro Martínez, Jr. and Richard B. Rosenfeld, "Does Immigration Increase Homicide? Negative Evidence from Three Border Cities," *Sociological Quarterly* 42(4), September 2001: 559–580.

[12] Rubén G. Rumbaut and Walter A. Ewing, *The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates among Native and Foreign-Born Men* (Washington: DC: Immigration Policy Center, American Immigration Law Foundation, Spring 2007), p. 6-10.

[13] Ibid.

[14] Immigration Policy Center, *The High Price of Being "America's Toughest Sheriff": Crime and Spending Soar in Maricopa County* (Washington, DC: American Immigration Law Foundation, December 17, 2008).

# EXHIBIT J

U.S. Department of Justice  Federal Bureau of Investigation  Contact Us  Data Quality Guidelines  UCR Home

Preliminary Annual Uniform Crime Report—Home      Table 1    Table 2    Table 3    Table 4    Downloadables

Return to Previous Page

# Table 4

January to December 2009
Offenses Reported to Law Enforcement
by State by City 100,000 and over in population
Alabama through California

Download Excel | Data Declaration

| State | City | | Population[1] | Violent crime | Mur-der | For-cible rape | Rob-bery | Aggra-vated assault | Property crime | Burglary | Larceny-theft | Motor vehicle theft | Arson[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALABAMA** | BIRMINGHAM | 2008 | | 3,249 | 82 | 212 | 1,499 | 1,456 | 20,054 | 5,153 | 12,761 | 2,140 | 134 |
| | | 2009 | 227,373 | 2,812 | 65 | 198 | 1,150 | 1,399 | 18,159 | 5,019 | 11,546 | 1,594 | 135 |
| | HUNTSVILLE | 2008 | | 1,222 | 18 | 93 | 412 | 699 | 10,647 | 2,369 | 7,196 | 1,082 | |
| | | 2009 | 178,601 | 1,164 | 13 | 89 | 433 | 629 | 9,790 | 2,520 | 6,375 | 895 | |
| | MOBILE[3] | 2008 | | 1,204 | 42 | 27 | 875 | 260 | 13,846 | 3,305 | 9,470 | 1,071 | 116 |
| | | 2009 | 246,171 | 1,180 | 24 | 37 | 857 | 262 | 14,123 | 3,716 | 9,457 | 950 | 91 |
| | MONTGOMERY | 2008 | | 883 | 23 | 49 | 463 | 348 | 12,545 | 3,513 | 8,117 | 915 | |
| | | 2009 | 202,818 | 871 | 31 | 85 | 453 | 302 | 11,065 | 3,092 | 7,113 | 860 | |
| **ALASKA** | ANCHORAGE | 2008 | | 2,647 | 10 | 263 | 544 | 1,830 | 9,211 | 1,191 | 7,254 | 766 | 106 |
| | | 2009 | 283,300 | 2,488 | 14 | 282 | 534 | 1,658 | 10,316 | 1,613 | 7,835 | 868 | 111 |
| **ARIZONA** | CHANDLER | 2008 | | 801 | 6 | 56 | 241 | 498 | 7,984 | 1,414 | 5,768 | 802 | 92 |
| | | 2009 | 256,091 | 740 | 5 | 46 | 205 | 484 | 7,458 | 1,376 | 5,599 | 483 | 62 |
| | GILBERT | 2008 | | 239 | 0 | 26 | 63 | 150 | 4,933 | 1,113 | 3,429 | 391 | 21 |
| | | 2009 | 231,799 | 194 | 4 | 22 | 59 | 109 | 4,523 | 999 | 3,301 | 223 | 28 |
| | GLENDALE | 2008 | | 1,330 | 17 | 66 | 588 | 659 | 13,435 | 2,665 | 8,389 | 2,381 | 80 |
| | | 2009 | 255,080 | 1,147 | 18 | 54 | 420 | 655 | 12,489 | 2,551 | 8,214 | 1,724 | 82 |
| | MESA | 2008 | | 2,289 | 16 | 161 | 656 | 1,456 | 17,516 | 2,866 | 12,603 | 2,047 | 73 |
| | | 2009 | 470,833 | 2,000 | 14 | 123 | 611 | 1,252 | 16,079 | 3,076 | 11,700 | 1,303 | 85 |
| | PEORIA | 2008 | | 315 | 8 | 50 | 104 | 153 | 5,339 | 1,197 | 3,572 | 570 | 18 |
| | | 2009 | 164,366 | 321 | 8 | 53 | 89 | 171 | 4,872 | 1,120 | 3,303 | 449 | 8 |
| | PHOENIX | 2008 | | 10,465 | 167 | 481 | 4,825 | 4,992 | 82,689 | 18,783 | 48,685 | 15,221 | 473 |

| State | City | Year | Population | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2009 | 1,597,397 | 8,730 | 122 | 522 | 3,757 | 4,329 | 65,617 | 16,281 | 39,643 | 9,693 | 436 |
| | SCOTTSDALE | 2008 | | 423 | 5 | 28 | 130 | 260 | 7,903 | 1,488 | 5,897 | 518 | 36 |
| | | 2009 | 239,115 | 410 | 10 | 19 | 129 | 252 | 6,798 | 1,337 | 5,155 | 306 | 31 |
| | SURPRISE | 2008 | | 115 | 0 | 8 | 45 | 62 | 2,555 | 594 | 1,753 | 208 | 35 |
| | | 2009 | 104,692 | 111 | 1 | 9 | 37 | 64 | 2,405 | 532 | 1,706 | 167 | 24 |
| | TEMPE | 2008 | | 856 | 6 | 34 | 323 | 493 | 10,242 | 1,545 | 7,584 | 1,113 | 54 |
| | | 2009 | 177,486 | 922 | 2 | 66 | 306 | 548 | 8,986 | 1,478 | 6,692 | 816 | 68 |
| | TUCSON[4] | 2008 | | 4,252 | 65 | 246 | 1,451 | 2,490 | | 5,157 | | 5,808 | 318 |
| | | 2009 | 547,981 | 3,560 | 35 | 204 | 1,246 | 2,075 | | 5,062 | | 3,564 | 225 |
| ARKANSAS | LITTLE ROCK[5] | 2008 | | 2,353 | 37 | 132 | 819 | 1,365 | 15,003 | 3,576 | 10,272 | 1,155 | 89 |
| | | 2009 | 190,205 | 2,795 | 32 | 171 | 799 | 1,793 | 15,828 | 4,412 | 10,253 | 1,163 | 105 |
| CALIFORNIA | ANAHEIM | 2008 | | 1,312 | 11 | 83 | 573 | 645 | 8,331 | 1,604 | 5,633 | 1,094 | 44 |
| | | 2009 | 335,970 | 1,184 | 9 | 72 | 504 | 599 | 7,993 | 1,457 | 5,591 | 945 | 37 |
| | ANTIOCH | 2008 | | 875 | 8 | 29 | 398 | 440 | 2,850 | 923 | 1,241 | 686 | 38 |
| | | 2009 | 101,243 | 897 | 5 | 40 | 315 | 537 | 2,653 | 824 | 1,082 | 747 | 38 |
| | BAKERSFIELD | 2008 | | 2,077 | 25 | 48 | 708 | 1,296 | 16,160 | 4,168 | 9,476 | 2,516 | 161 |
| | | 2009 | 330,897 | 2,099 | 27 | 49 | 704 | 1,319 | 15,605 | 3,888 | 9,341 | 2,376 | 127 |
| | BERKELEY | 2008 | | 652 | 8 | 25 | 496 | 123 | 6,837 | 1,095 | 4,790 | 952 | 28 |
| | | 2009 | 101,190 | 615 | 6 | 27 | 444 | 138 | 6,467 | 1,079 | 4,661 | 727 | 21 |
| | BURBANK | 2008 | | 235 | 2 | 17 | 86 | 130 | 2,941 | 589 | 1,834 | 518 | 26 |
| | | 2009 | 103,248 | 253 | 1 | 22 | 93 | 137 | 2,663 | 499 | 1,829 | 335 | 18 |
| | CHULA VISTA | 2008 | | 832 | 6 | 55 | 321 | 450 | 6,514 | 1,008 | 3,339 | 2,167 | 27 |
| | | 2009 | 224,841 | 747 | 4 | 49 | 335 | 359 | 5,263 | 912 | 3,048 | 1,303 | 27 |
| | CONCORD | 2008 | | 425 | 6 | 12 | 216 | 191 | 4,448 | 802 | 2,667 | 979 | 25 |
| | | 2009 | 121,042 | 397 | 2 | 19 | 212 | 164 | 3,870 | 808 | 2,202 | 860 | 13 |
| | CORONA | 2008 | | 283 | 4 | 25 | 133 | 121 | 4,093 | 680 | 2,875 | 538 | 28 |
| | | 2009 | 152,438 | 214 | 8 | 12 | 117 | 77 | 3,810 | 612 | 2,632 | 566 | 13 |
| | COSTA MESA | 2008 | | 350 | 1 | 39 | 120 | 190 | 3,367 | 516 | 2,547 | 304 | 12 |
| | | 2009 | 110,150 | 304 | 1 | 27 | 114 | 162 | 3,321 | 516 | 2,557 | 248 | 14 |
| | DALY CITY | 2008 | | 283 | 1 | 25 | 143 | 114 | 2,045 | 276 | 1,425 | 344 | 21 |
| | | 2009 | 101,284 | 240 | 1 | 18 | 102 | 119 | 1,753 | 317 | 1,126 | 310 | 13 |
| | DOWNEY | 2008 | | 451 | 3 | 24 | 252 | 172 | 3,980 | 712 | 2,038 | 1,230 | 8 |
| | | 2009 | 107,598 | 444 | 4 | 18 | 234 | 188 | 3,575 | 524 | 2,105 | 946 | 0 |
| | ELK GROVE | 2008 | | 660 | 0 | 22 | 149 | 489 | 3,590 | 882 | 2,359 | 349 | 12 |
| | | 2009 | 140,576 | 608 | 4 | 15 | 152 | 437 | 3,443 | 859 | 2,152 | 432 | 11 |
| | EL MONTE | 2008 | | 800 | 12 | 32 | 265 | 491 | 2,666 | 632 | 1,333 | 701 | 28 |
| | | 2009 | 122,428 | 716 | 3 | 14 | 304 | 395 | 2,810 | 644 | 1,407 | 759 | 9 |

# EXHIBIT K

**Arizona Politics**

## Arpaio to launch 16th crime, immigration sweep

Jun. 15, 2010 06:30 PM
Associated Press

Recommend    80 people recommend this.

Maricopa County Sheriff Joe Arpaio says he plans to launch his 16th crime and immigration sweep on July 30, the day after Arizona's new immigration law is set to take effect.

The sheriff's office hasn't revealed where it will conduct the sweep.

During the sweeps, deputies flood an area of a city - in some cases heavily Latino areas - to seek out traffic violators and arrest other alleged lawbreakers.

Arizona's new immigration law requires police, while enforcing other laws, to question a person's immigration status if officers have a reasonable suspicion that the person is in the country illegally.

Critics who are challenging the law have asked a judge to block enforcement of the law before it takes effect July 28.

**EXHIBIT L**

Get Email Updates | Contact Us

Home • Briefing Room • Statements & Releases

Search WhiteHouse.gov    Search

**The White House**

Office of the Press Secretary

For Immediate Release                                         June 03, 2010

**Readout of the President's Meeting with Governor Brewer of Arizona**



HEALTH CARE
REFORM

More Information

The President had a good meeting with Governor Jan Brewer of Arizona at the White House today to discuss a range of critical issues of mutual interest, including the President's comprehensive plan to secure the Southwest border and the unprecedented resources his Administration has devoted to that effort. The President and Governor Brewer also discussed the President's decision to deploy up to an additional 1,200 requirements-based National Guard troops to the border and his upcoming request to Congress of $500 million in supplemental funds for enhanced border protection and law enforcement activities as part of that integrated strategy.  The President listened to Governor Brewer's concerns, and noted that the Administration's ongoing border protection and security efforts have increased pressure on illegal trafficking organizations through record seizures of illegal weapons and bulk cash transiting from the United States to Mexico, resulted in significant seizures of illegal drugs headed into the United States, lowered the average violent crime statistics in states along the Southwest Border, and reduced illegal immigration into the United States.

Despite the significant improvements, the President acknowledged the understandable frustration that all Americans share about the broken immigration system, and the President and Governor agreed that the lack of action to fix the broken system at the federal level is unacceptable.  As he did at the recent meeting with Senate Republicans, the President underscored that security measures alone won't fix the broken borders, there needs to be comprehensive immigration reform that includes:  lasting and dedicated resources by which to secure our borders and make our communities safer; holding unscrupulous employers accountable who hire workers illegally and exploit them and providing clear guidance for the many employers who want to play by the rules; and requiring those who have come here illegally to pay a fine, pay back taxes, learn English, and get right with the law.  The President urged Governor Brewer to be his partner in working in a bipartisan manner on comprehensive immigration reform to implement the type of smart, sensible, and effective solutions the American people expect and deserve from their federal government. Regarding Arizona law SB1070, the President reiterated his concern with the measure, including that a patchwork of different state immigration regulations around the country would interfere with the federal government's responsibility to set and enforce immigration policy.

*Click HERE to view a photograph of the President's meeting with Governor Brewer today in the Oval Office.*

**BLOG POSTS ON THIS ISSUE**

July 06, 2010 4:12 PM EDT
**President Obama's Meeting with Prime Minister Netanyahu: Gaza, Iran, Nuclear Weapons & Peace**



The President welcomed Prime Minister Netanyahu for some intensive work on a wide range of issues.

July 06, 2010 3:25 PM EDT
**The AP's Look at Health Reform**
A report from the Associated Press finds that millions of Americans will benefit from key provisions that take effect in the early stages of Affordable Care Act.

July 06, 2010 12:39 PM EDT
**OSTP Seeks Input For New Nanotech Strategic Plan**
Today, a Request for Information published in the Federal Register asks for input to assist the Federal government in the development of the 2010 Strategic Plan for the National Nanotechnology Initiative (NNI).

VIEW ALL RELATED BLOG POSTS

| | |
|---|---|
| Facebook | YouTube |
| Twitter | Vimeo |
| Flickr | iTunes |
| MySpace | LinkedIn |

WWW.WHITEHOUSE.GOV

En español | Accessibility | Copyright Information | Privacy Policy | Contact
USA.gov | Subscribe to RSS Feeds | Apply for a Job

# EXHIBIT M

Get Email Updates  |  Contact Us

*Home • Briefing Room • Speeches & Remarks*

Search WhiteHouse.gov    [ Search ]

**The White House**

Office of the Press Secretary

For Immediate Release                                    July 01, 2010

### Remarks by the President on Comprehensive Immigration Reform

**American University School of International Service, Washington, D.C.**

11:12 A.M. EDT

THE PRESIDENT: Thank you very much. Thank you. Thank you. (Applause.) Everyone please have a seat. Thank you very much. Let me thank Pastor Hybels from near my hometown in Chicago, who took time off his vacation to be here today. We are blessed to have him.

I want to thank President Neil Kerwin and our hosts here at American University; acknowledge my outstanding Secretary of Labor, Hilda Solis, and members of my administration; all the members of Congress -- Hilda deserves applause. (Applause.) To all the members of Congress, the elected officials, faith and law enforcement, labor, business leaders and immigration advocates who are here today -- thank you for your presence.

I want to thank American University for welcoming me to the campus once again. Some may recall that the last time I was here I was joined by a dear friend, and a giant of American politics, Senator Edward Kennedy. (Applause.) Teddy's not here right now, but his legacy of civil rights and health care and worker protections is still with us.

I was a candidate for President that day, and some may recall I argued that our country had reached a tipping point: that after years in which we had deferred our most pressing problems, and too often yielded to the politics of the moment, we now faced a choice: We could squarely confront our challenges with honesty and determination, or we could consign ourselves and our children to a future less prosperous and less secure.

I believed that then and I believe it now. And that's why, even as we've tackled the most severe economic crisis since the Great Depression, even as we've wound down the war in Iraq and refocused our efforts in Afghanistan, my administration has refused to ignore some of the fundamental challenges facing this generation.

We launched the most aggressive education reforms in decades, so that our children can gain the knowledge and skills they need to compete in a 21st century global economy.

We have finally delivered on the promise of health reform — reform that will bring greater security to every American, and that will rein in the skyrocketing costs that threaten families, businesses and the prosperity of our nation.

We're on the verge of reforming an outdated and ineffective set of rules governing Wall Street — to give greater power to consumers and prevent the reckless financial speculation that led to this severe recession.

And we're accelerating the transition to a clean energy economy by significantly raising the fuel-efficiency standards of cars and trucks, and by doubling our use of renewable energies like wind and solar power -- steps that have the potential to create whole new industries and hundreds of thousands of new jobs in America.

So, despite the forces of the status quo, despite the polarization and the frequent pettiness of our politics, we are confronting the great challenges of our times. And while this work isn't easy, and the changes we seek won't always happen overnight, what we've made clear is that this administration will not just kick the can down the road.

Immigration reform is no exception. In recent days, the issue of immigration has become once more a source of



**WATCH THE VIDEO**



July 01, 2010
President Obama on Comprehensive Immigration Reform

**BLOG POSTS ON THIS ISSUE**

July 02, 2010 1:25 PM EDT
What You Missed: Open for Questions Roundtable on Comprehensive Immigration Reform
See the full video, with links directly to each question, for this first-of-its-kind event engaging citizens from every angle on the immigration debate.

July 01, 2010 4:29 PM EDT
President Obama on Fixing the Broken Immigration System: "Getting Past the Two Poles of This Debate"
President Obama calls for both parties to come together to fix a broken immigration system and implement comprehensive reform that demands accountability from government, from businesses, and from individuals.

June 30, 2010 9:52 PM EDT
The President's Speech, and a Chat, on Comprehensive Immigration Reform
Watch a major speech from the President on fixing our broken immigration system, then come back for an "Open for Questions Roundtable" with one of the President's closest advisors on the issue.

fresh contention in our country, with the passage of a controversial law in Arizona and the heated reactions we've seen across America. Some have rallied behind this new policy. Others have protested and launched boycotts of the state. And everywhere, people have expressed frustration with a system that seems fundamentally broken.

Of course, the tensions around immigration are not new. On the one hand, we've always defined ourselves as a nation of immigrants -- a nation that welcomes those willing to embrace America's precepts. Indeed, it is this constant flow of immigrants that helped to make America what it is. The scientific breakthroughs of Albert Einstein, the inventions of Nikola Tesla, the great ventures of Andrew Carnegie's U.S. Steel and Sergey Brin's Google, Inc. --- all this was possible because of immigrants.

And then there are the countless names and the quiet acts that never made the history books but were no less consequential in building this country -- the generations who braved hardship and great risk to reach our shores in search of a better life for themselves and their families; the millions of people, ancestors to most of us, who believed that there was a place where they could be, at long last, free to work and worship and live their lives in peace.

So this steady stream of hardworking and talented people has made America the engine of the global economy and a beacon of hope around the world. And it's allowed us to adapt and thrive in the face of technological and societal change. To this day, America reaps incredible economic rewards because we remain a magnet for the best and brightest from across the globe. Folks travel here in the hopes of being a part of a culture of entrepreneurship and ingenuity, and by doing so they strengthen and enrich that culture. Immigration also means we have a younger workforce --- and a faster-growing economy -- than many of our competitors. And in an increasingly interconnected world, the diversity of our country is a powerful advantage in global competition.

Just a few weeks ago, we had an event of small business owners at the White House. And one business owner was a woman named Prachee Devadas who came to this country, became a citizen, and opened up a successful technology services company. When she started, she had just one employee. Today, she employs more than a hundred people. This past April, we held a naturalization ceremony at the White House for members of our armed forces. Even though they were not yet citizens, they had enlisted. One of them was a woman named Perla Ramos -- born and raised in Mexico, came to the United States shortly after 9/11, and she eventually joined the Navy. And she said, "I take pride in our flag and the history that forged this great nation and the history we write day by day."

These women, and men and women across this country like them, remind us that immigrants have always helped to build and defend this country — and that being an American is not a matter of blood or birth. It's a matter of faith. It's a matter of fidelity to the shared values that we all hold so dear. That's what makes us unique. That's what makes us strong. Anybody can help us write the next great chapter in our history.

Now, we can't forget that this process of immigration and eventual inclusion has often been painful. Each new wave of immigrants has generated fear and resentments towards newcomers, particularly in times of economic upheaval. Our founding was rooted in the notion that America was unique as a place of refuge and freedom for, in Thomas Jefferson's words, "oppressed humanity." But the ink on our Constitution was barely dry when, amidst conflict, Congress passed the Alien and Sedition Acts, which placed harsh restrictions of those suspected of having foreign allegiances. A century ago, immigrants from Ireland, Italy, Poland, other European countries were routinely subjected to rank discrimination and ugly stereotypes. Chinese immigrants were held in detention and deported from Angel Island in the San Francisco Bay. They didn't even get to come in.

So the politics of who is and who is not allowed to enter this country, and on what terms, has always been contentious. And that remains true today. And it's made worse by a failure of those of us in Washington to fix a broken immigration system.

To begin with, our borders have been porous for decades. Obviously, the problem is greatest along our Southern border, but it's not restricted to that part of the country. In fact, because we don't do a very good job of tracking who comes in and out of the country as visitors, large numbers avoid immigration laws simply by overstaying their visas.

The result is an estimated 11 million undocumented immigrants in the United States. The overwhelming majority of these men and women are simply seeking a better life for themselves and their children. Many settle in low-wage sectors of the economy; they work hard, they save, they stay out of trouble. But because they live in the shadows, they're vulnerable to unscrupulous businesses who pay them less than the minimum wage or violate worker safety rules — thereby putting companies who follow those rules, and Americans who rightly demand the minimum wage or overtime, at an unfair [dis]advantage. Crimes go unreported as victims and witnesses fear coming forward. And this makes it harder for the police to catch violent criminals and keep neighborhoods safe.

VIEW ALL RELATED BLOG POSTS

Facebook          YouTube

Twitter           Vimeo

Flickr            iTunes

MySpace           LinkedIn

And billions in tax revenue are lost each year because many undocumented workers are paid under the table.

More fundamentally, the presence of so many illegal immigrants makes a mockery of all those who are going through the process of immigrating legally. Indeed, after years of patchwork fixes and ill-conceived revisions, the legal immigration system is as broken as the borders. Backlogs and bureaucracy means the process can take years. While an applicant waits for approval, he or she is often forbidden from visiting the United States — which means even husbands and wives may be forced to spend many years apart. High fees and the need for lawyers may exclude worthy applicants. And while we provide students from around the world visas to get engineering and computer science degrees at our top universities, our laws discourage them from using those skills to start a business or power a new industry right here in the United States. Instead of training entrepreneurs to create jobs on our shores, we train our competition.

In sum, the system is broken. And everybody knows it. Unfortunately, reform has been held hostage to political posturing and special-interest wrangling — and to the pervasive sentiment in Washington that tackling such a thorny and emotional issue is inherently bad politics.

Just a few years ago, when I was a senator, we forged a bipartisan coalition in favor of comprehensive reform. Under the leadership of Senator Kennedy, who had been a longtime champion of immigration reform, and Senator John McCain, we worked across the aisle to help pass a bipartisan bill through the Senate. But that effort eventually came apart. And now, under the pressures of partisanship and election-year politics, many of the 11 Republican senators who voted for reform in the past have now backed away from their previous support.

Into this breach, states like Arizona have decided to take matters into their own hands. Given the levels of frustration across the country, this is understandable. But it is also ill conceived. And it's not just that the law Arizona passed is divisive — although it has fanned the flames of an already contentious debate. Laws like Arizona's put huge pressures on local law enforcement to enforce rules that ultimately are unenforceable. It puts pressure on already hard-strapped state and local budgets. It makes it difficult for people here illegally to report crimes — driving a wedge between communities and law enforcement, making our streets more dangerous and the jobs of our police officers more difficult.

And you don't have to take my word for this. You can speak to the police chiefs and others from law enforcement here today who will tell you the same thing.

These laws also have the potential of violating the rights of innocent American citizens and legal residents, making them subject to possible stops or questioning because of what they look like or how they sound. And as other states and localities go their own ways, we face the prospect that different rules for immigration will apply in different parts of the country — a patchwork of local immigration rules where we all know one clear national standard is needed.

Our task then is to make our national laws actually work — to shape a system that reflects our values as a nation of laws and a nation of immigrants. And that means being honest about the problem, and getting past the false debates that divide the country rather than bring it together.

For example, there are those in the immigrants' rights community who have argued passionately that we should simply provide those who are [here] illegally with legal status, or at least ignore the laws on the books and put an end to deportation until we have better laws. And often this argument is framed in moral terms: Why should we punish people who are just trying to earn a living?

I recognize the sense of compassion that drives this argument, but I believe such an indiscriminate approach would be both unwise and unfair. It would suggest to those thinking about coming here illegally that there will be no repercussions for such a decision. And this could lead to a surge in more illegal immigration. And it would also ignore the millions of people around the world who are waiting in line to come here legally.

Ultimately, our nation, like all nations, has the right and obligation to control its borders and set laws for residency and citizenship. And no matter how decent they are, no matter their reasons, the 11 million who broke these laws should be held accountable.

Now, if the majority of Americans are skeptical of a blanket amnesty, they are also skeptical that it is possible to round up and deport 11 million people. They know it's not possible. Such an effort would be logistically impossible and wildly expensive. Moreover, it would tear at the very fabric of this nation — because immigrants who are here illegally are now intricately woven into that fabric. Many have children who are American citizens. Some are children themselves, brought here by their parents at a very young age, growing up as American kids, only to discover their illegal status when they apply for college or a job. Migrant workers — mostly here illegally — have

been the labor force of our farmers and agricultural producers for generations. So even if it was possible, a program of mass deportations would disrupt our economy and communities in ways that most Americans would find intolerable.

Now, once we get past the two poles of this debate, it becomes possible to shape a practical, common-sense approach that reflects our heritage and our values. Such an approach demands accountability from everybody — from government, from businesses and from individuals.

Government has a threshold responsibility to secure our borders. That's why I directed my Secretary of Homeland Security, Janet Napolitano -- a former border governor -- to improve our enforcement policy without having to wait for a new law.

Today, we have more boots on the ground near the Southwest border than at any time in our history. Let me repeat that: We have more boots on the ground on the Southwest border than at any time in our history. We doubled the personnel assigned to Border Enforcement Security Task Forces. We tripled the number of intelligence analysts along the border. For the first time, we've begun screening 100 percent of southbound rail shipments. And as a result, we're seizing more illegal guns, cash and drugs than in years past. Contrary to some of the reports that you see, crime along the border is down. And statistics collected by Customs and Border Protection reflect a significant reduction in the number of people trying to cross the border illegally.

So the bottom line is this: The southern border is more secure today than at any time in the past 20 years. That doesn't mean we don't have more work to do. We have to do that work, but it's important that we acknowledge the facts. Even as we are committed to doing what's necessary to secure our borders, even without passage of the new law, there are those who argue that we should not move forward with any other elements of reform until we have fully sealed our borders. But our borders are just too vast for us to be able to solve the problem only with fences and border patrols. It won't work. Our borders will not be secure as long as our limited resources are devoted to not only stopping gangs and potential terrorists, but also the hundreds of thousands who attempt to cross each year simply to find work.

That's why businesses must be held accountable if they break the law by deliberately hiring and exploiting undocumented workers. We've already begun to step up enforcement against the worst workplace offenders. And we're implementing and improving a system to give employers a reliable way to verify that their employees are here legally. But we need to do more. We cannot continue just to look the other way as a significant portion of our economy operates outside the law. It breeds abuse and bad practices. It punishes employers who act responsibly and undercuts American workers. And ultimately, if the demand for undocumented workers falls, the incentive for people to come here illegally will decline as well.

Finally, we have to demand responsibility from people living here illegally. They must be required to admit that they broke the law. They should be required to register, pay their taxes, pay a fine, and learn English. They must get right with the law before they can get in line and earn their citizenship -- not just because it is fair, not just because it will make clear to those who might wish to come to America they must do so inside the bounds of the law, but because this is how we demonstrate that being -- what being an American means. Being a citizen of this country comes not only with rights but also with certain fundamental responsibilities. We can create a pathway for legal status that is fair, reflective of our values, and works.

Now, stopping illegal immigration must go hand in hand with reforming our creaky system of legal immigration. We've begun to do that, by eliminating a backlog in background checks that at one point stretched back almost a year. That's just for the background check. People can now track the status of their immigration applications by email or text message. We've improved accountability and safety in the detention system. And we've stemmed the increases in naturalization fees. But here, too, we need to do more. We should make it easier for the best and the brightest to come to start businesses and develop products and create jobs.

Our laws should respect families following the rules — instead of splitting them apart. We need to provide farms a legal way to hire the workers they rely on, and a path for those workers to earn legal status. And we should stop punishing innocent young people for the actions of their parents by denying them the chance to stay here and earn an education and contribute their talents to build the country where they've grown up. The DREAM Act would do this, and that's why I supported this bill as a state legislator and as a U.S. senator -- and why I continue to support it as president.

So these are the essential elements of comprehensive immigration reform. The question now is whether we will have the courage and the political will to pass a bill through Congress, to finally get it done. Last summer, I held a meeting with leaders of both parties, including many of the Republicans who had supported reform in the past -- and some who hadn't. I was pleased to see a bipartisan framework proposed in the Senate by Senators Lindsey Graham and Chuck Schumer, with whom I met to discuss this issue. I've spoken with the Congressional Hispanic

Caucus to plot the way forward and meet -- and then I met with them earlier this week.

And I've spoken with representatives from a growing coalition of labor unions and business groups, immigrant advocates and community organizations, law enforcement, local government — all who recognize the importance of immigration reform.  And I've met with leaders from America's religious communities, like Pastor Hybels -- people of different faiths and beliefs, some liberal, some conservative, who nonetheless share a sense of urgency; who understand that fixing our broken immigration system is not only a political issue, not just an economic issue, but a moral imperative as well.

So we've made progress.  I'm ready to move forward; the majority of Democrats are ready to move forward; and I believe the majority of Americans are ready to move forward.  But the fact is, without bipartisan support, as we had just a few years ago, we cannot solve this problem.  That is the political and mathematical reality.  The only way to reduce the risk that this effort will again falter because of politics is if members of both parties are willing to take responsibility for solving this problem once and for all.

And, yes, this is an emotional question, and one that lends itself to demagoguery.  Time and again, this issue has been used to divide and inflame — and to demonize people.  And so the understandable, the natural impulse among those who run for office is to turn away and defer this question for another day, or another year, or another administration.  Despite the courageous leadership in the past shown by many Democrats and some Republicans -- including, by the way, my predecessor, President Bush — this has been the custom.  That is why a broken and dangerous system that offends our most basic American values is still in place.

But I believe we can put politics aside and finally have an immigration system that's accountable.  I believe we can appeal not to people's fears but to their hopes, to their highest ideals, because that's who we are as Americans.  It's been inscribed on our nation's seal since we declared our independence.  "E pluribus unum."  Out of many, one.  That is what has drawn the persecuted and impoverished to our shores.  That's what led the innovators and risk-takers from around the world to take a chance here in the land of opportunity.  That's what has led people to endure untold hardships to reach this place called America.

  One of the largest waves of immigration in our history took place little more than a century ago.  At the time, Jewish people were being driven out of Eastern Europe, often escaping to the sounds of gunfire and the light from their villages burning to the ground.  The journey could take months, as families crossed rivers in the dead of night, traveled miles by foot, endured a rough and dangerous passage over the North Atlantic.  Once here, many made their homes in a teeming and bustling Lower Manhattan.

It was at this time that a young woman named Emma Lazarus, whose own family fled persecution from Europe generations earlier, took up the cause of these new immigrants.  Although she was a poet, she spent much of her time advocating for better health care and housing for the newcomers.  And inspired by what she saw and heard, she wrote down her thoughts and donated a piece of work to help pay for the construction of a new statue -- the Statue of Liberty -- which actually was funded in part by small donations from people across America.

Years before the statue was built -- years before it would be seen by throngs of immigrants craning their necks skyward at the end of long and brutal voyage, years before it would come to symbolize everything that we cherish -- she imagined what it could mean.  She imagined the sight of a giant statue at the entry point of a great nation — but unlike the great monuments of the past, this would not signal an empire.  Instead, it would signal one's arrival to a place of opportunity and refuge and freedom.

"Here at our sea-washed, sunset gates shall stand," she wrote,

A mighty woman with a torch...
From her beacon-hand
Glows world-wide welcome...
"Keep, ancient lands, your storied pomp!"...
"Give me your tired, and your poor,
Your huddled masses yearning to be free...
Send these, the homeless, tempest-tossed to me,
I lift my lamp beside the golden door!"

Let us remember these words.  For it falls on each generation to ensure that that lamp — that beacon — continues to shine as a source of hope around the world, and a source of our prosperity here at home.

Thank you.  God bless you.  And may God bless the United States of America.  Thank you.  (Applause.)

END
11:47 A.M. EDT

W W W . W H I T E H O U S E . G O V

En español | Accessibility | Copyright Information | Privacy Policy | Contact
USA.gov | Subscribe to RSS Feeds | Apply for a Job

# EXHIBIT N

Advertisement

PHONES AS LOW AS $29⁹⁹ after mail-in offer OFFER ENDS SOON    cricket shop now

FIRST MONTH FREE WHEN YOU BUY ONLINE

# Chicago Tribune | ARTICLE COLLECTIONS

You are here: ChicagoTribune.com > Collections > Homeland Security

Ads by Google

**US Immigrant Ship Records**
Discover your ancestry by searching immigrant ship records. Free trial.
www.ancestry.com

**Law Enforcement Degree**
Criminal Justice Degree - 100% Online. Request Free Info Today!
www.Rasmussen.edu

**KC Immigration Lawyer**
Get Legal Services for Deportation, Naturalization or Asylum Today!
www.willmothlaw.com

**Law Enforcement Employment**
SWAT, K9, Narcotics, CSI & More. Online Degrees For Police Careers
www.Public-Service.US/PoliceCareers

**Arlington Immigration Law**
Give Us a Call Today for U.S. Immigration & Asylum Law Services.
www.Visa-Usa.com

FIND MORE STORIES ABOUT

- Homeland Security
- Crackdown

FEATURED ARTICLES

Chicago's religious leaders protest Arizona immigration law
May 12, 2010

Immigration protesters arrested
May 25, 2010

U.S. sued over detention of immigrants
April 9, 2007

# Immigration crackdown for Illinois

### Feds to step up enforcement

May 19, 2010 | By Oscar Avila, Tribune reporter

In the midst of an outcry over illegal immigration and Arizona's new crackdown, a top Department of Homeland Security official visiting Chicago on Wednesday said his agency intended to step up enforcement in places such as Illinois.

John Morton, who heads U.S. Immigration and Customs Enforcement, said his agency intends to expand the Secure Communities initiative, which gives police and sheriff's departments access to a Homeland Security database that includes fingerprints. The initiative recently grew to include most of Chicago's suburbs.

Morton, a former prosecutor, also said the agency intends to increase scrutiny of employers who knowingly hire illegal immigrants.

Ads by Google



Advertiseme

BORDERS.

Get weekly deals on stuff you **love**.

Plus FREE SHIPPING on orders $25 & up

"If we're going to bring about meaningful changes in behavior, you have to do that by focusing on the employer," he said during a meeting with the Tribune editorial board.

Morton said the government's stepped-up enforcement would result in a "sharp increase" in deportations this year. Last year's 400,000 overall deportations were a record, but this year there has already been a 40 percent jump in deportations of criminals, he said.

Echoing comments by President Barack Obama and others in the administration, Morton said that Arizona's new law targeting illegal immigration is not "good government." The law makes it a crime to be in the state illegally and requires police to check suspects for immigration paperwork.

Morton said his agency will not necessarily process illegal immigrants referred to them by Arizona officials. The best way to reduce illegal immigration is through a comprehensive federal approach, not a patchwork of state laws, he said.

"I don't think the Arizona law, or laws like it, are the solution," Morton said.

oavila@tribune.com

Ads by Google

# EXHIBIT O

## A Message from Assistant Secretary Morton

**To all ICE employees**
June 9, 2010

### Internal Realignment of ICE Offices

When I arrived last year as the Assistant Secretary, one of my priorities was to improve the management structure of ICE and to give the agency a clearer sense of identity and focus. Of particular concern to me was that the agency's core operational and management functions were divided among many different offices without a clear reporting structure.

After thoroughly reviewing our agency's leadership and reporting structure, I have determined that ICE will be able to better fulfill its mission if its offices are aligned around its two core operational responsibilities--criminal investigation and civil immigration enforcement supported by a robust management program. Therefore, I am pleased to announce that ICE will now operate through three new directorates—**Homeland Security Investigations (HSI)**, **Enforcement and Removal Operations (ERO)**, and **Management and Administration**. A revised organizational chart is attached.

With these three new directorates in place, ICE's core functions will be grouped and coordinated by a streamlined reporting structure. Each directorate will be led by an Executive Associate Director who will be responsible for managing and coordinating the work of the offices within their offices. Six program offices will remain distinct from the new directorates: the Office of the Principal Legal Advisor, the Office of Detention Policy and Planning, the Office of Professional Responsibility, the Office of Public Affairs, the Office of Congressional Relations, and the Office of State and Local Coordination.

The realignment is not a restructuring and will not alter any congressional appropriation or authorization. Similarly, the realignment does not abolish any of the agency's existing offices. These offices will remain, but will now be managed through a more efficient organization alignment. The realignment does not alter ICE's mission or its priorities, and will allow ICE to better fulfill the goals outlined in the Quadrennial Homeland Security Review Report delivered to Congress this past February.

The role and responsibilities of each of the new directorates is as follows.

**Homeland Security Investigations (HSI):** HSI will align the existing ICE offices that are primarily devoted to criminal investigation, namely the Offices of Intelligence, International Affairs, and Investigations. This directorate will continue to pursue ICE's existing role as DHS' principal investigative program, with responsibility for ICE's national security programs and ICE's investigative authority over criminal violations of U.S. law relating to illicit trade, travel, immigration, and finance. The directorate will also continue to investigate violations of the employment verification laws and visa violations in the U.S. and abroad. James Dinkins will serve as Executive Associate Director of HSI.

**Enforcement and Removal Operations (ERO):** ERO will align the existing offices in ICE that are primarily devoted to civil immigration enforcement, namely the Office of Detention and Removal Operations and the Secure Communities program. This directorate will ensure a coherent and consistent approach to civil immigration enforcement in a manner that prioritizes convicted criminals, fugitives and illegal re-entrants, and recent border violators. The directorate will also oversee the agency's detention system, removal flight operations, and efforts to locate aliens subject to criminal prosecution for illegal re-entry. James Chaparro will

serve as ERO Executive Associate Director.

**Management and Administration:**  The directorate will consist of the Offices of the Chief Financial Officer, the Chief Information Officer, Human Capital, Acquisition Management, Policy, Privacy, Training and Development, National Firearms and Tactical Training Unit, Freedom of Information Act, the Chief Diversity Officer, and Equal Employment Opportunity.  These offices support the missions of HSI and ERO and provide sound agency management.  The directorate will oversee management of ICE's budget, expenditure of funds, accounting and finance, procurement, human resources and personnel, workforce recruitment, equal employment opportunity, information technology systems, facilities, property, equipment, and the identification and tracking of performance measurements. Daniel Ragsdale will serve as Executive Associate Director for Management and Administration.

I am also pleased to announce the release of our Strategic Plan for fiscal years 2010-2014 (attached).  This document provides a clear set of priorities and targeted goals as we seek to improve our performance, organizational effectiveness, and efficiency.

It will also be available on the ICE Intranet site and I encourage everyone to review the plan so that we fulfill our mission to protect homeland security and public safety and address our enforcement priorities: (1) to prevent terrorism and enhance national security, (2) to secure and manage our borders, (3) to enforce and administer our immigration laws, and (4) to investigate cross border-related cyber crime.  The Strategic Plan outlines these priorities and our objectives for each in the coming fiscal years.

Please know that both the realignment and the Strategic Plan represent an opportunity to improve the agency's management and performance.  I thank all of you for your continued hard work on behalf of the agency and the many successes we achieve each day as we seek to protect homeland security and to uphold public safety.


John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

**EXHIBIT P**

# Support Our Law Enforcement and Safe Neighborhoods Act

# HOUSE BILL 1070 / HOUSE BILL 2162

# ISSUE REVIEW AND DISCUSSION

1

# A.R.S. 13-1509

## Willful failure to complete or carry an alien registration document;

## Assessment; exception; authenticated records; classification

Willful Failure to Complete or Carry an Alien Registration Document

# ELEMENTS of CRIME

Person is in violation of 8 U.S.C. 1304(e)

OR

Person is in violation of 8 U.S.C. 1306(a)

2

# A.R.S. 13-1509

## Willful failure to complete or carry an alien registration document;

## Assessment; exception; authenticated records; classification

Alien's immigration status determined by:

287g local law enforcement officer

OR

ICE Agent or Border Patrol Agent
Pursuant to 8 USC 1373(c)

Immigration status record admissible in court if:

Certified

By government agency custodian of records

3

# 8 U.S.C. 1304(e)

*Forms for registration and fingerprinting*

**(d) Certificate of alien registration or alien receipt card**

Every alien registered and fingerprinted under the provisions of the Alien Registration Act, 1940, or under the provisions of this chapter shall be issued a certificate of alien registration card

**(e) Personal possession of registration or receipt card; penalties**

Every adult alien shall carry in his personal possession the alien registration card issued pursuant to subsection (d)

4

# 8 U.S.C. 1306(a)

## Penalties

### (a) Willful failure to register

Any alien required to apply for registration and to be fingerprinted who willfully fails or refuses to make such application or to be fingerprinted shall be guilty of a misdemeanor........

5

# Alien Registration Act, 1940

## 8 U.S.C. 1302 (a)

Every alien at least 14 years-of-age who remains in the U.S. for 30 days or longer

Has the duty to be registered and fingerprinted before the end of the 30 days

6

For the purposes of A.R.S. § 13-1509, elements to establish a violation of 8 U.S.C.A. § 1306(a):

1. The suspect is an alien 14 years of age or older;

2. The suspect has been in the United States for 30 days or longer;

3. The suspect has willfully failed to register.

7

For the purposes of A.R.S. § 13-1509, elements to establish a violation of 8 U.S.C.A. § 1304(e):

1.  The suspect is an alien 18 years of age or older;

2.  The suspect has been in the United States for 30 days or longer;

3.  The suspect was not carrying with him/her an alien registration certificate/card issued pursuant to 8 U.S.C.A. § 1304(d).

8

# Alien Registration Act, 1940 (Smith Act)

Intent to fingerprint and create record of every non-citizen

Began in August 1940

Act best known for other sections

Conspiracies to overthrow the government

Used against Communist, Nazi, and Fascist groups

9

# ISSUES RE: 13-1509

## 8 U.S.C. 1302, 1304, 1306

❖ **13-1509 statutory scheme relies entirely on violation of 8 USC 1304(e) or 8 USC 1306(a)**

- Requires interpretation and applicability of federal law
- Arguably and practically, these federal statutes only apply to lawful aliens
- 13-1509 exempts persons authorized by feds to be in the U.S. (lawful aliens)

❖ **The Alien Registration Act establishes a 30-day grace period**

- Becomes an element of offense

10

11

# ISSUES RE: 13-1509
## 8 U.S.C. 1302, 1304, 1306

❖ **The practical use of 1304 and 1306 today**

- Today, lawfully admitted aliens satisfy registration when provided with documents

- Appears no Alien Registration Act prosecutions at AZ US Attorney's Office

❖ **Evidentiary challenges**

- Cannot be enforced at local level without federal cooperation

- Trial would require certified federal document or federal witness

- Federal cooperation is undetermined at this time

12

# HYPOTHETICALS

**After the July 29, 2010, effective date of HB 1070.........**

(1)

**Local law enforcement is called to a bar fist-fight at a local tavern.**

**The suspect and victim and witnesses are contacted by the Officer Jones.**

(2)

**Officer Miller, a local law enforcement officer, is on patrol.**

**Officer Miller observes a sedan driving below speed limit and weaving in lane**

# 11-1051

## Cooperation and assistance in enforcement of immigration laws

- For any lawful stop detention or arrest

- Where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States.

- A reasonable attempt shall be made, when practicable, to determine the immigration status of the person.

- Except if the determination may hinder or obstruct an investigation.

- The person's immigration status shall be verified with the federal government pursuant to 8 United States code section 1373(c).

13

# For any lawful stop detention or arrest

Is there a lawful stop / detention / arrest?

Specific articulable reason for the stop / detention / arrest

Well-documented in DR

Training to emphasize non-discrimination

TRAFFIC STOP for DUI
If citation and arrest or release:
   DR lists all observations of violation
   DR documents reason for stop
   Stop not based on race

CALL to BAR FIGHT

DR contains observations/statements
DR documents reason for arrest
Arrest not based on race

14

# Where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States

## Reasonable Suspicion that unlawful alien

**May be Combination of Factors and Circumstances:**

Mexican Driver's License
Mexican Voter Card
Forged/Fraudulent Arizona Driver's License
Invalid SS#
Admission by suspect
Admission about suspect by third party

**CALL to BAR FIGHT**
ID presented by suspect
Witness says suspect hold him illegal

**TRAFFIC STOP**
Suspect presents Mexican DL
Suspect statement of illegal entry

15

# A reasonable attempt shall be made, when practicable, to determine the immigration status of the person

## Reasonable Attempt

3 questions to ask everyone in stop / detention / arrest

1) Are you a U.S. citizen
2) How long in the U.S.
3) If not citizen, do you have documentation of legal entry

16

# A reasonable attempt shall be made, when practicable, to determine the immigration status of the person (con't)

## CALL to BAR FIGHT

Ask Ques #1

Suspect answers, Yes, citizen

Ends 11-1051 inquiry

## TRAFFIC STOP

Ask Ques #1

Suspect answers, Not a citizen

Ask Ques #2

Ask Ques #3

Suspect answers, No docs

Discretion to cite for 13-1509

Cite and release

Cite and arrest

17

# A reasonable attempt shall be made, when practicable, to determine the immigration status of the person

## When Practicable

**Issues:**

If suspect not English-speaker, does the officer speak suspect's language?

Delay to obtain officer speaking suspect's language?

Does the situation pose significant practical issues-
ill child, wife in labor?

If person is being booked into jail, does jail have 287g officers?

## TRAFFIC STOP

Child in car is ill, on way to Dr

## CALL to BAR FIGHT

Suspect speaks only Spanish

Officer speaks only English

Spanish-speaking officer ETA in 2 hours

18

19

# Except if the determination may hinder or obstruct an investigation

## Reasonable Interpretation:

This language would exempt a victim or a witness or a confidential informant.

During investigation or prosecution

## CALL to BAR FIGHT

When victim and witnesses determined, no 11-1051 inquiries

# The person's immigration status shall be verified with the federal government pursuant to 8 U.S.C. 1373(c).

§ 1373. Communication between Government agencies and the Immigration and Naturalization Service

. . . .

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

20

**The person's immigration status shall be verified with the federal government pursuant to 8 U.S.C. 1373(c)** (con't)

# LESC

Law Enforcement Support Center

## Issues:

**To satisfy 11-1051 for information only (telephonic)**

**No evidentiary value for 13-1509/court ICE, CBP, and USCIS cooperation is undetermined at this time**

21

## 13-2928

## Unlawful stopping to hire and pick up passengers for work; unlawful application, solicitation or employment; classification; definitions

A.  It is unlawful for an occupant of a motor vehicle that is stopped on a street, roadway or highway to attempt to hire or hire and pick up passengers for work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

B.  It is unlawful for a person to enter a motor vehicle that is stopped on a street, roadway or highway in order to be hired by an occupant of the motor vehicle and to be transported to work at a different location if the motor vehicle blocks or impedes the normal movement of traffic.

22

23

## 13-2928

## Unlawful stopping to hire and pick up passengers for work; unlawful application, solicitation or employment; classification; definitions

C. It is unlawful for a person who is unlawfully present in the united states and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state.

G. For the purposes of this section:

1. "solicit" means verbal or nonverbal communication by a gesture or a nod that would indicate to a reasonable person that a person is willing to be employed.

2. "unauthorized alien" means an alien who does not have the legal right or authorization under federal law to work in the United States as described in 8 United States Code Section 1324a(h)(3).

24

## 13-2929

## Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens; vehicle impoundment; exception; classification

A. It is unlawful for a person who is in violation of a criminal offense to:

1. Transport or move or attempt to transport or move an alien in this state, in furtherance of the illegal presence of the alien in the united states, in a means of transportation if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.

25

# 13-2929

## Unlawful transporting, moving, concealing, harboring or shielding of unlawful aliens; vehicle impoundment; exception; classification  (con't)

2.  Conceal, harbor or shield or attempt to conceal, harbor or shield an alien from detection in any place in this state, including any building or any means of transportation, if the person knows or recklessly disregards the fact that the alien has come to, has entered or remains in the United States in violation of law.

3.  Encourage or induce an alien to come to or reside in this state if the person knows or recklessly disregards the fact that such coming to, entering or residing in this state is or will be in violation of law.